**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

FEDERAL TRADE COMMISSION and
OFFICE OF ATTORNEY GENERAL,
DEPARTMENT OF LEGAL AFFAIRS,
STATE OF FLORIDA,

                    Plaintiffs,

vs                                                    Case No.  3:10-cv-266-J-34JBT

ALCOHOLISM CURE CORPORATION,
also doing business as Alcoholism Cure
Foundation, and ROBERT DOUGLAS
KROTZER, individually and as an officer
and/or director of Alcoholism Cure
Corporation,

                    Defendants.

_____

## ORDER

Plaintiffs Federal Trade Commission and the State of Florida have brought this civil

enforcement action seeking to shut down as unlawfully deceptive and false, Defendants'

internet-based alcoholism cure business, which solicits customers by claiming to offer a

"permanent cure" to alcoholism by prescribing "customized" dietary supplements for a fee.

In their Complaint, Plaintiffs seek injunctive and equitable relief against Defendant, based

upon alleged violations of sections 5(a) and 12 of the Federal Trade Commission Act, 15

U.S.C. §§ 45, 52 ("FTC Act"), and the Florida Deceptive and Unfair Trade Practices Act, Fla.

Stat. §§ 501.201 et seq. ("FDUTPA") (Doc. 1; Complaint).  On May 26, 2010, the Court

granted Plaintiffs' Unopposed Motion for Entry of a Stipulated Order for Preliminary

Injunction, (Doc. 12; 05/26/10 Order), and entered the Stipulated Order for Preliminary

Injunction by the parties, as modified by the Court. (Doc. 12-1; Stipulated Preliminary Injunction).

The case, which is proceeding against Defendant Robert Douglas Krotzer only as Alcoholism Cure Corporation is in default,[1] is presently before the Court on the parties' cross motions for summary judgment as well as various related motions. Specifically, the Court considers: Defendant's Motion for Summary Judgment (Doc. 96; Defendant's Motion for Summary Judgment) and Plaintiff's Response in opposition (Doc. 118; Plaintiffs' Response to Defendant's Motion for Summary Judgment); Plaintiffs' Motion to Strike Text and Exhibits (Doc. 99; Plaintiffs' Motion to Strike) and Defendant's Response in opposition (Doc. 102; Defendant's Response to Motion to Strike); Plaintiffs' Motion for Summary Judgment (Doc. 123; Plaintiffs' Motion for Summary Judgment) and Defendant's Response in opposition (Doc. 136; Defendant's Response to Plaintiffs' Motion for Summary Judgment); Defendant's Motion to Strike (Doc.131; Defendant's Motion to Strike), and Plaintiffs' Response in opposition (Doc. 132; Plaintiffs' Opposition to Motion to Strike); Plaintiffs' Motion to Strike

---

[1]  Plaintiffs originally named as defendants Alcoholism Cure Corporation and Robert Douglas Krotzer. See Complaint. On July 14, 2010, Defendants' former counsel moved to withdraw as counsel, saying that he had been discharged from employment by the Defendants, who advised that they were unable to pay attorneys' fees. (Doc. 17; Motion to Withdraw). The Court granted the Motion to Withdraw, and advised that Defendant Alcoholism Cure Corporation may appear and be heard only through counsel admitted to this Court. (Doc. 18; 7/19/10 Order (citing Rule 2.03(e)) Local Rules, United States District Court, Middle District of Florida (Local Rules(s)). The Court ordered both Defendants to respond to Plaintiffs' Complaint by August 20, 2010. Id. at 3. The Court subsequently extended the time for Defendants to respond to the Complaint to September 13, 2010, and ordered corporate Defendant Alcoholism Cure Corporation to retain counsel by that date. (Doc. 23; 8/23/10 Order); See Local Rule 2.03(e); see also Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir. 1985)("a corporation is an artificial entity that can act only through agents, cannot appear pro se, and must be represented by counsel"). Individual Defendant Krotzer answered the Complaint on September 13, 2010 (Doc. 36) and corporate Defendant Alcoholism Cure Corporation did not. Plaintiffs moved for the Clerk to enter a Default against corporate Defendant Alcoholism Cure Corporation for failure to plead or otherwise defend the action. (Doc. 37; Motion for Clerk's Default). The Court granted the Motion for Clerk's Default (Doc. 46; 9/21/10 Order), and the Clerk entered a Default against corporate Defendant Alcoholism Cure Corporation on September 22, 2010. (Doc. 47; Clerk's Default).

Edwards' Affidavit (Doc. 135); Plaintiffs' Motion to Strike Edwards' Affidavit), and

Defendant's Response in opposition. (Doc. 137; Defendant's Response to Motion to Strike

Edwards Affidavit); Krotzer's Second Motion for Summary Judgment (Doc. 140); Plaintiffs'

Motion to Strike Krotzer's Second Motion for Summary Judgment (Doc. 142) and

Defendant's Response in opposition (Doc. 145; Defendant's Response to Motion to Strike

Krotzer's Second Motion for Summary Judgment); Plaintiffs' Motion To Exclude The

Proffered Expert Testimony Of Defendant Robert Douglas Krotzer And Carl Edwards, And

Memorandum In Support. (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards

Expert Testimony), and Defendant's Response in opposition (Docs. 147, 148, 149;

Defendant's Response to Motion to Exclude Testimony); Defendant's Supplemental Memo

of Law (Doc. 152) and Plaintiffs' Response to Defendant's Supplemental Memo of Law (Doc.

153).[2] Additionally, the Court has before it: Defendants' Motion to Vacate the Preliminary

---

[2] The full titles of the parties' motions and responses are as follows: Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law; Oral Hearing Requested (Doc. 96; Defendant's Motion for Summary Judgment); Plaintiffs' Opposition To Defendant Krotzer's "Amendment [sic] & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As a Matter Of Law" (Doc. 118; Plaintiffs' Response to Defendant's Motion for Summary Judgment); Plaintiffs' Motion To Strike Added Text And Certain Exhibits To Defendant Krotzer's "Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law" (Doc. 99; Plaintiffs' Motion to Strike); Response Opposing Four Motions Designed To Prolong Litigation (Doc #100 Motion to Strike Reply; Doc #99 Motion to Strike added text and certain exhibits re Amended and Corrected Motion for Summary Judgment; Doc #98 Reply to Response to Motion for Summary Judgment; and Doc #97 Opposing Protective Order) (Doc. 102; Defendant's Response to Motion to Strike); Plaintiffs' Motion For Summary Judgment And Memorandum In Support, Dispositive Motion (Doc. 123; Plaintiffs' Motion for Summary Judgment); Response To "Motion For Summary Judgment Against Robert Douglas Krotzer" (Doc #123) Emergency Going Critical (Oral Argument Requested) (Doc. 136; Defendant's Response to Plaintiffs' Motion for Summary Judgment); Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc.131; Defendant's Motion to Strike); Plaintiffs' Opposition To Defendant Krotzer's "Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc. 132; Plaintiff's Opposition to Motion to Strike); Plaintiffs' Amended Motion To Strike The Affidavit Of Carl Edwards Filed By Defendant Robert Douglas Krotzer (Doc. 135; Plaintiffs' Motion to Strike Edwards' Affidavit); Defendants [sic] Response To "Plaintiffs' Amended Motion To Strike The Affidavit Of Carl Edwards Filed By Defendant Robert Douglas Krotzer" (Doc. 137; Defendant's Response to Motion to Strike Edwards Affidavit); Dispositive

(continued...)

Injunction (Doc. 56; Motion to Vacate), and Plaintiffs' Response in opposition (Doc. 71;

Plaintiffs' Response to Motion to Vacate); Plaintiffs' Motion for Order to Show Cause to Hold

Defendant Krotzer in Civil Contempt (Doc. 58; Motion for Order to Show Cause) and

Defendant's Response in opposition (Doc. 74; Response to Motion for Order to Show

Cause); and Defendant's Motion To Permit Speaking And Book Writing (Doc. 144;

Defendant's Motion To Give Speeches and Publish Books); Plaintiffs' Response in

opposition (Doc. 146; Plaintiffs' Response to Motion to Give Speeches and Publish Books).[3]

---

[2](...continued)
Motion #2: One Piece Of Paper Capsulizes Injustice - Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology (Doc. 140; Krotzer's Second Motion for Summary Judgment); Plaintiffs' Motion To Strike Defendant Robert Douglas Krotzer's "Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice - Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology" (Doc 142; Plaintiffs' Motion to Strike Krotzer's Second Motion for Summary Judgment); Defendant's Response To Motion To Strike "Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice - Need For Defendant's Judgment Without Delay (Doc. 145; Defendant's Response to Motion to Strike Krotzer's Second Motion for Summary Judgment); Plaintiffs' Motion To Exclude The Proffered Expert Testimony Of Defendant Robert Douglas Krotzer And Carl Edwards, And Memorandum In Support (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony); Defendant's Response To "Exclude Testimony Of All Defendant's Experts" (Docs. 147, 148, 149; Defendant's Response to Motion to Exclude Expert Testimony); Defendant's Supplemental Memorandum of Law: Statutory "Truth" Is Not Only Determined By The Only Method That Would Prohibit Major Advances In Natural Medicines (Doc. 152; Defendant's Supplemental Memo of Law); and Plaintiffs' Response to Defendant Krotzer's "Supplemental Memorandum of Law" in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 153; Plaintiffs' Response to Defendant's Supplemental Memo of Law).

[3]     These motions and responses are entitled: Defendant's Opposed Motion to Vacate Preliminary Injunction Stipulated Under False Pretenses and Without Statutory Authority Or Jurisdiction. Alternatively Request For Order Interpreting The Injunction (Doc. 56; Motion to Vacate); Plaintiffs' Opposition To Defendant Krotzer's Motion To Vacate The Stipulated Order For Preliminary Injunction (Doc. 71; Plaintiffs' Response to Motion to Vacate); Plaintiffs' Motion For An Order To Show Cause Why Defendant Robert Douglas Krotzer Should Not Be Held In Civil Contempt, And Memorandum In Support (Doc. 58; Motion for Order to Show Cause); Defendants [sic] Amended Response To Motion For Show Cause Order for possible violation of Preliminary Injunction (Doc. 74; Response to Motion for Order to Show Cause); Opposed Motion To Permit Unfettered Speaking And Book Writing (Doc. 144; Defendant's Motion To Give Speeches and Publish Books); and Plaintiffs' Opposition To Defendant Robert Douglas Krotzer's "Motion To Permit Unfettered Speaking And Book Writing" and Memorandum in Support (Doc. 146; Plaintiffs' Response to Motion to Give Speeches and Publish Books).

## I.    **Background**

Starting in 2005, the Alcoholism Cure Foundation ("ACF") and its sole officer and shareholder, Robert Douglas Krotzer ("Krotzer") solicited consumers nationwide through its internet websites.  ACF and Krotzer targeted consumers who were alcoholics.  ACF enticed consumers to sign up for its "Permanent Cure Program" ("Program") by guaranteeing on its website, and through e-mail and telephone representations, that its Program could "cure" their alcoholism in five months or less by using recommended "natural" dietary supplements.  After securing the consumer's credit information, ACF would not permit the "members" to cancel, and instead, charged them tens of thousands of dollars.  The FTC and the State of Florida Office of the Attorney General, Department of Legal Affairs ("State of Florida") allege that ACF and Krotzer perpetrated an injurious scam upon consumers, in violation of the FTC Act and FDUPTA.  Defendant Krotzer responds that he "invented a brand new cure for a major disease based [sic] a cutting edge understanding of brain chemistry of addiction and combined natural medicines."  Defendant's Response to Plaintiffs' Motion for Summary Judgment at 21.  He calls his therapy "Molecule Multiplicity."  Id. at 2-4.  Except where otherwise noted, the following facts are undisputed.

**A.    Undisputed Facts**[4]

**1.    The Parties**

Plaintiff the Federal Trade Commission ("FTC") is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  Among its other duties, the FTC is charged with enforcing Section 5(a) of the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce, 15 U.S.C. § 45(a), as well as false advertising for food, drugs, devices, services, or cosmetics in or affecting commerce.  15 U.S.C. § 52.

Plaintiff the State of Florida enforces FDUTPA, which prohibits unfair or deceptive acts or practices in trade or commerce.  Fla. Stat. § 501.204(1).

Defendant Alcoholism Cure Corporation is a Florida, for-profit corporation that was incorporated in 2005, with its principal place of business in Jacksonville, Florida.  (Doc. 123-1 at 912 (Krotzer Admissions 2-4); Doc. 58-1 (Henry 1st Decl. ¶ 4); Doc. 58-2 (Corporate Records)).  Alcoholism Cure Corporation uses the registered fictitious name of "Alcoholism Cure Foundation."  ("ACF").  Krotzer Admission 5.  Defendant Krotzer resides in Jacksonville, Florida, and is the registered agent, president, sole officer and 100% owner of Alcoholism Cure Corporation.  He controls the operation of Alcoholism Cure Corporation, and was primarily responsible for communicating with consumers during the relevant period. Krotzer Admissions 1, 111-113, 116; Corporate Records.  In his communications on behalf

---

[4]  Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's motion, view the facts presented in the light most favorable to the party opposing summary judgment.  The Court will so note its perspective when appropriate.  The facts recited in this section are either undisputed, or any disagreement has been indicated.  See T-Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp.2d 1337, 1340 (M.D. Fla. 2008).

of ACF, Krotzer used the moniker "Dr. Doug" or "DD." Krotzer is not a medical doctor, and has not earned a "PhD," or any other scientific degree or license relevant to alcoholism treatment. <u>See</u> Krotzer Admissions 54-59.

ACF advertised, marketed, and signed-up consumers for its Permanent Cure Program through its Alcoholism Cure Foundation Website ("ACF Website"). Krotzer was solely responsible for the contents of the ACF Website, (Doc. 123-1 at 1047-48 (Krotzer Interrogatory Answer 5)), and for communicating with consumers who signed up for the ACF Permanent Cure Program. Krotzer Admission at 116. As of the Spring of 2010, ACF and Krotzer had sold the Permanent Cure Program to 450 consumers throughout the United States. Krotzer Admission 123.

### 2. Patent Applications

Krotzer has two pending applications for patents, both filed in 2008. Henry 1st Decl. ¶ 22; (Doc. 58-18 at 2 (Composition Patent App.); Doc. 58-19 at 2 (Internet Patent Appl.)). The patents provide a summary of ACF's Permanent Cure Program and Krotzer's internet-based methodology. Krotzer states in the Composition Patent application that his product is:

> A composition effective in the treatment of alcoholism comprising one or more alcohol craving blocker components such as Kudzu and Rhodiola Rosea, one or more antidepressant components such as St. Johns' Wort (Hypericin), 5-Hydroxytryptophanm SAMe, Melatonin and Taurine, and/or one or more anti-anxiety components such as Vitamin B complex, Glutamine, Niacin, SAMe, Hops, Melatonin and Rhodiola Rosea, the components chosen such that in combination they beneficially affect the nutritional, physiological and psychological deficiencies that combine to cause alcohol dependency.

Composition Patent App. at 1 (Abstract).  The Internet Patent Application proposes a "method" patent, and summarizes Krotzer's marketing methodology:

> An Internet methodology for the treatment of human problem conditions such as alcoholism, obesity/weight loss, depression, or the like, or for long-term commercial enterprise, wherein capturing the client during a short window of opportunity and providing means to assure continued participation in the treatment program is essential, both for the success of the treatment and for providing a viable commercial enterprise. The methodology comprises control of website design, advertising, sale closing, pricing, guaranteed payment, monitoring, and quality control of nutraceuticals.

Internet Patent Appl. at 1 (Abstract).  Claim 1 of the 11-claim patent describes

> [a] method of capturing and retaining individuals in a voluntary treatment program . . . providing an Internet website comprising large amounts of information, wherein the information is presented under different headings with multiple pages of text, the text ending beyond a single visible screen such that scroll continue reading the text, a continuously visible table of contents on each page, . . . and prominent linking icons positioned on the text pages; . . . ; providing a means to join the voluntary treatment program immediately online through acceptance of credit cards as payment; providing an on-line assessment form to be filled out by the individual and contacting the individual within one day of filling out the assessment form; providing a pricing structure for the treatment program with a low initial cost and remaining costs disclosed as daily expenses; and providing a long-term contract that is executed by the individual, wherein the individual agrees to acceleration of all charges in the event of a cancellation request by the individual.

Id. at 1-2 (Claim 1).  The description of the "Invention" in the application includes the following: "closing the sale is essential to success," "[t]he client should find it very easy to sign up by credit card, with ample linking via the many Express buttons to the sign-up page." Id. at 6, ¶ 0034.  Krotzer explains in the Internet Patent Application that the customer

"need[s] to be eased into pricing by avoiding the significance of the expense, instead of relating it to the amount of money to be saved when they stop drinking." Id. at ¶ 0035.

> [A] long-term contract is essential, and an important component of the contract is a provision for acceleration of the total contract fees in the event that the client requests cancellation. This is a critical incentive for the client to continue with the program, as it then becomes more costly for the client to drop the program as it is for the client to continue with it.

Id. ¶ 0038. The patent application explains that "A key technique is acceleration of credit card charges. When the client indicates a reluctance to continue to pay, the payments are accelerated by previous contractual agreement. The request for cancellation is the trigger for acceleration, not actual default in payments." Id. at ¶ 0040.

### 3. The Alcoholism Cure Foundation Website

In May, 2008, FTC investigator Linda Henry was assigned to investigate Krotzer and the Permanent Cure Program. Henry 1st Decl. ¶ 3. As part of its investigation, the FTC issued a Civil Investigative Demand ("CID") to ACF on September 11, 2008. Henry 1st Decl. ¶ 13. The FTC's investigation focused upon Defendants' website http://www.alcoholismcure.org, which advertises the Permanent Alcohol Cure Program as an individualized alcoholism cure service for people who have an addiction to alcohol. Henry 1st Decl. ¶¶ 5-6. Henry printed selected pages from the ACF Website on May 4, 2009 and June 12, 2009. Henry 1st Decl. ¶¶ 7, 8; (Docs. 58-4 and 58-5; 5/4/09 ACF

Website and 6/12/09 ACF Website)).[5]   The first page of the printed 59-page ACF Website[6]

appeared as follows:

---

[5]   Unless otherwise indicated, the following excerpts are drawn from the 5/4/09 ACF Website.

[6]   Krotzer argues that Plaintiffs' ACF Website exhibit is a "partial" copy, omitting "~100 member testimonials and ~450 scientific studies supporting individual ingredients."   Defendant's Response to Plaintiffs' Motion for Summary Judgment at 5, 17, 19.   As support, Defendant cites to an exhibit submitted both in support of his Motion for Summary Judgment and in response to Plaintiffs' Motion for Summary Judgment entitled "Countervailing Benefits pages Intentionally Hidden From This Court" (Docs. 96-15 and 96-16; Docs. 136-2 and 136-3 (DX-105: "OMITTED Countervailing Benefits Evidence in PLAIN SIGHT" and DX-106: "MORE OMITTED CounterVailing Evidence in PLAIN SIGHT")).   The testimonials are referred to in the ACF Website: "Twenty pages of Recent Testimonials can be found starting at weekly ENews."   5/4/09 ACF Website at 37.   Krotzer's Exhibit DX-105 includes images of several computer screens with such entries as "enews" and "successes."   Preliminarily, the Court observes the exhibit is indecipherable.   DX-106 is 27 pages, which includes "member" testimonials and interjected comments and "ENews" which Krotzer says were sent by e-mail and later published on the ACF Website with an e-mail announcement.   Moreover, as Krotzer acknowledges, Plaintiffs did submit a CD-ROM of the ACF Website which included the testimonials.   Additionally, Defendant's testimonials are not competent evidence.   They were compiled by Defendant, and are documents that refer to anonymous unidentified alleged Permanent Cure Program customers.   Lastly, Krotzer fails to cite to specific evidence within these voluminous statements, making only broad-brush references to the  "testimonials."   In so doing, he fails to comply with the mandate of Rule 56(c)(1)(A), which requires citation to "particular parts of materials in the record."   Krotzer's complaint that Plaintiffs' printed presentation of the ACF Website is deficient does nothing to erode the significance of the actual representations made, which the Court considers here.

**Alcohol Abuse**
- **3rd Leading Cause of Death**
- **50% More Hospitalizations**

# Alcoholism Cure Foundation℠
### DetoxificationThatWorks.com℠



## GETTING YOUR LIFE BACK ... WHAT IS IT WORTH TO YOU?
Most say "Priceless," or "Worth more than $350,000"
### Our Whole Program is Virtually Free!
### Pay Little Until You See Results!
*Most fees payable from savings on alcohol not used*
*Only after you are Social Dronking*

## Best Technology to End Alcohol Abuse Permanently
### "Enjoy A Few Drinks" -- Without Cravings

**What's Different About Us?**
- Only we provide the molecules your brain needs, safely satisfying alcohol cravings with ingredients from the health food store.
- Other accepted treatments use conversation, religion and willpower. What other disease in modern times is "treated" with conversation"?

**Will We Work for You?**
- Yes, beyond our PhDs' wildest dreams. We have cured nearly all members -- many hundreds. Your guarantees are explained below.

**How?**
- PhD teams created *Molecule Multiplicity*(℠) by combining vast amounts of accepted science:
  - Alcohol abuse is caused by lack of normal amounts of "feel good" molecules in your brain
  - Certain natural ingredients (nutraceuticals) supply similar molecules,
  - Your Assessment and our testing tell us which, and how much

## What's Stopping You From Joining Us Right Now?
**Family and Friends want you sober?**
- That's what we do.

**You need alcohol's support to get thru the day?**
- *Molecule Multiplicity* safely provides stable good moods.

**Want to keep the good feelings alcohol brings?**
- You can really enjoy a few drinks. No cravings!

**Beyond "No problem, only a six-pack or bottle a day?"**
- Did you know doctors say 2+ ounces/day destroys your brain and will eventually kill you?

**No job, or it is not paying you enough?**
- Let's do something about that.

## Welcome to your only chance to have it all -
## You can Enjoy A Few Drinks, without wanting more.

### Medical certainty. There is no alcoholism if you replace missing molecules your brain seeks in alcohol.

**We will cure you ... guaranteed. Often within 1-10 weeks, nearly always by 5 months.**
**You may cancel anytime you are not being cured as we describe.**
**Virtually cost free. Cure Dividend Savings typically exceed regular monthly fees.**

Prefer to skip ahead to Secure Sign Up, and read the details later?

## Formula Ingredients
Our long list of incredibly safe ingredients contains common and uncommon nutraceuticals, purchased separately from quality health food stores. All are well known to specialist PhDs for their alcohol curing effects. According to the internet, every nutraceutical cures alcohol abuse. Which ones really work, and in which combinations requires our expertise.

All our ingredients have been used safely for centuries by millions of people as recognized by the **FDA** and the **National Institute on Alcohol Abuse and Alcoholism** ("NIAAA").

**Only our program can guarantee success**, which requires using far above label amounts. For some, that is no problem, for others it is a major source of concern. Many, including the **FDA**, **warn against experimenting without our specialized knowledge, experience and monitoring.** Similar molecules working together are an important part of what cures you, and can also be the source of concern. We have many checks and cross checks that make doing brain chemistry in your kitchen incredibly safe.

**No Lists of Ingredients in Advance.** Without supervision by our doctors, even if you knew

---



**Get Your Life Back**
**Join Now !**

### Which Program is Right for You?
- **Permanent Cure:** Customized to deliver the neurotransmitters your brain seeks in alcohol. Doctor (not MD) 15/7 monitored programs. Over the years, nearly all have been cured. Lowest initial cost. Most spend less than $350 until they see results and remaining fees typically payable from monthly savings from consuming far less alcohol.
- **Rapid Withdrawal:** The latest and best Medical Doctors and prescription drug can do. Not a permanent cure.

**New Program**
- **Cure Yourself:** Lowest cost program anywhere that really works. ($387 plus about $50 for ingredients purchased separately).

  We show you how to experiment with our four most commonly needed ingredients (purchased separately for quality assurance) that are safe without doctor monitoring. Expect a long term cure rate 50% better than expensive clinics. You may not need more powerful nutraceuticals or the doctor monitoring that requires (FDA safety recommendation). Save the cost. However, you must study detailed directions and follow them very carefully. We make it as simple as possible, but it's still brain chemistry. Upgrade discount.



**Get Your Life Back**
**Join Now !**

### "Life is Good"
Uncompensated testimonial from a Medical Doctor and long term member. He is a senior professor teaching physiology to medical doctors at a major university medical school. A lifelong student of alcoholism, his family tree has 80 hard core alcoholics, more than a few dying very young. Hereditary alcoholism can be the most difficult to cure. We work for him, put us to work for you.

"I haven't had the need to contact you because as you can see life is good. I have had no drinks, nor any desire to drink. I learned from the last episode in December that I have to take the pills every day (ed note-some do some don't). My last relapse was pretty bad so no way do I want to get in that situation again.

"I continue to teach and enjoy it so much more without the booze hanging over my head. Moreover, my doc says I am healthier than he

(Doc. 58-4 (5/4/09 ACF Website at 1).  The fifth page of the printed 5/4/09 ACF Website is illustrative of the "continuously visible table of contents" and the plethora of "prominent linking icons," Internet Patent Appl. at 1-2, which spill over into the following page:

• **Die 15 Years Sooner**

# *Alcoholism Cure Foundation*™
## Our Doctors and Programs
### Permanent Cure
**Heavy Drinker and Very Heavy Drinker**

of Death
• **50% More Hospitalizations**

> **Famous References**
> **All Costs**
> **Formula Ingredients**
> **Social Drinking**
> **Women In Jeopardy**
> **Summary of Benefits**
> **Do Your Assessment**

Home Page
Can This Be True?
$20,000 Says Yes
Basic Science
Hard Questions
Denial
$35 Million Validation
Sudden Success
About Us
Our Limitations
Testimonials 1
Testimonials 2
Testimonials 3
Testimonials 4
Testimonials 5
Government Research
Scientific References
Summary for Doctors
Educate Yourself
Even More Information
**Benefits**
Low Cost Cure
Permanent Success
Social Drinking
No Backsliding
Health
Save Your Job
Save Your Marriage
Stay Alive
Endangering Others
Avoid DWI/DUI
**Information**
What is Alcoholism?
Why am I an Alcoholic?
Word Meaning
Abuser or Alcoholic
Causes of Alcoholism
Binge Drinking
Compare Results
Low Cost Cure
DWI/DUI Citations
Formula Ingredients
Nutraceuticals
MDs & Nutraceuticals
Our Limitations

**Your Personal Doctor** (PhD, ND, JD) selects your
with good alcohol replacing profiles.

Your assessment answers, **other medications** and our
**successful experience** guide the choices. Which ones,
how much, and in what combinations are likely to be what
your brain seeks from alcohol.

**Most our members see good results** within 1-10 weeks.
If you are a really difficult case, as long as 5 months may
go by until results. We require you to commit to 5 months,
and expect a pleasant surprise. **Most importantly,
everyone who faithfully follows their program is
Permanently Cured!** *Once you are cured, no one cares
about a few months. Our $20,000 reward
assures that.*

You have probably noticed a lot of repeating and summarizing.
Because:

• The rest of your life depends on learning much that is new for
  you, and unlearning much that is no longer true.
• Everyone comes to our Foundation motivated by a different
  "Alcohol Scare." Each has searched for (and seen) different
  information.
• The rest of your life depends on fully understanding why and
  how only we permanently cure nearly everyone.



No tests can tell us what your brain seeks in alcohol, but
our experience and monitoring produce success for nearly
everyone. Prepare yourself for five months with no
results, although most are cured long before. Some go
months with lots of pills and no results.

Success announces itself. Every one is different:
• **Often success is dramatic.** Weeks of "nothing
  special", then**"I realize it's too early to get as
  excited as I am, this is so miraculous."** (testimonial on file)
• **Success is sometimes so gradual we have to point
  it out to you.**

If you cannot wait, consider our **Rapid Withdrawal
Program** (Which might get your drinking down right away, but
does not replace the pleasure your brain seeks in alcohol, nor
permit Social Drinking except under unusual circumstances.)

**Permanent Cure** might be a better choice?
**You may research special questions in our index on
the left, or skip ahead to SecureSignUp. We
recommend you know more about how we work. Read
these pages, then:**

• **Formula Ingredients**

for their expertise by our non
MD doctor) use the newest
prescription drugs to possibly
cause temporary abstinence.
**Legally, MDs must give you
with****Legally, MDs must give you**
the drugs, since they are not
a permanent cure. Counseling
tries to help you feel better
about yourself by providing
brain pleasure center
neurotransmitters. Some can
be helped by this counseling
approach, despite its **poor
history of backsliding.**

**Unless you are ready to sign
up now, you will want to
return here.
Create Desktop Shortcut
Before Your Next
Alcohol Scare.**

Anxiety and impatience are two
symptoms of the brain damage
that afflicts all abusers. This
program can be a good choice if
you need prescription drugs for
anxiety or attention deficit
disorder.

However, alcohol abuse is
proven to be the lack of the
proper pleasure center molecules
in your brain, **Permanent Cure
is a better choice** if you have a
history of backsliding, or
alcoholism runs in your family.

Our MDs do a great job at a
reasonable price, since
counseling by Internet is
available much more when you
need it, and much more
efficiently, maximizing the
benefits of your counselors
expensive time.

**Spouse Not Care?
Save Your Marriage!**

• **Cooperation not needed.**
  He won't know until you are
  both enjoying the results.
• **So convenient** you do the
  work for him.
• **He still gets the fun** of
  drinking, just no cravings
• **You get your spouse back
  and save your marriage**

**Stealth Permanent Cure.**
Combine pills with many foods
and beverages, much as you do
for children or others who won't
take pills.

Or, some women tell their men
they are taking vitamins to help
with whatever problems he will
admit. This is almost certainly
true, just without mentioning the
drinking that causes most
problems. We have men who
won't think of quitting taking
large numbers of pills this way.

Once your alcoholic realizes that
two drinks are as enjoyable as
when he started, he is usually
delighted to proceed to a **Safety
Net Formula** that cuts down the
number of pills, maybe to where
he only takes them in times of
great stress.

**Low Cost Cure**
&
**FREE Assessment**
for next 200 members
**Join Us Now and
Save $135
To Go** ◖◗

updated daily

the Internet?  Having trouble

<u>Id.</u> at 5.

The ACF Website advertises that the Permanent Cure Program is supported by qualified alcoholism experts on staff. The Website represents that the Program can cure people of their addiction to alcohol while still allowing them to drink alcoholic beverages "socially." Henry 1st Decl. ¶ 6. Additionally, the ACF Website states that the Permanent Cure Program offers the "best technology to end alcohol abuse permanently," that the Program is "[m]any times more effective than any other treatment," and that consumers who purchase the Permanent Cure Program may "still enjoy alcohol, but in the amount MDs recommend." Krotzer Admissions 17-19. It explains that:

> **A program that provides each abuser with an experimentally determined combination of these alcohol effective nutraceuticals is the best approach to providing a permanent cure to alcohol cravings.**

5/4/09 ACF Website at 45.[7] ACF touts a "Success Rate" of "Above 97%." <u>Id.</u> at 48.

During 2009, the ACF Website could be accessed by consumers through a search of the internet using such terms as "how to stop drinking," "alcoholism" and "treatment for alcoholism." (Doc. 123-1 at 932 and 956 (Henry 2d Decl. Attach. D and E (LS Dep. at 11; JR Dep. at 10); Doc. 58-33 (Consumer 1 Decl. ¶ 3); Doc 58-48 (Consumer 2 Decl. ¶ 3)).[8]

---

[7] The ACF Website presents text in numerous fonts, faces, and sizes. Replications of the Website text in this Order will include the exact presentation when possible.

[8] Krotzer seeks to "strike" the Second Amended Declaration Of Linda Henry (Doc. 128; Henry 2d Decl.)), filed by Plaintiffs in support of their Motion for Summary Judgment. (Doc.131; Defendant's Motion to Strike). Krotzer argues that this declaration "should be stricken and replaced with a full text and recording of what actually was said, or provide Krotzer with copies so he can do the extracting." <u>Id.</u> at 1. Krotzer apparently refers to the four deposition excerpts attached as exhibits to the Henry 2d Declaration. (<u>See</u> Docs. 123-1 at 932, 956, 1013, 1060). Krotzer argues that the Henry 2d Declaration and attachments do not present "the whole truth" by "selectively quoting" from the depositions and taking quotations "out of context." Defendant's Motion to Strike at 1-4. Krotzer also complains that the court reporter who transcribed the depositions "refused" to give him "<u>pro bono</u> copies" of the deposition transcripts, making the unsubstantiated allegation that the court reporter refused to do so "citing their fear
(continued...)

The ACF Website is rife with "cure" representations, beginning on page one with:

> **We will cure you . . . guaranteed. Often within 1-10 weeks, nearly always by 5 months.**
> **You may cancel anytime you are not being cured as we describe.**
> **Virtually cost free. Cure Dividend Savings typically exceed regular monthly fees.**
> . . .
> **only our program can guarantee success . . . .**

5/4/09 ACF Website at 1; <u>see also</u> <u>e.g.</u> <u>id.</u> at 31 ("[o]ur internet based program has a **near**

**100% cure rate**").  The Website "explains":

> **Your Personal Doctor** (PhD, ND, JD, not MD) studies your assessment answers for many insights into what your brain seeks in alcohol. He screens to avoid any adverse interactions with your medications.  Based on our successful experience, he determines the composition and amounts of your First Recommendations.  We do that so well, most are cured with few further adjustments.
>
> **Doctor Monitoring 15/7** We can safely do many things others cannot because your World Class Specialist is only minutes away.

---

[8](...continued)
of retribution by Plaintiff FTC" who is a "very substantial customer of the Court Reporter nationwide." <u>Id.</u> at 6.  Krotzer cites only to the "rule of evidence called the 'Best Evidence Rule' that perhaps applies" as legal authority.  <u>Id.</u> at 5.  Plaintiffs respond in opposition that it has no obligation to file the entire deposition transcripts in support of their motion for summary judgment.  (Doc. 132; Plaintiff's Opposition to Motion to Strike)).

First, Defendant's Motion to Strike Henry Declaration is unnecessary, inasmuch as Rule 56, Federal Rules of Civil Procedure governing summary judgment, provides a mechanism for objecting to material cited in support or opposition to a motion.  <u>See</u> Fed. R. Civ. P. 56(c)(2).  As such, "[t]here is no need to make a separate motion to strike."  Fed. R. Civ. P. 56 advisory committee's note 2010 Amendments.

Moreover, newly revised Rule 56 provides that a party may support an assertion that a fact is not disputed by: "(A) citing to <u>particular parts of materials in the record, including depositions</u> . . . ."  Fed. R. Civ. P. 56(c)(1)(A)(emphasis added).  Although, often helpful, nothing in Rule 56 requires that a party must file entire depositions rather than excerpts of depositions in support of their position on a motion for summary judgment.   Additionally, courts that have considered the issue have found that submission of deposition transcript excerpts, rather than entire depositions, in support of a motion for summary judgment is acceptable, "because a party who believes that there is additional relevant information in the deposition transcripts that is not contained in the excerpts is free to file its own excerpts or the full transcripts in support of its response." <u>O'Hara v. Univ. of W. Fla.</u>, 750 F. Supp.2d 1287, 1293 (N.D. Fla. 2010); <u>see also</u> <u>Clay v. Equifax, Inc.</u>, 762 F.2d 952, 955 n.2 (11th Cir. 1985); <u>Zhanjian Go-Harvest Aquatic Products Co., Ltd. v. Southeast Fish & Seafood, Co.</u>, No. 07cv60126-CIV, 2008 WL 516109, at *1 (S.D. Fla. Feb. 25, 2008).  This conclusion applies even when the opposing party is a <u>pro se</u> litigant who contends he or she cannot afford to purchase a copy of the deposition, <u>O'Hara</u>, 750 F. Supp.2d at 1293 & n.5, 1299.

Finally, the fact that Krotzer is proceeding <u>pro se</u> and contends he cannot afford to purchase copies of the transcripts provides no basis to disregard the relevant evidence provided by Plaintiffs.  For all of these reasons, Defendant Krotzer's Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc.131; Defendant's Motion to Strike), is due to be **DENIED**.

. . .

**Costs - Virtually Free**
1-10 weeks - Difficult cases spend a few hundred dollars more. This **includes the cost of ingredients** which are purchased separately . . . . Typically your costs are paid by your **Cure Dividend Savings,** the alcohol you no longer drink. You must follow your program for 5 months, since you may be a difficult case and may cancel anytime after 5 months if not being cured as we describe.

Id. at 2.  The following representation appears on the same page:

**Molecule Multiplicity Supported By:**

**Developed by:**
- Two times Nobel prize winner known for nutraceutical work **Dr. Linus Pauling**
- PhD teams at worldwide consulting firms
- Harvard University Medical School
- $35,000,000 validating research study
- Expensive clinics use some of our technology

**Backed up by:**
- Over $200,000,000 in research
- Clinical experience of many hundreds of cured members including many doctors executives and other professionals
- **FTC determination supported by substantial science**
- $20,000 guarantee our claims are supported by actual results
- Limitless number of testimonials
- PayPal division of EBay vouches we have large numbers of satisfied members, and most members do not use PayPal

Id.

The remaining pages of the printed 59-page website repeat the aforesaid representations, and numerous hyperlinks, sometimes in a larger font size or in colored print.  Representative examples (but by no means an exhaustive list), include:

**$35,000,000**
**Scientific Validation**
**Our Unique Permanent**
**Cure Programs**
. . .

**Doctor Monitoring** Your doctor is always available to answer your questions.  We can safely do many thinks others cannot because you talk to your doctor as soon as you need to.
. . .

Id. at 5.

We want to answer you questions before you even think of joining our:

**Science Based Programs**
**Tested and Validated**
**Permanent Cures to Alcohol Abuse and Addiction**

-16-

Id. at 42; see also e.g. id. at 11 ("**$35,000,000 Scientific Validation Our Unique Permanent Cure Program**"), 13, 43 ("**$35 million study** validates our **Molecule Multiplicity** method") 39-40 ("**Many Pages of Journal Articles Supporting our Technology**" (citing articles)); 43 ("**$35 million Scientific Validation**"); 46 ("**We Cure You Permanently**"); 51 ("100's of examples of articles by **doctors validating our ingredients**").

The ACF Website also references

> **The American Journal of Psychiatry** (the **most respected independent source** of information for MDs who treat alcoholism) and **The Wall Street Journal** . . . .

as providing support for "Molecule Multiplicity" treatment of the brain.  Id. at 22.

The site repeatedly makes its representations about ACF's "team of doctors:"



Id. at 9; see also e.g.. id. at 31 ("[t]he **team of doctors** employed by Alcoholism Cure did the research in the two sciences").  The Website promises:

<u>**Only Our Doctors**</u>
- Apply medical science directly to where the problem is, your Brain.
- Stimulates your Brain similar to alcohol every day unless not needed.
- Makes Social Drinking Part of the Program
- Gives you absolute Privacy.
- You never see your advisor face to face.
- Your advisor never knows where you live.

Id. at 48.  "[P]rofessional supervision is required to safely adapt this knowledge to each alcoholic. . . . "  Id. at 51.[9]

ACF represents that its Permanent Cure Program employs well-researched mainstream techniques, stating:

> **Our Formula Ingredients** are all **"Dietary Supplements"** under the Dietary Supplements Health & Education Act ("DSHEA") of 1994.  Vitamins, Minerals, Herbs, and Amino Acids (part of proteins).  They have been part of traditional or alternative medicine for hundreds of years, mostly for other health reasons.  Now called **nurtraceuticals because of their similarity to pharmaceuticals,** all doctors embrace at least some of them.  Many prescription medicines use molecules **originally found in nutraceuticals.**

Id. at 13 see also id. e.g. at 17 ("**[w]e spent a fortune learning to use over $200,000,000** in medical research on how alcohol works"); 31 ("[o]ur programs are built on two major realizations proved by over $200,000,000 in research"); 46 ("**Basic Science Advances Pointed to Alcoholism Cure by 1995**"); 47, 49 ("Based on the research of our scientists as well as many others . . . ."); 51 (ACF "**spent a fortune**").

Information about the cost of the program is elusive.  For instance, the ACF Website represents that the Permanent Cure Program is low-cost and "virtually free".

---

[9] Plaintiffs contend that "Defendant refers more than 500 times on his website to 'doctor,' 'world class specialist,' and other specialized or scientific knowledge."  Plaintiffs' Motion for Summary Judgment at 8.

**Alcoholism Cure Foundation**™

• Age Faster
• Die 15 Years Sooner

**Being Cured Pays for Itself**
**Our Programs are Virtually Free**

**Ingredient Costs: about $1.50/day**, perhaps up to $2.25/day while testing. Perhaps zero with *Safety Net* or *Sudden Success* formulas.

**Membership Fees:**
Most members are *Social Drinking* in 1 -10 weeks before spending $350. Even difficult cases are *Drinking Down Half* or *Social Drinking* before spending a few hundred dollars more., **Substantial savings** from not purchasing alcohol and related prescription drugs (**Cure Dividends** - see right) **more than pay** most members monthly costs (fees plus ingredients, see examples below). What you really need to know, and sets us apart from all other treatments, is **nearly all members are cured within five months. You have our $20,000 guarantee that is a true statement.**

**Our main financial support is cured members.** Our World Class Doctor specialists (not MDs), and a lot of other expenses must be paid. So you fully understand our fees once you are being cured, we ask you now agree to step up fees at the second and fourth months. The money you save in **Cure Dividends** typically more than pays these increases. Results slower than typical? **We cheerfully refund increases** to make sure most of your fees are paid from **Cure Dividends.** The only conditions are you must take your ingredients and submit reports. Fees begin at $2/day stepping up to $6/day ($179.96/month). Very Heavy Drinker begins at $3.33/day up to $9/day ($269.96 /month). Since untruthful Diary reports to lower fees may delay your cure and hurt other members, we reserve the right to refuse these partial refunds. Your doctor's decision can be appealed to our Board. Your ultimate protection is the right to cancel. It is not in either of our interests to have you cancel.

**Follow Me** • **Alcohol Scare** • **Secure Sign Up**

When you think carefully, and include all the expenses of drinking including tips, all hugely underestimate the amount and cost of our drinking. And that doesn't count other costs, like the 50% greater number of hospitalizations -- or $15,000 for a DUI. **Cure Dividend** does not begin to count the **many non cash improvements** in your life.

**You may cancel anytime if not being cured** as we tell you on seven month's notice. We expect you will be at least partially cured within about three months of joining. If you are being cured, you should maintain your membership to guard against false success and help support us in curing other alcohol abusers. You may stop your membership fees if your cure is not permanent and you have worked with us a reasonable time to restore your success.

Your **continuing membership is virtually cost free to you.** And you get all the valuable benefits of *Safety Net* drinking, including **your increased life span of 15 years of happy healthy life.**

Id. at 10; see also e.g. id. at 26, 27. The Website explains:

> So that you fully understand our fees, we ask you now to agree to step up fees after the first and third months. We fully expect the money you save in **Cure Dividends** to pay for these increases. **We cheerfully refund increases** if your results are slower than typical and to help make sure most of your fees are paid from **Cure Dividends**. The only conditions are you must take your ingredients and submit reports. Fees begin at $2/day stepping up to $6.day. Very Heavy Drinker begins at $3.33/day up to $9/day.

Id. at 43.

The three-page "free" "Assessment" sign-up page, which is the object of a number of the hyperlinks throughout the Website, requires the consumer to complete questions concerning his or her personal identification, health conditions, medication and prescriptions, alcohol use, "street drug" use, favorite foods, job description, and activity level. Id. at 23-25. It also repeats a number of the same representations made throughout the Website,

including the "$35,000,000 Scientific Validation" representation, id. at 25; and costs

representations:

> **Costs are typically under $350 until you see results in 1-10 weeks.** Difficult cases only a few hundred more.
> **We cheerfully refund step up fees** if you are not *Drinking Down Half* in the typical 1-10 weeks. This typically keeps your cost (including ingredients) less than a single bar drink/day.
> **You may cancel anytime** you are not at least *Drinking Down Half* after following your program for five months, or we can not bring you down to *Social Drinking* within a reasonable time afterwards. The **Cure Dividend Savings typically exceed all costs**. and your program is virtually **cost free** until you are **Permanently Cured.**
>
> **Confidentiality:** All your personal information is protected by doctor patient privilege and high level unencrypted computer security measures that have never been breached.

Id. at 23. The first page of the Assessment Page in the 5/4/09 ACF Website states in large

font: "Do Your Assessment - Then Sign Up." The fill-in-the-blank form appears on pages

one and two, and at the bottom of page 2, the form states:

> By submitting your Free Assessment you agree to terms and conditions.
> Fees are partially refundable except low cost new *Cure Yourself* Program.

---
Press Here To Submit Free Assessment
---

The hyperlink to "Terms and Conditions" appears in small print at the bottom of the third

page, a page full of narrative, with nothing to fill-out. Id. at 24-25.

The 5/4/09 ACF Website sets forth ACF's "Terms and Conditions" in three pages of

fine print beginning on page 53 of the printed Website. Id. at 53-57. The "Terms and

Conditions" include the following:

**Terms and Conditions**
**Refund and Cancellation Policies**

Our Permanent Cure programs are designed so the bulk, typically
all your financial obligations to us are paid from your Cure Dividend.

**Refund Policy**

As is true with all doctors, we give no refunds. As a charity, our other policies are much
less expensive than traditional doctors in many ways. For instance, we largely guarantee
results, your payments continue only as you stay cured. We do give Partial Refunds
described below to keep your total cost extremely low until you see we are curing you.
Also, we have a $20,000 reward that we cure nearly all members who follow their program
for five months. No medical program works for everyone -- even more so when we are
dealing with a disease that is generally considered incurable.

**Partial Refunds**

**We Cheerfully Refund** step up fees if your results are slower than typical and to
assure you most of your fees are paid from **Cure Dividends.**

To qualify, you must faithfully follow your recommended program. This is simply doing
recommended increases every five days and an honest diary at least once every month.
**You must make each request within ten days** of each 30 day membership period.

This protection for you can be abused. **Curing you requires honest reporting, and
most our members report accurately.** Unfortunately, there are some who seek to
cheat. The intense analysis of your diary that is part of curing you discloses clues about
dishonest reporting. While the effect of any one ingredient on alcohol consumption is
unpredictable, **each ingredient has very predictable effects on your body and mood.
And can be measured by blood tests.** There is now a hair test that reliably reveals
alcohol consumption over the preceding 90 days.

Our **charitable purpose is to cure everyone.** And **your continued membership is
in our financial interest.** We lean over backwards to be fair. If you disagree with your
doctor's (not MD) decision, you may appeal to our Board, whose decision must be final.
They may condition refunds on five easy/inexpensive proofs of continued drinking, or
current hair, blood and other tests, sent directly from the lab to us. This process may
require obtaining your prior records from your MD (with your written approval).

and

You should know that joining
us **creates the same legal
obligation as any other
contract.** You do not need a
pen and paper to make a
contract. By submitting your
assessment, signing up and
making payment, you produce
written evidence documented
by third parties of our contract.

Id. at 53. On Page 54 of the printed 5/4/09 Website, ACF frames the cost of the Permanent

Cure Program as being based upon the "Cure Dividends" realized by the "cured" customer

who is no longer purchasing large quantities of alcohol. Labeled "Payback Time," and

"Legal, Moral and Financial Reasons to Continue Your Membership," ACF also provides a

rationale for the "cured" customer to continue paying "to help advance our work." Id. at 54.

Under "Cancellation Policies," ACF represents that "our foundation relies on your continuing membership. . . . All benefit by making relatively small payments over a long time." Each customer is required to "**make a five month commitment**." Id. Then, "**[o]nce your drinking is under control, please repay our charity**."[10] The following terms are set forth on the bottom of Page 54:

_____

[10] Krotzer has stated to consumers that Alcoholism Cure Corporation is a "charity." Krotzer Admission 48 ("A FOR PROFIT CHARITY"). In communications with consumers, Defendants stated: "As a charity, our major purpose is to help you." Krotzer Admission 50. However, Alcoholism Cure Corporation is not registered as a charity with the Internal Revenue Service or the State of Florida. Krotzer Admission 49.

**You may cancel anytime if not being cured as described** after following your program for five months. Your common sense, the first page and many others you read on our site, all told you we are an indefinite commitment if your long time drinking stops for any reason, while a member or soon afterwards. Nearly all our members are cured, and afterwards, very few are willing to keep their commitment to pay over their Cure Dividends as agreed. We regularly win over 80% of what we are owed in court or arbitration You may stop your membership only by meeting the unlikely conditions described below. You have been drinking for many years, and you have been warned repeatedly to expect a period of time after signing up when cravings will stop, called false success. Offers to quit prematurely, whether or not you have followed your program for five months, usually signal members have stopped drinking, whether or not permanently cured, and will be considered your election to prepay your total fee. You authorize us now to charge then for part or all of your remaining fees totaling 76 months. You will then automatically be a paid up long term member. If you attempt to cancel prematurely, denying us the chance to permanently cure you, or fail to follow your program, you are considered cured for all purposes and our fees are fully earned, no matter if as a result of the dietary and lifestyle advice we give you, knowing about or using the ingredients we recommend, *Sudden Success* by stopping our ingredients, by joining another form of alcoholism treatment, or any other reason, while a member or a reasonable amount of time afterwards. The law says you owe us basic fairness and honesty. That means you have a legal obligation to follow these Cancellation and Refund Policies.

Id. at 54.  On the following page, the Website refers (in fine print) to "you [sic] obligation to pay us for 76 months."  Id. at 55.  Specifically regarding cancellation, ACF states on the Website:

> If you are thinking about quitting and violating your contractual agreement with us, **we suggest taking advantage of our seven month notice period.** This is an open communication that gives us seven months to work together to make sure your drinking stays down, adjust your formula with both long term safety and convenience in mind, and helps you keep your obligations to yourself, your family, and us, as your brain recovers from the damaging effects of the alcohol you no longer drink. Most importantly, it preserves your right to change your mind without triggering the acceleration of your entire obligation as happens if you just quit paying. Many members make the mistake of trying to cancel their membership the moment they stop drinking and then, to there dismay, resume drinking and want to Resignup. This protects you.

. . .

> Since our typical member spends more than $12/day on drinking, during your membership your **Cure Dividend Savings typically exceed your fees.** Your payment obligations cease upon request in the unlikely event you meet the following conditions. 1. You have worked with us and followed your customized program and are not at least *Drinking Down Half* after 5 months, or Social Drinking within 11 months afterwards. 2. We explain solid evidence in your diaries or emails that contradicts your statements about following the program or your continued drinking. You agree to submit a hair sample for analysis which will disclose your drinking over an 90 day period, or your choice of two from our standard list of simple and inexpensive "Proofs of Continued Drinking." In extreme cases, we will require the hair test, which costs over $500.

> This contract is entered into when your assessment and credit card information arrives in Florida. Your full fee obligations arise when your First Recommendations are mailed from Florida. All work is performed, and

Id. at 55. However, cancellation rights represented throughout the Website are contradictory. For instance, at some locations on the Website, ACF represents that the customer may "**cancel anytime** if you are not being cured as we tell you." E.g. id. at 6. At other locations, ACF represents that "**You may cancel at any time** on seven months notice if you are not being cured as we described." E.g. id. at 29.

The "Secure Sign-Up" Page appears at page 26 of the printed Website, and contains representations of "Privacy and Security," "Doctor-Patient Privilege, "You may cancel anytime," and "You may quit anytime if not being cured as we describe." The "Terms and Conditions" are not set forth on the Sign-Up page, but rather a hyperlink to "Terms and Conditions" appears in small print to the right of the page. Id. at 26.

**Alcohol Abuse**
- 3rd Leading Cause of Death
- 50% More Hospitalizations

# Alcoholism Cure Foundation℠
## Secure Sign Up

**Continuing Support**
from cured members
makes our
low prices possible...
The best testimonials
we know.

**Need More Detailed Information?**
- Costs
- How Do Programs work?
- Terms and Conditions

**Privacy and Security**

*Doctor-Patient Privilege* plus high level security assurances are important benefits. Does anyone seriously think weekly meetings in rooms full of alcoholics are Anonymous? **Alcoholism Cure Foundation** leads all other alcohol abuse treatments, in all ways, not just that our Permanent Cure rate is 300% better, and costs far less.

**Permanent Cure costs** about $350 until you see results in **1-10 weeks**. Difficult cases only a few hundred more.
**All Programs are Tax Deductible** see your tax advisor
**We cheerfully refund step up fees** if you are not *Drinking Down Half* in the typical 1-10 weeks. This keeps your cost (including ingredients) until you are cured to less than a single bar drink/day.
**You may cancel anytime** you are not at least *Drinking Down Half* after following your program for five months, or if we can not bring you down to *Social Drinking* within a reasonable time afterwards. From when you first see results, **Cure Dividend Savings typically exceed all costs**, and your program is virtually **cost free.**

**Which Permanet Cure Program Is Right For Me?**

**Very Heavy Drinker Program** works best:
- More than 7 ounces/day more than 3 days/month
- Drinking 10+ years of 2+ drinks/day
- Female under 120 pounds drinking 3+ ounces/day
- Spend about $6-15/Day on alcohol

Faster results, more side effects, more monitoring. Fee begins at **$3.33/day** ($99.96). *Drinking Down Half* usually in **1-10 weeks.** Anticipating your cure, fee steps up in the 2nd month to $5/Day (PayPal charges 2nd+3rd months together) and final step up to $9/day ($269.96/month) 4 months from now.

**Heavy Drinker Program** works best:
- Less than 7 ounces/day except rarely
- No binge drinking over 10 oz/day/month
- Heavy Drinking under 10 years
- Spend less than $7/day on alcohol

Fee begins at **$2/day** ($59.96). *Drinking Down Half* usually in **1-10 weeks.** Anticipating your cure, fee steps up in the second month to $3/Day (PayPal charges 2nd+3rd months together) and final step up to $6/day ($179.96/month) 4 months from now



We have many health care professionals as cured members
**If you need help in deciding to join, send an email to**
**uncompensated cured health care professional**

Or Select/Copy/Paste into your address bar:
contented.sobriety@yahoo.com

**Please use this service only if you really need it, your professional will be helping you for free.**

## You may quit anytime if not being cured as we describe
**You will see impressive results ... guaranteed. Often within 1-10 weeks, nearly always by 5 months.**
**You must follow the program for five months since you may be a difficult case.**
**Virtually Cost Free. Cure Dividend Savings typically exceed regular monthly fees.**

**Membership Virtually COST FREE to You      Yes, Most members SAVE MONEY each month more than fees!**

### Press "Yes, I Want My Life Back"
Your family will be everlastingly thankful you made the smartest move of your life.
Dec de now.



**Very Heavy Drinker**

Yes! I Want My Life Back

PayPal division of EBay has over 100,000,000 members and accepts all major payment methods
(Click, Wait 20 secs, Arrow Back Only)

**Heavy Drinker**



Yes! I Want My Life Back

**FREE** Assessment
Next 200 Members
$135

To Go

updated frequently




- **Prefer to ask a few questions of our Advisors? Keep this page open.**
**Call Us Now: 904-234-0103**
- **Or pay with your credit card at PayPal and save $45.**

<u>Id.</u>

ACF's "Privacy Policy appears on Page 57 of the 5/4/09 Website, and states, <u>inter alia</u>:

> Alcoholism Cure Advisors hold doctorate degrees (PhD, ND, JD) but are not medical doctors (MD).  We strongly believe the DSHEA law gives us

-25-

> the right to extend to you the same total privacy right extended by all
> medical doctors.

<u>Id.</u> at 57.

### 4. <u>Science Claims</u>

Defendant Krotzer acknowledges that the claim that the Permanent Cure Program cures alcoholism is not supported by traditional science. Krotzer Admission 45. Additionally, although Krotzer has stated to consumers that he has a "Doctorate" from Harvard, Krotzer is not a medical doctor; does not hold a "PhD" degree; "N.D." (Doctor of Naturopathic Medicine); or a "D.O. (Doctor of Osteopathic Medicine) degree. Krotzer Admission 54-57, 59. Instead, as Krotzer admitted in response to the FTC's Civil Investigative Demand ("CID"), Krotzer received a Bachelor of Science degree from Lehigh University in 1964, and graduated from Harvard Law School in 1967. Other ACF employee "qualifications" included "one employee that had been in the military, one that had worked with nurses, one that was a recovered addict with a 'strong nutraceutical background,' and one that had a 'strong nutraceutical background.'" Henry 1st Decl. ¶¶ 12,13.

Krotzer contends that his claim that the Permanent Cure Program had been "validated" by a $35 million study, referred to an article in the <u>American Journal of Psychiatry</u>, which was reported in the <u>Wall Street Journal.</u> <u>Id.</u> ¶ 14. However, he concedes that the articles in the <u>American Journal of Psychiatry</u> and the <u>Wall Street Journal</u> did not make any references to Defendants' Permanent Cure Program. Krotzer Admission 26; Henry 1st Decl. ¶ 14.

**5.    Alcoholism    Cure    Foundation's    Dietary    Supplement Recommendation**

After a consumer signs up for the Program, Krotzer e-mails the consumer ACF's "First Recommendations," an approximately twenty-page form letter, which includes instructions to buy and consume a variety of dietary supplements in the form a multiple pills. (Docs. 59-1 and 59-2 (Consumer 5 Decl. Ex. A; Recommendation)); Krotzer Admissions 36, 124, 125; JR Deposition at 40-41.  For example, Krotzer recommended that Consumer 5, a pilot, purchase and take Kudzu ("start with 3 mgs . . . increase by 2 mgs . . . not to exceed a total of 9 mgs"); Niacin ("Do not exceed a total of 1,200 mgs (less if flushing occurs more than mildly, up to 400mg/increase if no flushing, use your judgment . . . With real Niacin, some will experience alarming sensations of intense heat, blotchy skin, itching or rash.  It will not hurt you . . . Try to tolerate the flush . . . ."); 5 Hydroxy-Tryptophan ("Do not exceed a total of 300mg . . . Common reactions - Nausea, vomiting and diarrhea may occur, usually gone in 5 weeks.  If this occurs, cut usage to where bad symptoms stop.  Increase slowly and carefully.  Let me know, but not cause for alarm. . .   Not likely but possible: difficulty sleeping, mental status changes, rigidity, hot flashes, rapidly fluctuating blood pressure and heart rate"); Vitamin B Complex ("Your Daily Amounts: Highest Label Amount . . . Don't let the 1000%-3000% figures scare you; in vitamins only, they are desirable and safe"); Taurine (amount illegible).  Consumer 5 Recommendation at 6-7.  "Approximate amounts are always OK."  Id. at 9.

The Recommendation does not discuss the specific interaction of the multiple supplements with each other or with other medications, or the cumulative effect of taking the recommended supplements all at once.   It states only that:

> Almost no bad interactions are reported about Formula ingredients, but are possible at some of the higher levels you will be using . . . . We believe we do a good job of avoiding dangerous interactions with any drugs you have told us about, but **ultimately that is up to you. In all of medicine, there are no guarantees** . . . **Neither the drug interaction services I use, nor I am perfect. Or you could have an interaction not generally reported**. . . . **If you have any doubts, . . . we strongly recommend asking your pharmacist**.

Id. at 10.

Krotzer instructs the consumer to fill out and submit by e-mail a "Diary" (in Excel spreadsheet form) of ongoing personal and health information, including any dietary supplements, prescription medicine, health conditions and feelings. The customer is required to document his or her use of the supplements recommended and the effects of those supplements. Consumer 1 Decl. ¶ 4; Krotzer Admission 37; JR Deposition at 41; (Doc. 58-34 (Consumer 1 Decl. Ex. A; Diary Template)); (Doc. 59-2 (Consumer 5 Recommendation at 11)).

Some customers reported adverse reactions to the recommended supplements. For example, Consumer 3 told Krotzer that he felt "foggy" and that "my nervous system feels like it's being pushed too far," and that "[t]he cravings for alcohol have increased." (Doc. 58-57 (Consumer 3 Decl. Ex. B)). Consumer 4 "experienced tremendous headaches, hives, body shakes, and hot flashes." (Doc. 58-61 (Consumer 4 Decl. ¶ 7)). Consumer 7 reported that the nutraceuticals, including niacin, St. Johns Wort, Vitamin B, and Kudzu, which were recommended by Krotzer at rates "far beyond what the FDA suggests," resulted in nausea, severe diarrhea, and strong flushing. (Doc. 60-14 (Consumer 7 Aff. at 4)). And Consumer 11 reported to the State of Florida that as soon as he began ingesting the recommended

supplements, "I was nauseous, I had stomach pains continuously and due to the shear quantityof pills, I obtained acid reflux. When I called to get the support that was promised, I was told I could only do so via email through my diary once a month." (Doc. 60-38 (Consumer 11 Aff. at 5)).

Krotzer has instructed consumers to discontinue their doctor-prescribed medications or to disregard their physician's concerns. JR Deposition at 29 (Krotzer recommended consumer stop taking a medication called "Campral" prescribed by consumer's psychiatrist "so that the other natural, St. John's Wort and those things could take effect"); see also id. at 33; (Doc. 58-34 (Consumer 1 Decl. Exhibit A at 1 ("Discontinue your prescription meds once your cravings start down and you are feeling a mood enhancement on our ingredients")); Consumer 2 Decl. ¶ 7 (Krotzer advised consumer to follow ACF recommendations rather than consumer's medical doctor's prescription medication recommendation). He is critical of physicians in his communications with consumers. For example, he told Consumer 2:

> Mostly, while it is good to check with your MD, you should know that no formal education of MDs spends more than an hour talking about alcohol. MDs have no prescription drug that works and cannot afford to stay current on nutraceuticals.
>
> By contrast curing alcohol abuse cravings is all we do. We have had PhDs assemble the research of large teams of PhDs. More importantly we are curing nearly all our members. No one else comes close to that result.
>
> It sounds like your MD has an interest in the subject, which is commendable. That is a long way from exhaustive knowledge. . . .
>
> . . .

> I am amazed that your MD who feels so authoritative has not heard of **Kudzu**. By far is [sic] our best known and most scientifically researched ingredient. . . .

(Doc. 58-50 (Consumer 2 Decl. Ex. B)).

### 6. Cancellation

When customers complained, or inquired about cancelling their participation in the ACF Permanent Cure Program, Krotzer claimed that, according to the "disclaimer" on the ACF Website, the customer was deemed "cured" and liable for thousands of dollars of fees for as much as 52 months, 76 months, "forever" or "for life." Krotzer Admissions 89, 99; LS Deposition at 40; JR Deposition at 50; JR Deposition at 32; (Doc. 58-11; Henry 1st Decl. Attach. J at 1-9). Additionally, Defendants considered customers' cancellation of PayPal or credit card accounts to be signals that the consumers had stopped drinking and were "cured." Krotzer Admission 104. Defendants considered at least 27 consumers who quit the program before five months to be "cured." Krotzer Admission 89.

Upon receiving a cancellation request from a customer, "Dr. Doug" would e-mail the customer under an ACF heading notifying the customer that "you committed to no less than five months." (See Doc. 58-9 (Henry 1st Decl. Attach. H; 11/10/06 E-Mail). In a 2006 e-mail, Krotzer included a link to the Alcoholism Cure Website and stated that the customer had made a "**long term commitment**, and that "If you are cured or being cured for any reason while a member or afterwards . . . and you cancel your membership; **you agree to immediately pay fees totaling 52 months** plus attorney fees in all courts, and interest at the maximum legal rate." Id. In order to establish that the Permanent Cure Program did not cure alcoholism, and thus that no money was owed upon cancellation, the customer was

required to submit a notarized note from a doctor on the doctor's stationary; notarized notes from five friends with identifying information; liquor receipts for the past two months; and laboratory testing, requiring detailed information and testing results, and "3 test tubes of at least 10 milliliter blood samples" and a "[l]arge lock of hair (at least 1½ inches long) from your body where the sun does not shine (nape of neck if you have long hair, chest or pubic hair)." Id. at 4. If the data submitted is "inconclusive," Krotzer could require lie detector test in order to establish that the customer is not cured. Id.[11]

---

[11] Krotzer told the consumer that in order to prove that they were not cured, and thus possibly eligible for cancellation, the consumer was required to submit "Proof of Continued Drinking" which included:

Possible submissions suggesting you are not cured.
(Include as many as possible)

A.   Notarized note from you MD on their stationary
B.   Notarized notes from five friends with their Name, address, phone number and email addresses.
C.   Liquor receipts for the last two months
D.   Laboratory testing

Print out and take the following information to a Quest Laboratory diagnostic center early in the morning (usually open at 7 am) before your first drink. Have them send all of the following to [ACF]

1)   Heart panel
2)   Liver panel
3)   State exactly how many drinks of (hard liquor, wine, beer) you have consumed in the preceding 24 hours.
4)   Patient states they have taken the following nutraceuticals in the preceding 48 hours:
  a.   List your ingredients
  b.   Each one you are taking
5)   Patient states they have taken the following in the last two days
  a.   Beers - 12 ounce - # yesterday, day before
  b.   Type of Liquor (brand and # of ounces - vodka, whiskey, scotch, other) - yesterday, day before
  c.   Wine [red or white] - # yesterday, day before
6)   Do not use cloves, mint or lemon for 24 hours, and have them complete this statement: "I have smelled the patient's breath, from a distance of less that [sic] two feet, and I smell ...

(continued...)

-31-

Krotzer informed customers who attempted to cancel that "**You created the same legal obligation as a written contract** when you made your first payment. . . . **By signing up, you committed to pay substantial sums when we cured you or you did not follow our recommendations as stated in our post cancellation policies**." Id. at 1-2. This same e-mail in substantially the same form was sent to other customers. (Doc. 58-11 (Henry 1st

---

[11](...continued)

|     |       |                                                                          |
| --- | ----- | ------------------------------------------------------------------------ |
|     | a.    | No perfume, cologne, toothpaste or other commercial scent                |
|     | b.    | Cloves                                                                   |
|     | c.    | Mint                                                                     |
|     | d.    | Lemon                                                                    |
|     | e.    | Beer                                                                     |
|     | f.    | Other readily identifiable alcoholic drink" [sic]                        |
| 7)  |       | Have them send us directly all this information plus                     |
|     | a.    | 3 test tubes of at least 10 milliliter blood samples                     |
|     | b.    | Large lock of hair (at least 1½ inches long) from your body where the sun does not shine (nape of neck if you have long hair, chest or pubic hair) |
| 8)  |       | Send the label of all the ingredients you were taking prior to cancelling |

Send us authorization to release records from your general practitioner or family medical center for any heart or liver test you have had in the last 5 years, or a statement that no such records exist.

This data often proves members are not drinking. Occasionally it helps us decide to suspend legal action. It is not a commitment to do so. If the data are inclusive, are you willing to take a lie detector test?

Henry 1st Decl. Attach. H at 4; see also Doc. 58-11 (Henry 1st Decl. Attach. J at 8-9).

At least one consumer submitted nearly all of the required information (except the hair sample and five notarized statements of friends) and ACF refunded approximately $5,800 of the $13,378 charge on her credit card when she attempted to cancel. ACF kept the remaining $7,578. Additionally, ACF did not "allow" the consumer to cancel unless she paid a lump sum $4,000 representing a "discount" to "pay off" her "commitment." JR Deposition at 48, 53-55, 57-58, 66, 80-81; see also (Doc. 58-33; Consumer 1 Decl. ¶ 15 ("In June 2007, Dr. Doug informed me that the Board had agreed to refund 50% of the $13,378, minus three months that I owed, under the condition that I sign a notarized settlement agreement committing to continue my membership with ACF and make regular monthly payments until March 2010. . . . On August 2, 2007 I signed the notarized settlement agreement because I wanted to avoid a lawsuit as the ACF had previously threatened, and I could not afford to make such a large single payment. . . . As a result, I received a refund from the ACF for $5,879.12.")).

Decl. Attach. J; 11/6/08 E-Mail ($14,038 Due NOW!"); Doc. 58-12 (Henry 1st Decl. Attach. K 11/6/08 Breach of Contract E-Mail ($13,098 due NOW!")).  Other earlier dunning e-mails contained slightly different assertions, such as representing to the customer that the customer "agreed" "[t]o pay us for 52 months which is defined as the time required to be sure Cures are Permanent."  (Doc. 58-13 (Henry 1st Decl. Attach. L; 2/2/07 E-Mail).

> By suggesting premature termination of your membership, you have triggered your preauthorization to charge you AMEX card for your entire financial obligation at once.  Your weak excuse unrelated to being cured, your submission of Diaries, and our astounding track record effectively prove you have been cured.

Id. at 1.  Because the customer was deemed "cured," "Our terms and conditions make it even clearer, and reduce your obligations from the lifetime obligations we say elsewhere, to the 52 months of the boilerplate legal language."  Id.  Warning one customer against stopping payment on his credit card, Krotzer stated that "**[o]ur chargeback department wins far more than half its cases, and has won 8 out of 8 of our last chargebacks.**"

Id.  And in a particularly caustic passage, Krotzer told the customer:

> We have many alcoholics members who are not nice people.  You are not our first cured alcoholic to attempt payment evasion.  Unless you quickly understand your legal position today, you are starting a long process which is likely to restart your disease and cost you the entire amount we collected today, plus thousands more.
>
> You should think carefully.  Everyone involved in your case (including your local media should this become a lawsuit) will focus on you saving more the **$x/day** on alcohol (your Cure Dividend).  No one sides with cured alcohol abusers who are saving all that money while their life is being saved and incredibly refuse to share some of those benefits with their liberator.

Id.

## 7. <u>Finances</u>

Krotzer advises the consumer that "disclaimers" contained in the ACF Website create a "contract" which authorizes him to place charges amounting to the "full cost" of the Permanent Cure Program on consumers' accounts because the customers were "cured" or they cancelled "prematurely." Then, unbeknownst to the consumer, and without their express authorization, Krotzer actually charges thousands of dollars to the consumers' credit accounts. <u>See</u> LS Deposition at 24-25, 35 (upon the consumer's attempted cancellation, Krotzer charged the consumer's credit card twice, once for $800, and a second time for $12,000 without authorization); JR Deposition at 48 (charging consumer's credit card $13,378 without authorization); (Doc. 58-11 (Henry 1st Decl. Attach. J; 11/6/08 E-Mail at 1-9, and Attachment K 1/6/08 Breach of Contract E-Mail at 1-9; Doc. 58-55 (Consumer 3 Decl. ¶ 9-10 (Krotzer stating to consumer that consumer had agreed to immediately pay 52 months in fees; charging consumer's credit card $7,000 without authorization, and threatening that consumer still owed $13,527.96 which he would collect by agreement or by suing consumer)[12]); (Doc. 59 (Consumer 5 Declaration ¶ 7 (Krotzer told Consumer 5 that

---

[12] On February 2, 2007, Krotzer wrote to Consumer 3 in part as follows:

**By the way, you may have noticed when you refuse to follow the program for 5 months you are deemed cured, since you did not do your part. That is the essence of why we will win.**

DD

***Hopefully you are reading this not right after you "12 beers" and you might try thinking before your next moves.***

(Doc. 58-58 (Consumer 3 Decl. Ex. C at 3)).

he "had charged me $13,527.96 for violating a so-called contract by canceling")); (Doc. 58-16 (Henry 1st Decl. Attach. O (internal ACF flow chart showing cancellation practices)).

At various times, Defendants had credit card processing accounts with Independent Bankers Bank and First Data Card Services. Krotzer Admission 126, 128. However, because of a high rate of consumer "charge backs" of Defendants' fees, First Data Card Services and Independent Bankers Bank terminated the accounts. Henry 1st Decl. ¶ 15. Defendants also had a PayPal account for internet payments. Henry 1st Decl. ¶¶ 9, 10; (Doc. 58-6 at 2; Henry 1st Decl. Atts. E and F; PayPal Websites).[13] On January 31, 2010, PayPal informed the FTC they had terminated Defendants' account on December 19, 2009, for violating their 'Acceptable Use Policy.'" Henry 1st Decl. ¶ 11.

Based on financial records recovered, the FTC determined that as of October 2008, ACF received $425,396 in credit card payments from consumers, and as of January 2010, ACF received approximately $291,084 in payments from consumers through PayPal. Henry 2d Decl. ¶¶ 4, 5. "The financial records . . . show that Defendants' total revenue, including refunds, from May 2005 to January 2010 from all sources . . . was approximately $716,480." Id. ¶ 6; accord (Doc. 53 at 3 (Krotzer Amended Answer ¶ 7 ("$700,00 gross revenue over 5 years")). ACF documents contain the names of 405 individual consumers, with 155 of those consumers making at least one entry in their ACF "diary." Henry 2d Decl. ¶ 7. Krotzer

---

[13] The "Heavy Drinker" PayPal Website for Alcoholism Cure Foundation sets forth the above-stated costs, and represents that the payment was for "Very Heavy Drinker Membership +Free Assessment, $3.33/Day, Increases ONLY if Drinking Down: By Half-$6/Day, Social Drinker-$9D." The link also represents that "Amounts CHEERFULLY REFUNDED unless mostly paid by CURE DIVIDEND [sic] as explained." The second PayPal link represents "'VIRTUALLY FREE" - Savings pay all but a few hundred dollars [sic]. Have Read & Accept All Terms & Conditions." PayPal Websites

admits that approximately 450 consumers purchased the Permanent Cure Program. Krotzer Admission 123.

### 8. Relations With Consumers

#### a. FTC's Investigator's Phone Conversation With Defendant Krotzer

On September 12, 2008, FTC investigator Henry conducted an undercover phone call to ACF, calling the number listed on the ACF Website, posing as a potential customer, and recording the conversation. She spoke with a man who identified himself as "Dr. Doug." Henry 1st Decl. ¶¶ 19, 20, 21; (Doc. 58-17 (Henry 1st Decl. Attach. P; 9/12/08 Telephone Conversation Transcript (Tr.)). While acknowledging that he is not a medical doctor, "Dr. Doug" said that "my doctorate is from Harvard." 9/12/08 Telephone Conversation Tr. at 5. Later in the conversation, "Dr. Doug" stated that "quite frankly, medical doctors know very little . . . about how to cure alcoholism. . . . We do have a medical doctor who's available. He's a guy that we cured from alcohol. And he's available if we'd need him. But quite frankly, we don't. " Id. at 25-26. "Dr. Doug" told the prospective customer that he has been an alcoholic all of his life, as had members of his family, and that in 1996, he began researching "the nutraceutical area." Id. at 5. "Dr. Doug" said that he spent

> about $150,000 having a team of top-notch scientists go over everything that was known at the time. And we isolated 15 different ingredients with 50 different molecules, all of which had some effect on alcoholism and that's been proven by very reputable scientific experiments. The bibliography is on the website. There's about a thousand medical journal articles that say that these ingredients have some effect on alcohol some of the time. . . . [T]he basic principle was that by using combinations, about which we can make pretty good guesses based on your assessment.

Id. at 6. "[C]ombining them is so important. We call it molecule multiplicity." Id. at 17. "Dr. Doug" stated: "the guarantee that we give you is that you'll be at least drinking down half within five months, but about half of our members are cured within one to ten weeks. Id. at 7. But

> once we get your drinking down, that doesn't mean you're permanently cured. . . . It takes us quite a bit of time to be sure that they're long-term, and during that time, we do all of this for almost no money at the beginning. And so, while you're paying us money out of the money that you're saving from not drinking alcohol, we're learning exactly what it takes to make sure you're permanently cured.

Id. at 7.

As to costs, "Dr. Doug" stated:

> [T]he monthly fee starts off low and it steps up as you're cured. If we're slow in curing you, you can get a partial refund to keep the fee at the same base level. . . . And then once you're cured, it goes to the full amount, which is almost always less than you're already spending on alcohol so that you actually save money every month. . . The only thing that is extra is the ingredients . . . ."

Id. at 29. "Dr. Doug" stated that the cost for the "heavy drinker" program starts at $3 a day, climbing to $6 a day in the fourth month. Id. at 35. When asked about cancellation, "Dr. Doug" responded, "No, once we have you . . . once you have started on the program, you have what will cure you. . . And so, the . . . the only reason you can cancel is if that does not cure you." Id. at 38-39. "Dr. Doug" represented that ACF is a "charitable foundation," but that payments "are tax deductible as medical expenses." Id. at 46. Additionally, he assured the prospective customer that ACF "guards" the names of its members "jealously" using "ironclad security"; "our security is second to none" Id. at 46-47.

-37-

### b.    Consumers' Statements

In the course of her investigation, FTC investigator Henry identified 235 consumer complaints regarding ACF and the Permanent Cure Program.  Henry 1st Decl. ¶ 12.[14] Krotzer was aware of consumer complaints against Alcoholism Cure Corporation made to the Florida Office of the Attorney General and to the Better Business Bureau, as well as the "chargeback" requests made by consumers.  Krotzer Admissions 117, 118, 120.

Plaintiffs have submitted evidence that consumers relied upon the ACF Website representations relating to scientific and medical support for the Permanent Cure Program. See Docs. 123-1 at 932, 956, 1013 (Henry 2d Decl. Attachs. D, E and F (LS Dep. at 12, 14; JR Dep. at 11; RJ Dep. at 14)).  Specifically, Plaintiffs have submitted excerpts from the depositions of three consumers, and Declarations of nine consumers.  One of those consumers thought Krotzer was a medical doctor based upon the ACF Website, only to learn after he signed up for the Permanent Cure Program that Krotzer was not.  LS Dep. at 16.  Another believed medical doctors were involved in the Program based upon the photos of a man in a white jacket on the ACF Website and references to "Dr. Doug."  JR Dep. at 11-

---

[14]    Investigator Henry stated:

> I identified (13) complaints of which three complaints had been filed using [the FTC's Consumer Information System] and eleven (11) complaints had been filed with the [Better Business Bureau].  I also identified approximately 200 complaints in the Documentation provided by Defendants in response to the FTC's Civil Investigative Demand ("CID") issued to ACF on September 11, 2008.  In addition to these 224 complaints, the Florida Department of Agriculture and Consumer Services provided the FTC with four (4) consumer complaints.  Also, the Florida State Attorney General's Office provided the FTC with seven (7) consumer declarations concerning grievances with ACF.

Henry 1st Decl. ¶ 12.

12; see also RJ Dep. at 15 (Website left customer with the "impression" that he was being "treat[ed]" by an "actual doctor"); Doc. 58-61 (Consumer 4 Decl. ¶ 5 ("[w]hile I did not expect my recommendations to come from a medical doctor, I thought that my recommendations would come from an individual with a PhD in a field related to the treatment of alcohol"). Moreover, the consumers believed that their personal information would remain anonymous and confidential, based upon the representations made in the ACF Website. See LS Dep. at 16-17; JR Dep. at 14-15; RJ Dep. at 17.

As to costs and cancellation, the consumers deposed testified as to their understandings, based upon the ACF Website. "I assumed in order to participate, an individual . . . needed to participate for 5 months and see how it went," and that if the Program did not cure alcoholism, the customer could cancel after five months without having to pay any additional money. JR Dep. at 12-13. JR said that when she signed up for the Permanent Cure Program, she believed she was committed to five months costing $99 a month. She testified that she did not read the "Terms and Conditions" on the ACF Website, and did not read any representation that she would be subject to accelerated payments if she cancelled the Program, or that she would have to submit proof that she was not cured in order to cancel. JR Dep. at 16-18; see also R.J. Dep. at 11, 19 ("I saw it as being five months" and then cancellable). "The web site was explicit in numerous locations that that was cancellable at any time. . . . That if I chose not to continue the treatment, that I would just notify them and it would be cancelled," without having to meet any special qualifications first. LS Dep. at 17 (who does not recall reading "Terms and Conditions" section of the Website); see also RJ Dep. at 35 (does not recall seeing terms and conditions); accord

(Doc. 58-33; Consumer 1 Decl. ¶ 4 ("I did not see any terms and conditions on the website"). LS said that he did not read on the Website before he signed up that if he was committing to a long-term contract, that if he cancelled the Program, he would subjected to having to pay advanced or accelerated fees, or that he would have to submit proof of continued drinking in order to cancel. LS Dep. at 18-19. LS testified that he did not authorize ACF to charge his credit card for 52 weeks of fees or for life. Id. at 28, 40. Krotzer never told the Consumers, nor did the Consumers have any understanding that by continuing to participate in the Permanent Cure Program, they were agreeing to pay $13,000 or more ($22,000) if they cancelled or that they were agreeing to pay for the program for 52 or 76 months. JR Dep. at 44; RJ Dep. at 33-34.

Plaintiffs also submitted Consumer Declarations (with the customers' names redacted). Each consumer recounted how they attempted to cancel the Permanent Cure Program, and how ACF placed unauthorized charges on their credit cards as a result. The first consumer recounted how ACF charged her credit card $13,378 when she attempted to cancel her "membership," and that she attempted to have $13,378 charged back from her credit card which was denied because she "had entered into a binding subscription with ACF." (Doc. 58-33; Consumer 1 Decl. ¶ 13). In total, the consumer paid ACF a sum of $18,300; her Declaration and the exhibits attached thereto, including e-mail exchanges with "Dr. Doug," recount the financial ruin that resulted from this ACF expenditure. See Consumer 1 Decl. and Exs.[15]

---

[15] "So far, we sold my husbands [sic] truck, borrowed all available funds against my teacher's retirement accounts, and opened a line of credit to cover the 'accelerated payments.'" (Doc. 58-37; Consumer 1 Decl. Ex. D at 5)). "My involvement with your organization has been financially draining and

(continued...)

A second consumer recounted how he signed up for the Permanent Cure Program over the phone (including providing his credit card information and e-mail address) in February 2007, after having seen the ACF Website. Although his medical doctor expressed concern that some of the ACF recommended dietary supplements would interfere with his prescription medication and suggested some changes, "Dr. Doug advised me to follow all of the ACF recommendations." (Doc. 58-48; Consumer 2 Decl. ¶ 7; Doc. 58-50; Consumer 2 Decl. Ex. B). By April, 2007, the consumer requested that his "membership be cancelled because Dr. Doug's recommendations were not working for me." Consumer 2 Decl. ¶ 8; Doc. 58-51, Consumer 2 Decl. Ex. C). Krotzer responded with the form letter to requests for cancellation, saying "You have violated your contract with us by demanding to cancel." (Doc. 58-52; Consumer 2 Decl. Ex. D). Krotzer stated in the e-mail response that "you preauthorized us to charge the unpaid balance of your fees to your credit card." Id. The consumer closed his bank VISA card in May 2007 to terminate his relationship with ACF. He had paid ACF a total of approximately $5,550. Consumer 2 Decl. ¶ 12. On January 2, 2010, Krotzer sent the consumer an e-mail threatening to sue the consumer if he did not make an "amnesty" payment of $1,889.72. Id. at ¶ 13 and Exhibit E.

Consumer Number 3 stated that he came across ACF after having conducted a search of the internet and signed up by phone using his credit card. (Doc. 58-55; Consumer 3 Decl. ¶¶ 1, 3, 5). The consumer began to follow the ACF recommendations on January 5, 2007, but, on January 30, 2007, informed "Dr. Doug" that he was terminating the

_____

[15](...continued)
a source of dispute in my marriage." (Doc. 58-45; Consumer 1 Decl. Ex. L at 2)).

Permanent Cure Program "as my cravings for alcohol had only increased and I could no longer tolerate the side effects of the recommendations." Consumer 3 Decl. ¶ 8; (Doc. 58-57; Consumer 3 Decl. Ex. B). On February 1, 2007, Krotzer informed the consumer that he was contractually obligated to pay for the program for a minimum of five months, and to pay 52 months for a permanent cure. "He also informed me that he had charged $7,000 to my credit card and that I still owed $13,527.96, which could be collected through an agreement or he would collect it by suing me." Consumer 3 Decl. ¶ 10; (Docs. 58-58 - 58-60; Consumer 3 Decl. Ex. C).

A fourth consumer recounted a similar experience. This consumer, who did not want his wife and two children to know how much he drank, chose to sign up for the Very Heavy Drinker Program on-line after reading the ACF Website and corresponding with "Dr. Doug" by e-mail in January 2006. (Doc. 58-61; Consumer 4 Decl. ¶¶ 3, 4); (Docs. 58-62, 63; Consumer 4 Decl. Exs. A and B)). The consumer followed the Permanent Cure Program recommendations for six months, paying his monthly fee with a Visa credit card through PayPal. Id ¶ 6. On August 10, 2006, the consumer sent an e-mail requesting that ACF cancel his account because "the recommendations were not working." Id. ¶ 8. The next month, ACF informed him that because his "exit interview" indicated that "ACF had cured my alcoholism," the consumer was obligated to pay $14,000 in order to cancel, or face a lawsuit. Id. at ¶ 10; (Doc. 58-65; Consumer 4 Decl. Ex. D at 8). The consumer then "received an email from ACF informing me that they had charged $8,400 to my Visa credit card as a settlement fee." Consumer 4 Decl. ¶ 11; (Doc. 58-66; Consumer 4 Decl. Ex. E). In order to avoid his family and co-workers learning about his relationship with ACF, the

consumer paid ACF the $8,400 "settlement," bringing his total payments to ACF to approximately $9,000. Consumer 4 Decl. ¶¶ 12, 14; Ex. E.

Consumer 5 signed her pilot husband up for membership with the ACF on November 25, 2006. The consumer upgraded to the "more expensive membership" after being reassured by ACF employee "Pam" "that I could cancel at any time." (Doc. 59 at 2; Consumer 5 Decl. ¶ 5). After receiving the dietary supplement recommendation from "Dr. Doug," the consumer became concerned that the side effects from the recommended supplements "would negatively effect my husband's work as a pilot." Id. ¶ 6. Despite assurances to the contrary from Dr. Doug, the consumer learned that the Federal Aviation Administration ("FAA") had determined that the "side effects . . . could adversely affect pilot performance," and that "supplements do not fall under FDA testing and monitoring and sometimes have unlisted ingredients." Consumer 5 Decl. ¶ 6; (Docs. 59-2, 59-3; Consumer 5 Decl. Ex. A at 10 and Ex. B at 1). On November 29, 2006, the consumer e-mailed ACF to cancel the membership. "As a result, Dr. Doug told me that the ACF had charged me $13,527.96 for violating a so-called contract by cancelling." Consumer 5 Decl. ¶ 7; (Docs. 59-4, 59-5; Consumer 5 Decl. Exs. C and D at 1). A later e-mail from "Dr. Doug," dated December 20, 2006, and entitled "**PLEASE DO NOT PUT YOUR HUSBANDS** [sic] **JOB IN FURTHER JEOPARDY**," threatened:

> As you know, a dispute will involve many people. Any one of them may feel a moral or legal obligation to report his alcoholism to the FAA. After all, totalling [sic] a car while drunk is not what anyone wants to read about pilots. We certainly feel that disclosure obligation, but we consider we are bound by doctor-patient privilege not to disclose it.

(Doc. 59-8; Consumer 5 Decl. Ex. G at 1); <u>see also</u> LS Deposition at 42 ("he was threatening to report my husband to the FAA"). The consumer was able to secure a $12,688.12 "charge-back" credit from her credit card company. Consumer 5 Decl. ¶ 10. Thereafter, in April 2007, "Dr. Doug e-mailed the consumer proposing a reduced settlement" of "25% of the original amount you owed," or $3,381, in order to avoid the cost and embarrassment of litigation. <u>Id.</u> ¶ 11; (Doc. 59-9; Consumer 5 Decl. Ex. H). In a January 4, 2010 e-mail, "Dr. Doug" threatened to sue the consumer for thousands of dollars unless she paid an "Amnesty Offer" of $1,889.72. Consumer 5 Decl. ¶ 11; (<u>see</u> Doc. 59-10; Consumer 5 Decl. Ex. I).

Amy Sams, investigator with the Economics Crimes Division of the State of Florida, Office of the Attorney General, submitted six additional consumer affidavits which accompanied their complaints about ACF. (Doc. 60; Sams Decl.). Consumer 6 submitted a complaint and sworn affidavit and supporting documentation on March 1, 2007. Sams Decl. ¶ 5. "When [Consumer 6] attempted to cancel her participation in the Program, she had paid a total of $149.92. Mr. Krotzer threatened legal action and advised her that he would collect $13,137.08." <u>Id.</u>; (<u>see also</u> Docs. 60-1- 60-3; Sams Decl. Attach. A, Consumer 6 Aff.).

Consumer 7 learned of the ACF program through an "internet advertisement." (Doc. 60-14; Consumer 7 Aff. at 1). Consumer 7 attempted to cancel her participation in the ACF Permanent Cure Program after having paid $957.87, and Krotzer threatened legal action to collect $14,038.00. Sams Decl. ¶ 6. Consumer 7 wrote:

> On May 4th, 2006, at a particularly difficult time of my life, I sought help for drinking too much by researching treatments on the web. I found The Alcoholism Cure Foundation site and called to ask more questions. I spoke with a man who referred

> to himself as Dr. Doug (real name Robert Krotzer) who claimed
> they had a 90% cure record through use of "neutraceuticals".
> After talking to him, I decided to give it a try and signed up. I
> was told I would be assigned a doctor who would be in constant
> touch with me and would develop a plan of ingredients for me
> to take that was, supposedly, tailored to my specific physical
> needs.
>
> After receiving this information and . . . giving my American
> Express card to make payments, I purchased the
> neutraceuticals (such as niacin, St. John's Wort, vitamin B,
> Kudzu) and proceeded to take them as prescribed. The doses
> recommended were far beyond what the FDA suggests but I
> was assured this was safe. I was supposed to increase my
> doses weekly but after the first week or so, I began to have very
> uncomfortable responses (nausea, severe diarrhea, strong
> flushing from the niacin that would not go away and I felt very
> uncomfortable in general. I told this to Doug, . . . and he told me
> to increase at a lower rate which I did but I felt so lousy, I
> discontinued and quit a month later.

Consumer 7 Aff. at 4. Consumer 7 attempted the treatment again, experienced the same

symptoms, and quit again. On December 29, 2006, Krotzer sent Consumer 7 a certified

letter "re: Additional Strong Evidence Confirming Your Cure - Your Refusal to Answer

Questions $14,038 Due NOW!" and threatened legal action. Id. at 6.

Consumer 8, who submitted a complaint to the state of Florida in December 2009,

stated that he attempted to cancel with ACF after having paid ACF $1,579.68, "Mr. Krotzer

threatened legal action and advised [Consumer 8] that he would collect $ 22,706.00." Sams

Decl. ¶ 7. Consumer 8 also learned of ACF through an "internet advertisement." (Doc. 60-

16; Sams Decl. Attach. C, Consumer 8 Aff.). Consumer 8 stated:

> After a couple of weeks of following the program I began to have
> physical symptoms of high blood pressure and nausia [sic]. I
> spoke with my Dr. and he advised me to stop taking any and all
> of the medications recommended by the foundation. I
> attempted to cancelle [sic] my membership several times and

> was told I would be sued for thousands of dollars. The foundation claims to have cured my disease of alcoholism.

Id. at 2. On November 11, 2009, Krotzer wrote to Consumer 8 that he should be "careful where you spread libel about us. Depending on how you count, that adds $100,000 or $200,000 to the amount you already cannot afford. You already know you have breached our contract, and we win regularly in court and arbitrations." Id. at 26.

Consumer 9 found ACF through an internet search. "When [Consumer 9] attempted to cancel her participation in the Program, she had paid a total of $839.84. Mr. Krotzer threatened legal action and immediately charged her credit card for $12,688.12." Sams Decl. ¶ 8. Consumer 9 found ACF through an "Internet search" on November 25, 2007. (Docs. 60-17 - 60-23; Sams Decl. Attach. D, Consumer 9 Aff.). Consumer 9 said he "received notice I was 'in breach of contract' and my credit card was charged $13,527.96. ($839.84 + 12,688.12)". Id. at 2.

Consumer 10 submitted a complaint to the State of Florida on January 7, 2008. Krotzer threatened legal action against Consumer 10 when Consumer 10 attempted to cancel his participation in the ACF Program after having expended $2,729.56. Sams Decl. ¶ 9. Consumer 10 discovered ACF "while surfing the internet," and after reading the ACF Website claims, he "decided to give it a try." Consumer 10 followed the ACF recommendation, purchasing and taking several varieties of over the counter "vitamins" - "ingesting over 30 vitamin tablets a day" - and experiencing such side effects as "dizziness, sour stomach, and diarrhea." (Doc. 60-24; Sams Decl. Attach. E, Consumer 10 Aff. at 5). When he communicated that he wished to "exercise my 6 month cancellation notice," ACF

replied that Consumer 10 had entered into a 76-month contract and was obligated to pay the full amount. Id. at 5-6.

And Consumer 11 told the State of Florida that when she attempted to cancel her participation in the Program, after having paid $1,397.00, "Mr. Krotzer threatened legal action and advised [Consumer 11] that he would sue her for $13,638.00." Sams Decl. ¶ 10; (Doc. 60-38; Sams Decl. Attach. F, Consumer 11 Aff. at 11). Consumer 11 recounts her experience as follows:

> In January 2007 I was seeking help for an alcohol problem. I went on line and found this organization. . . . They offer help and support by doctors. They state that they have a cancellation policy. They state that this is a "Guaranteed Cure." They lead you to believe they are a "Foundation." When in fact they are a business.
>
> They continue to claim they cure 100% of their "members," as they responded to the complaint I filed with the Better Business Bureau in Jacksonville.
>
> The company states that they have a five (5) month cancellation policy. The company states that they have a scientific formula for this cure. The company states that I would have to purchase the ingredients in the formula. The company states that they are there to support you.
> . . .
>
> As soon as I purchased the "formula," and began to take it, I began to have adverse affects [sic]. I was nauseous, I had stomach pains continuously and due to the shear quantity of pills, I obtained acid reflux. When I called to get the support that was promised, I was told I could only do so via email through my diary once per month. As I continued to write, to no avail, I again called and was told that I may not call. I was told that I take up too much valuable time and I am to only send email via diary.
> . . .

> Finally I simply emailed them on the third month and let them know that this was not only not working, but I was still very sick, (I was scared to stop taking the stuff due to the cancellation policy) and I need to know how to get out, what the cancellation policy was. They immediately sent me an email stating that I breached the contract. They charged my credit card another $1,000. I immediately stopped that credit card and wrote to the company. . . .
>
> . . .
>
> When I called them because they took the $1,000 . . . [t]hey . . . told me I could no longer take advantage of the cancellation policy and that they would be taking the $13,000 as quickly as they could.

Id. 5-6.

Krotzer sent the same form cancellation letters to each of the aforesaid consumers, tailoring them somewhat to the Consumer's situation.

### 9. **Privacy breaches**

The ACF Website stated that the "Doctor-Patient Privilege plus high level security assurances are important benefits" of the Permanent Cure Program, and (on the Assessment page) that "Confidentiality: All your personal information is protected by doctor patient privilege and high level unencrypted security measures that have never been breached." ACF Website at 23; see Krotzer Admissions 64, 65. On the Privacy page, the Website states that "Under no circumstances will we sell or share your identity for commercial purposes to anyone, ever, period. Your records are protected by us, Norton Internet Security Systems and PayPal ultra secure payment technology. Each the best in their class." ACF Website at 57; see Krotzer Admission 66.

However, Krotzer made veiled threats to expose the names of consumers who attempted to cancel their participation in the ACF Program. See Henry 1st Decl. Attach. K

at 4 (Krotzer e-mail to a consumer stating "Avoid the hassle and expense of messy litigation and its perhaps unwanted publicity by making a one-time discounted payment"); LS Dep. at 42 ("he was threatening to report my husband to the FAA"); JR Deposition at 52 (Krotzer's threat of a lawsuit would be "a public thing. That's a public record. Your name is out there with that and that . . . would also have been damaging"); RJ Deposition at 36-37 (threat of lawsuit and resultant publicity caused consumer, a pilot, to sign back up with ACF); Consumer 4 Decl. ¶¶ 10, 12 and Ex. D (consumer disturbed that ACF sent to her office a certified letter readily identified as being from Alcoholism Cure Foundation, regarding her attempted cancellation, "put[ting] my privacy at risk").

Defendants disclosed consumers' sensitive health information to third parties. For instance, several ACF responses to inquiries from credit card companies and the Better Business Bureau attached e-mails between Krotzer and the consumer that discussed the consumer's medical issues and treatment. Additionally, ACF provided these entities with security information that gave them access to ACF's files, which included sensitive consumer health information. Henry 1st Decl. ¶ 17; (Doc. 58-14; Henry 1st Decl. Attach. M (E-Mail to debt collector "Sean")); (Doc. 93-1 at 43-49; 2/8/11 Henry Decl. Attach. E at 1-7 (Krotzer Letter to credit card company regarding charge-back, and including initial health and personal Assessment completed by "Complainer" Consumer). Defendants revealed the identities of at least 11 purchasers of the Permanent Cure Program in small claims lawsuits, filed against consumers who attempted to cancel the Permanent Cure Program. Krotzer Admissions 70, 109.

### 10.    Post Complaint Activity

By April 9, 2010, the ACF Website, http://www.alcoholismcure.org, appeared to be inactive, consisting of a one-page "placeholder" page bearing the statement that the site was "under construction."  Henry 1st Decl. ¶ 23; (Doc. 58-20; Henry 1st Decl. Attach. S)).  Henry determined that on February 25, 2010, Krotzer had registered a new website: http://www.enjoyafew.com (Enjoy A Few Website), which is very similar to the Alcoholism Cure Website, with many of the pages appearing to be the same, with the same pictures and multiple hyperlinks.  Henry 1st Decl. ¶¶ 24, 25; (Doc. 58-21 at 2-29; Henry 1st Decl. Attach. T ("4/16/10 Enjoy A Few Website").  On May 26, 2010, a person named "Magic Krotzer" (referred to by "Dr. Doug" in the taped telephone conversation as his wife, registered another new website entitled http://www.guiltfreedrinking.com ("Guilt Free Website").  Henry 1st Decl. ¶ 26; (Doc. 58-24; Henry 1st Decl. Attach. U); Krotzer Admissions 11-13; see 9/12/08 Telephone Conversation Tr. at 50.  The Guilt Free Website was on-line throughout the summer and early fall of 2010.  Henry 1st Decl. ¶ 28; (Docs. 58-26, 58-27, 58-28 at 2 (Henry 1st Decl. Attachs.W, X, Y (Guilt Free Website on 7/27/10 and 9/28/10)).  The Guilt Free Website consists of approximately six pages; a home page, assessment page, terms and conditions, secure sign-up page, and privacy policy, plus 44 hyperlinks, most of which direct the user to the same six pages within the Guilt Free Website, and approximately 17 hyperlinks directing the user to the assessment page.  Henry 1st Decl. ¶¶ 33-35.

Krotzer registered the website http://www.dougkrotzer.com on June 18, 2010.  Henry 1st Decl. ¶ 27; Krotzer Admissions 11-13; (Doc. 58-30; Henry 1st Decl. Attach. Z ("8/27/10 Doug Krotzer Website")).  The five-page website promotes Krotzer as an "innovative"

"creative troubleshooter," with "spectacular successes" in diverse industries. 8/27/10 Doug Krotzer Website. One of the Doug Krotzer Website 36 hyperlinks directs the user to the Guilt Free Website. Henry 1st Decl. ¶ 36. On September 10, 2010, FTC investigator Henry accessed Krotzer's profile on the professional network information exchange website http://www.linkedin.com. There, she found Krotzer's summary. Henry 1st Decl. ¶ 37; (Doc. 58-31 at 2; Henry 1st Decl. Attach. AA (Linked In Website)). In his summary, Krotzer lists that he is "Founder/President" of "Florida for profit charity at Guilt Free Drinking," and has held that position from 1995 to the present. He provides hyperlinks to the Guilt Free Website and the Doug Krotzer Website. Krotzer represents that Guilt Free Drinking provides "THE ONLY LONG TERM SOLUTION FOR PROBLEM DRINKERS" and that "Payment [is] contingent on success, making a $20,000 fee 'Virtually Free.'" Linked In Website at 1-5.

Defendants started www.guiltfreedrinking.com after the Stipulated Preliminary Injunction was entered. Since the entry of the Preliminary Injunction, Krotzer has received at least $11,000 from consumers. Krotzer Admissions 132, 146.

B.     FTC and State of Florida's Complaint

Plaintiffs initiated this action on March 29, 2010, by filing a seven-count Complaint for Permanent Injunction and other Equitable Relief against Defendants. (Doc. 1; Complaint). In the Complaint, Plaintiffs seek injunctive and equitable relief against Defendants, based upon alleged violations of sections 5(a) and 12 of the FTC Act and FDUTPA. See Complaint at 2. Counts I through VI are brought by the FTC against Defendants alleging violations of Sections 5(a) and/or 12 of the FTC Act for various aspects of Defendants' conduct. The State of Florida, Office of Attorney General, brings Count VII

of the Complaint, alleging that Defendants violated the FDUTPA based upon Defendants'
various representations and charge backs.  It alleges that "Defendants have engaged in
representations, acts, practices, or omissions that are material, and which are likely to
mislead consumers under the circumstances," constituting "deceptive acts or practices" in
violation of the FDUTPA.  Id. ¶¶ 57-59.

Defendant Krotzer answered the Complaint generally denying its allegations.  (Doc.
53; Answer at 2, 10).[16]  Krotzer has asserted an estoppel affirmative defense, contending
that Plaintiffs' "multiple stopping of investigation activity after hearing Defendants [sic]
responses, helped Defendant reasonably conclude the complained of activities were not
viewed as materially violative of law." Answer at 14.[17]  ACF has not answered the Complaint
and thus is in default. (Doc. 47; Clerk's Default). As such, the instant motions for summary
judgment relate to Krotzer only.

C.    **Stipulated Preliminary Injunction**[18]

Upon the filing of their Complaint, Plaintiffs indicated that they were prepared to file
a Motion for Preliminary Injunction.  (See Docs. 2 at 1; 3 at 2; 10 at 2).  However, on May
6, 2010, Plaintiffs filed an Unopposed Motion For Entry Of A Stipulated Order For
Preliminary Injunction, in which the Plaintiffs stated that "the parties have agreed to a

---

[16]    Though listed as an affirmative defense of "Lack of Harm and/or Damages Fail To State A
Claim No Violations of the FTC or Florida Acts As A Matter Of Law," the Court determined to treat the
"defense" as a specific denial."  (Doc. 77; 12/13/10 Order at 4, 6).

[17]    The remaining affirmative defenses were either stricken or re-construed as a denial of the
claims.  (Doc. 77; 12/13/10 Order at 5-6).

[18]    Section 13(b) of the FTC Act gives a court the authority to issue a permanent injunction.  15
U.S.C. § 53(b).  As an incident to that authority, the Court may also enter a preliminary injunction.  FTC
v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984).

Stipulated Order for Preliminary Injunction that obviates the need for Plaintiffs to file a Motion for Preliminary Injunction." (Doc. 10; Unopposed Motion for Stipulated Preliminary Injunction at 2). The parties forwarded the proposed Stipulated Preliminary Injunction to the Court for the Court's review, (see Doc. 11), and on May 26, 2010, the Court granted Plaintiffs' Unopposed Motion for Entry of a Stipulated Order for Preliminary Injunction. (Doc. 12; 05/26/10 Order). The Court signed and docketed a Stipulated Order for Preliminary Injunction, as modified by the Court, which was also signed by the parties, including Krotzer, Alcoholism Cure by Krotzer, its president, and L. Michael Maddox, attorney for Defendants Alcoholism Cure and Krotzer. (Doc. 12-1; Stipulated Preliminary Injunction at 16). All sixteen pages of the Stipulated Preliminary Injunction were initialed by Krotzer.

Although Defendants entered the Stipulated Preliminary Injunction "without admitting or denying liability for any of the conduct alleged in the Complaint," id. at 1, the parties specifically agreed that "Plaintiffs have the authority to seek the relief they have requested" pursuant to the FTC Act and FDUTPA. Id. ¶ 3. The Stipulated Preliminary Injunction prohibits five categories of representations; requires clear and conspicuous disclosures of all fees and costs and material restrictions or conditions applicable to the purchase or cancellation of the product or service; prohibits unauthorized billing and the use or disclosure of personal consumer information; and requires cessation of collection efforts, and preservation of records.

Pursuant to the Stipulated Preliminary Injunction, Defendants[19] are prohibited from making a number of specific misrepresentations, including:

> making, or assisting others in making, directly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that a covered product or service:[20]
>
> A.　Cures alcoholism for most alcoholics who use it;
>
> B.　Cures alcoholism while allowing alcoholics to drink socially; or
>
> C.　Is more effective than other treatments for alcoholism.

Id. at 7.  The Stipulated Preliminary Injunction also prohibits Defendants from making

> any representation about the health benefits, performance, or efficacy of any covered product or service, unless the representation is non-misleading, and, at the time of making such representation, Defendants possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

Id. at 8.　Additionally, Defendants are prohibited from misrepresenting directly or by implication the conclusions of any tests, study or research including

---

[19]　The Stipulated Preliminary Injunction reaches "Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and their officers, agents, servants, representatives, employees, and all persons or entities in active concert or participation with them who receive actual notice of the Order . . . , in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any covered product or service, in or affecting commerce . . . ."  Stipulated Preliminary Injunction at 7.

"Defendants" is defined as Alcoholism Cure Corporation "and its successors and assigns," and Krotzer, individually, collectively, or in any combination.  Id. ¶ 1, 3.

[20]　"'Covered product' means any dietary supplement, food, or drug," and "'Covered service' means any health-related service or program, including, but not limited to, the Permanent Cure Program." Id. ¶¶ 9, 10.

-54-

misrepresenting that the product or service:

A.    Is scientifically proven to cure alcoholism; or

B.    Has been validated by a $35,000,000 research study.

Id. at 9.  Further, Defendants may not in any way misrepresent the "cost of any product or service; . . . [t]he terms or conditions of any cancellation policy; and [t]he expertise, training, education, experience, or qualifications of Defendant Krotzer or any employee or contractor of defendants," or "the manner or extent to which any information collected from or about consumers is used, disclosed, maintained or protected."  Id. at 10, 11.

Finally, the Stipulated Preliminary Injunction requires that Defendants "shall immediately cease all collection efforts on accounts or claims" arising from contracts or agreements between Defendants and "any person who purchase or registered for, or purportedly purchased or registered for, the Permanent Cure Program prior to the date of entry of this Order."  Id. at 12.  This prohibition requires Defendants to cease all collection efforts by them or third parties, cease furnishing negative information relating to any ACF customer to any consumer reporting agency, and refraining from filing lawsuits or arbitration proceedings against any such customer.  Id.

## II.    **Standard of Review**[21]

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[22] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).

---

[21]    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 53(b) and 57b. This action arises under 15 U.S.C. § 45(a)(1). Defendants maintained a substantial course of trade in the offering for sale and the sale of services, in the form of purported "cure" for alcoholism, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act. 15 U.S.C. § 44. The Court rejects Krotzer's suggestion that "the Court exercise its discretion to refuse jurisdiction as this case is de minimis, odious and unfair." Defendant's Motion for Summary Judgment at 26.

[22]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  A non-moving party "cannot merely rest upon his bare assertions, conclusory allegations, surmises, or conjectures." FTC v. 1st Guaranty Mortgage Corp., No. 09-cv-61840, 2011 WL 1233207, at *17 (S.D. Fla. March 30, 2011)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  "[T]he non-moving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Bryant v. U.S. Steel Corp., No. 10-13165, 2011 WL 2150193, at *2 (11th Cir. May 31, 2011)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T-Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). Upon review of cross-motions, "the Court must determine whether either party deserves judgment as a matter of law on the undisputed facts." Id. Thus, the court must view the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolve all reasonable doubts about the facts in favor of the non-moving party Amer. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005).

Particularly pertinent here, where the parties have flooded the Court's docket with "exhibits," many of which include argument, charts, and summaries of information compiled by Defendant Krotzer, is the new Rule 56 admonition: "The court need consider only the cited materials, but it may consider other materials in the record." Rule 56(c)(3). The Court need not "undertak[e] an independent search of the record." Rule 56(c)(3) advisory committee's note 2010 Amendments. Additionally, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Id. at 56(c)(2). "The burden is on the proponent [of the evidence] to show that the material is admissible as presented or to explain the admissible form that is anticipated." Rule 56(c)(2) advisory committee's note 2010 Amendments.

Finally, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion; [or] grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it." Rule 56(e)(2) and (3). Thus, "[s]ubdivision (e)(2) authorizes the court to consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied." Rule 56(e)(2) advisory committee's note 2010 Amendments.

## III.  The Federal Trade Commission Act

The FTC is authorized to initiate proceedings in federal district court to enjoin violations of the FTC Act, in order to secure such equitable relief as may be appropriate, and to obtain consumer redress. 15 U.S.C. §§ 53(b), 57b. See e.g. FTC v. Holiday Enter., Inc., No. 1:06-CV-2939-CAP, 2008 WL 953358, at *1 (N.D. Ga. Feb. 5, 2008); FTC v. Capital Choice Consumer Credit, Inc., No. 02-21050 CIV, 2004 WL 5149998, at *2 (S.D. Fla. Feb. 20, 2004), aff'd 157 F. App'x 248 (11th Cir. 2005). The FTC's arguments on summary judgment are premised upon its allegations that Krotzer and ACF violated Sections 5 and 12 of the FTC Act. Section 5 of the FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a). Section 12 addresses false advertising and provides that the dissemination of false advertisements - defined as advertisements that are misleading in a material respect - is an unfair or deceptive practice. 15 U.S.C. §§ 52(b) and 55.[23] A violation of Section 12, dissemination of false advertising, constitutes a deceptive

---

[23]  Section 12 provides:

§ 52. Dissemination of false advertisements

(continued...)

act or practice in violation of Section 5(a). <u>FTC v. Nat'l Urological Group, Inc.</u>, 645 F. Supp.2d 1167, 1188 (N.D. Ga. 2008), <u>aff'd</u> 356 F. App'x 358 (11th Cir. 2009), <u>reh'g denied en banc</u>, 401 F. App'x 522 (11th Cir. 2010; <u>cert. denied</u>, 131 S.Ct. 505 (2010). "Given the strong similarity between the terms 'deceptive' and misleading', it is no surprise that sections 45 and 52 are sometimes applied in tandem as the basis for an FTC action against an alleged false advertiser; indeed, such a tandem reading is expressly allowed by 15 U.S.C. § 52(b)." <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 624 F.3d 1, 7-8 (1st Cir. 2010)(citing 15 U.S.C. §§ 45 and 52).

The FTC Act defines "false advertisement" as follows:

> The term "false advertisement" means an advertisement, other than labeling, which is misleading in a material respect; and in determining whether any advertisement is misleading, there shall be taken into account (among other things) not only

---

[23](...continued)
(a) Unlawfulness

It shall be unlawful for any person, . . . or corporation to disseminate, or cause to be disseminated, any false advertisement -

  (1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or

  (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics.

(b) Unfair or deceptive act or practice

The dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in or affecting commerce . . . .

15 U.S.C. § 52.

> representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the commodity which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual. . . .

15 U.S.C. § 55(a)(1). "Two types of false advertising are actionable: '(1) advertising which makes claims which are literally false on their face, and (2) advertising which, although literally true on its face, is perceived by a significant proportion of the relevant market as making "subliminal" or "implicit" claims which are provably false. With regard to the second type of false advertising, the courts sometimes say that the advertising has a tendency to mislead, confuse or deceive.'" FTC v. Bronson Partners, LLC, 564 F. Supp.2d 119, 124 (D. Conn. 2008)(quoting Schering Corp. v. Pfizer Inc., 189 F.3d 218, 229 (2d Cir. 1999)). Thus, even if individual statements in an advertisement are literally true, a representation will be found to be deceptive and in violation of Section 5 of the FTC Act if its net impression is likely to mislead consumers. FTC v. Braswell, No. CV 03-3700 DT (PJWX), 2005 WL 4227194, at *5 (C.D. Cal. Sept. 27, 2005)

To establish liability under Sections 5 and 12 of the FTC Act for deception and false advertising, the FTC must prove: (1) that there was a representation; (2) that the representation was likely to mislead customers acting reasonably under the circumstances; and (3) that the representation was material. FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); see also FTC v. Peoples Credit First, LLC, 244 F. App'x 942, 944 (11th Cir. 2007). "Section 5 of the FTC Act is to be applied broadly to protect the public interest . . . ." FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *32. "[C]aveat

emptor is simply not the law . . . ." <u>FTC v. Tashman</u>, 318 F.3d at 1277.  The FTC alleges

deception and false advertising claims in Counts I - V of the Complaint.  In Count VI, the

FTC alleges an "unfair practice" claim.  "[S]ection 5 [of the FTC Act] by its very terms makes

deceptive and unfair practices distinct lines of inquiry . . . . [W]hile a practice may be both

deceptive and unfair, it may be unfair without being deceptive." <u>Orkin Exterminating Co. v.

FTC</u>, 849 F.2d 1354, 1367 (11th Cir. 1988)(citation omitted).  "[T]he unfairness doctrine

'differs from and supplements, the prohibition against consumer deception.'" <u>Id.</u> (citation

omitted).  "'To justify a finding of unfairness the injury must satisfy three tests.  It must be

substantial; it must not be outweighed by any countervailing benefits to consumers or

competition that the practice produces; and it must be an injury that consumers themselves

could not reasonably have avoided.'" <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 569 F. Supp.2d

285, 299 (D. Mass. 2008)(citation omitted), <u>aff'd</u>, 624 F.3d 1 (1st Cir. 2010); 15 U.S.C. §

45(n).  "While conduct must meet each of these prongs to be deemed unfair, 15 U.S.C. §

45(n), conduct that is unfair violates section 5(a) of the FTC Act." <u>FTC v. Capital Choice

Consumer Credit, Inc.</u>, 2004 WL 5149998, at *37 (citing <u>Orkin Exterminating Co.</u>, 849 F.2d

at 1364).  Unlike a "deceptive practice" claim, proof of consumer injury is required to

establish liability for an "unfair practice."  <u>See</u> <u>FTC v. Braswell</u>, 2005 WL 4227194, at *4.

### A.    Representation

The first element in a deceptive act or practices claim under Section 5 of the FTC, is

that there was a misrepresentation.  Although "[t]he meaning of an advertisement, the claims

or net impressions communicated to reasonable consumers is fundamentally a question of

fact," the question "may be resolved by the terms of the advertisement itself or by evidence

of what consumers interpreted the advertisement to convey." <u>FTC v. Nat'l Urological Group, Inc.</u>, 645 F. Supp.2d at 1189. "When assessing the meaning and representations conveyed by the advertisement, the court must look to the advertisement's overall, net impression rather than the literal truth or falsity of the words in the advertisement." <u>Id.</u> (citing <u>FTC v. Peoples Credit First, LLC</u>, No. 8:03-cv-2353-T-TBM, 2005 WL 3468588, at *5-6 (M.D. Fla. Dec. 18, 2005)(finding that an advertisement was implicitly deceptive by looking at the net impression that it was likely to make on the general public), <u>aff'd</u>, 244 F. App'x 942 (11th Cir. 2007)); <u>see also</u> <u>FTC v. RCA Credit Serv., LLC</u>, 727 F. Supp.2d 1320, 1329 (M.D. Fla. 2010); <u>FTC v. Capital Choice Consumer Credit, Inc.</u>, 2004 WL 5149998, at *32. "[W]hether a representation is likely to mislead reasonable consumers, must be determined 'by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.'" <u>FTC v. Peoples Credit First, LLC</u>, 2005 WL 3468588, at *6 (internal quotations and citations omitted).

> [T]he important criterion in determining the meaning of an advertisement [or representation] is the net impression that it is likely to make on the general populace.
>
> [T]he determination is not restricted to a consideration of what impression an expert or careful reader would draw from the advertisement [or representation], but rather involves viewing the [representation] as it would be seen by the public generally which includes the ignorant, the unthinking and incredulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions. Thus, being mindful of the fact that the buying public does not weigh each word in an advertisement or a representation, the Court will consider the impression that is likely to be created upon the prospective purchaser.

FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at *6 (quoting FTC v. Think Achievement Corp., 144 F. Supp.2d 993, 1010 (N.D. Ind. 2000)).

"Thus, implied claims as well as express claims may be deceptive, and a claim may be deceptive even though it is literally true." FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *32. Indeed, "[d]eception may be accomplished by innuendo rather than by outright false statements . . . ." Id. (internal quotations and citations omitted); see also FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at *6.

> The elements of a sales presentation that contribute to the net impression, and so to the representations conveyed, include the headline, general tone, the presence or absence of elements contradicting a general impression or tone, the interaction of all the different elements, and the juxtaposition of phrases within the presentation.

FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *32. Additionally, "fine print notices" appearing "on the reverse side" of a solicitation do not preclude liability for deceptive advertising; "[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." FTC v. Cyberspace.com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006).

"If the advertisement explicitly states or clearly and conspicuously implies a claim, the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1189; see also FTC v. QT, Inc., 448 F. Supp.2d 908, 958 (N.D. Ill. 2006), amended in part on other grounds, 472 F. Supp.2d 990 (N.D. Ill. 2007), aff'd, 512 F.3d 858 (7th Cir. 2008). Indeed, consumer survey evidence is not required to support a finding that an advertisement has a tendency to deceive. FTC v. Medlab, Inc., 615 F. Supp.2d 1068, 1077-78 (N.D. Cal. 2009). However,

if an advertisement implies a claim, the court need not conclude that the advertisement makes such a representation without evidence of consumer perceptions. FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1189.

B.    **Likely to Mislead**

To demonstrate the second element, whether a claim made is likely to mislead a reasonable customer, the FTC "may proceed under a 'falsity theory,' a 'reasonable basis theory,' or both." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citation omitted); see also FTC v. Garvey, 383 F.3d 891, 901 (9th Cir. 2004); FTC v. Pantron I Corp., 33 F.3d 1088, 1096 (9th Cir. 1994). "If the FTC proceeds under a falsity theory, it 'must demonstrate either that the express or implied message conveyed by the ad is false.' . . . If the FTC proceeds under a 'reasonable basis' theory, it must demonstrate that the advertiser lacked a reasonable basis - or adequate substantiation - for asserting that the message was true." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citations omitted); FTC v. Garvey, 383 F.3d at 901; FTC v. Pantron I Corp., 33 F.3d at 1096.

The "reasonable basis" theory is particularly applicable to efficacy claims made about health-related products. An advertisement that makes an objective product claim, containing affirmative information about a product's attributes, performance or efficacy, implies support by a reasonable basis. FTC v. Braswell, 2005 WL 4227194, at *8 (citing In the Matter of Thompson Medical Co., 104 F.T.C. 648, 813 (1984), aff'd 791 F.2d 189 (D.C. Cir. 1986), cert. denied, 479 U.S. 1086 (1987)).

> If the ad contains express representations regarding the particular level of support that the advertiser has for the claim or implies a particular level of substantiation to reasonable consumers, then the reasonable basis consists of the amount

and type of substantiation the advertiser claimed to have. . . . Typically, advertising that expressly or impliedly represents support by a scientific level of substantiation contains such words as "tested," "established," "here's proof" or "medically proven." . . . If such advertisement represents that a particular claim has been scientifically established, then the advertiser must possess a level of proof sufficient to satisfy the relevant scientific community of the claim's truth.

FTC v. Braswell, 2005 WL 4227194, at *8 (citations omitted). "When the FTC brings an action based on the theory that advertising is deceptive because the advertisers lacked a reasonable basis for their claims, the FTC must: (1) demonstrate 'what evidence would in fact establish such a claim in the relevant scientific community'; and (2) 'compare . . . the advertisers' substantiation evidence to that required by the scientific community to see if the claims have been established.'" FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 8 (quoting Removatron Int'l Corp. v. FTC, 884 F.2d 1489, 1498 (1st Cir. 1989)). Where advertisers lack a reasonable basis, their advertisements are deceptive as a matter of law. Id., 624 F.3d at 8 (citing Removatron, 884 F.2d at 1498). "Defendants have the burden of establishing what substantiation they relied on for their product claims. The FTC has the burden of proving that Defendants' purposed substantiation is inadequate, and the FTC need not conduct or present clinical studies showing that the product does not work as claimed." FTC v. QT, Inc., 448 F. Supp.2d at 959.[24]

---

[24] A "reasonable basis" inquiry may apply to specific claims of scientific support, and to simple "efficacy" claims as follows:

In assessing reasonable basis arguments, two different types of advertising claims may be at issue: (1) establishment claims and (2) non-establishment claims. . . . Establishment claims contain express or implied representations about the level of support for a particular claim (i.e., the claim states that a product has been found to be superior by scientific tests). . . . For such claims, the advertiser must

(continued...)

"[I]n the case of health-related claims or claims concerning the efficacy or safety of dietary supplements, this reasonable basis must, at minimum, consist of competent and reliable scientific evidence." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citing FTC v. OT, Inc., 448 F. Supp.2d at 961). "[W]hat constitutes competent and reliable scientific evidence . . . is a question of fact for expert interpretation." Id. In the case of dietary supplements or health related claims, "competent and reliable scientific evidence" consists of "'tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.'" Id. (quoting Bureau of Consumer Protection, Federal Trade Commission, Dietary Supplements, An Advertising Guide for the Industry at 9 (2001)). "The Court can look to what experts in the relevant area of study would consider to be adequate in determining the amount and type of evidence that is sufficient" for scientific validation of the advertisement's claims. FTC v. Braswell, 2005 WL 4227194, at *10.

Notably, the FTC need not show Defendant intended to deceive the consumer; intent is not an element of a Section 5 FTC Act violation. FTC v. Capital Choice Consumer Credit,

---

[24](...continued)
       possess the level of proof claimed in the ad. . . . For non-establishment claims, claims that do not assert a specific level of substantiations (i.e. a simple claim of efficacy), "the reasonable basis inquiry has been defined more flexibly." . . . For such non-establishment claims, the Court can look to a number of factors to determine what level of substantiation was required. . . . The factors include: (1) the type of claim; (2) the product; (3) the consequences of a false claim; (4) the benefits of a truthful claim; (5) the cost of developing substantiation for the claim; and (6) the amount of substantiation experts in the field believe is reasonable. . . .

FTC v. QT, Inc., 448 F. Supp.2d at 959 (citations omitted).

Inc., 2004 WL 5149998, at *33, 34. Thus, an advertiser's "good faith" does not immunize it from responsibility for its misrepresentations, and is not a defense. Id., 2004 WL 5149998, at *34.

### C.    Materiality

As to the third element, a representation or omission is "material" "'if it is the kind usually relied on by a reasonably prudent person.'" FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citation omitted). "'Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumptively material.'" Id.; FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at *7; FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *34. Likewise, an inference of materiality may reasonably be made when a deceptive omission is found. Id. at *33. Claims that "'significantly involve health, safety, or other issues, that would concern reasonable customers'" are presumptively material. FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (quoting FTC v. QT, Inc., 448 F. Supp.2d at 960, 965-66). Indeed, "when a customer makes a decision to purchase a health product that he or she will ingest for purported health benefits, any claim on the label regarding the health benefits (i.e.,any product efficacy claims) or any claims regarding the safety of the product can be presumed material." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1191. Moreover, representations are material to consumers if "they were instrumental in affecting consumers' decisions to pay for goods and services." FTC v. 1st Guaranty Mortgage Corp., 2011 WL 1233207, at *13. Thus, "[e]xpress claims and deliberately-implied claims used to induce the

purchase of a product or service are presumed to be material to consumers as a matter of law." Id. at *12; see generally Kraft, Inc. v. FTC, 970 F.2d 311, 322 (7th Cir. 1992).

Reliance may be presumed to be reasonable when it is in response to an express claim or to a deliberately made implied claim. FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *33. Indeed, the Eleventh Circuit has held that a "'presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product.'" McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000)(citation omitted). "[O]nce the Commission shows that the representations were of the type ordinarily relied on by reasonably prudent persons, that they were widely disseminated, and that consumers purchased the product, the burden then shifts to Defendants to show there was no reliance." FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *323. (citations omitted); see also FTC v. World Traveler Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988)); FTC v. Phoenix Avatar, LLC, No. 04 C 2897, 2004 WL 1746698, at *10 (N.D. Ill. July 30, 2004).

D.    **Individual Liability**

In a case brought by the FTC, individual defendants may be held directly liable for their own violations of §§ 5 and 12 of the FTC Act. FTC v. Windward Mktg., Ltd., No. Civ.A 1:96-CV-615F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997)). Additionally, an individual may be held liable for a corporate defendant's violation of the FTC Act if:

> the FTC demonstrates that (1) the corporate defendant violated the FTC Act; (2) the individual defendants participated directly in the wrongful acts or practices or the individual defendants had authority to control the corporate defendants; and (3) the

> individual defendants had some knowledge of the wrongful acts
> or practices.

Id. (emphasis in original); see also FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1207; FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at *7; FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *46. "If a defendant was a corporate officer of a small, closely-held corporation, that individual's status gives rise to a presumption of ability to control the corporation." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1207. "To establish the knowledge requirement, the FTC need not demonstrate actual knowledge of material misrepresentations; instead, the FTC may meet this element by 'showing that [an] individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of truth."'" Id. (citations omitted); see also FTC v. 1st Guaranty Mortgage Corp., 2011 WL 1233207, at *14-15.

Section 13(b) of the FTC Act "authorizes the FTC to seek, and the district courts to grant, preliminary and permanent injunctions against practices that violate any of the laws enforced by the Commission." FTC v. Gem Merchandising Corp., 87 F.3d 466, 468 (11th Cir. 1996); see also 15 U.S.C. § 53(b). "Pursuant to this statute, the Commission may bring suit for injunctive relief when it has reason to believe 'that any person, partnership, or corporation is violating or is about to violate, any provision of law enforced by the Federal Trade Commission.'" FTC v. Citigroup, Inc., 239 F. Supp.2d 1302, 1304 (N.D. Ga. 2001)(citing 15 U.S.C. § 53(b)(1)). Additionally, "[t]he Court can order injunctive relief against individual defendants for violations of Section 5(a) of the FTC Act if the individuals participated directly in the deceptive acts or practices or had the authority to control them."

<u>FTC v. 1st Guaranty Mortgage Corp.</u>, 2011 WL 1233207, at *15 (citing <u>FTC v. Gem Merchandising Corp.</u>, 87 F.3d at 470). Lastly, "the Court may order monetary relief against the individual defendants if they had or should have had knowledge or awareness of the misrepresentations." <u>Id.</u>

## IV.    **Evidentiary Issues**

### A.    **Plaintiffs' Motion to Strike Portions of Defendant's Motion for Summary Judgment and Exhibits (Doc. 99)**

Plaintiffs have moved to strike portions of Krotzer's submissions filed with his Motion for Summary Judgment, contending that the Motion is not in compliance with the provisions of the Local Rules of the United States District Court, Middle District of Florida (Local Rule(s)). (Doc. 99; Plaintiffs' Motion to Strike). Specifically, Plaintiffs argue that five exhibits attached to Defendant's motion are actually "57 additional pages of argument" rather than evidence, and thus, violate Local Rule 3.01(a) which restricts the length of a motion to twenty-five (25) pages. Plaintiffs' Motion to Strike at 3. Additionally, Plaintiffs contend that text and exhibits added to Defendant's Motion for Summary Judgment, which is an "amended" motion, supplanting Defendant's original motion for summary judgment, (<u>see</u> Doc. 84), is actually a "reply" to Plaintiffs' response to the original motion for summary judgment, (<u>see</u> Doc. 93), filed without leave of Court as required by Local Rule 3.01(c). Plaintiffs also argue that Defendant's Motion for Summary Judgment requests a panoply of improper affirmative relief, lacks citation to authority, and "amounts to 84 pages of rambling, repetitious, and indecipherable musings . . . . " Plaintiff's Response to Plaintiff's Motion for Summary Judgment at 3-6.

Defendant Krotzer responds to Plaintiff's Motion to Strike that he "has done his best to fit this case within the Local Rules," that "[t]he Court does not need his permission to ignore any parts the Court may not understand," that "[t]here is no reasonable way Krotzer has the ability to condense or alter the form of those facts to fit any better than he already thinks they do within the local rules encouraging clarity," and "[l]et's stop quibbling." Defendant's Response to Motion to Strike at 10, 16.

Plaintiffs take issue with the following exhibits as being improper argument: DX-3 entitled "History and Development," (Doc. 96-3); DX-102 entitled "Krotzer's Fundamental Integrity Literal and Implied Truthfulness Counts I-VII," (Doc. 96-12); DX-104 entitled "One-Sentence-Clickwrap-Contract," (Doc. 96-14); DX-105 entitled "Countervailing Benefits Pages Intentionally Hidden From This Court," (Doc. 96-15); and DX-106 entitled "Selected Countervailing Benefits Testimonials From 50% of Members . . . ." (Doc, 96-16).

Defendant Krotzer has flooded this record with numerous "exhibits" which are no more than his own re-typed rendition of what he considers to be evidence, as opposed to any actual evidence. For example, DX-30 (Doc. 68-2; 96-5; "Clinical Survey Alcoholism Cure Foundation; 29 Subjects Chosen By the State of Florida August 23, 2009" (authored by Krotzer[25])), and DX-31 (Doc. 96-6 (a chart entitled "Alcoholism Cure Foundation; Clinical Survey of 27 Case Sample Chosen by Independent Researchers"; a chart prepared by Krotzer bearing the date and time "1/25/20113:44 AM")); see Defendant's Response to Plaintiffs' Motion for Summary Judgment at 8, 17), are unsworn statements and "opinions" by Defendant Krotzer prepared in the context of this litigation, and are not as the titles might

---

[25] See Krotzer Admission 46.

suggest reliable scientific evidence.  (See Doc. 123-2; Hutchinson 3/30/11 Decl. ¶ 25).  As such, these exhibits are not competent evidence on the question of whether the Permanent Cure Program in fact "cures" alcoholism. See Rule 56(c)(1)(A) and (c)(4).

Turning to the Krotzer exhibits that Plaintiffs object to, Krotzer's Exhibit 102, DX-102, entitled "Krotzer's Fundamental Integrity Literal and Implied Truthfulness," is an 18 page memorandum of argument - a "point by point analysis" - as to why he should prevail in this lawsuit.  (Docs. 96-12 and 136-1; DX-102; "Krotzer's Fundamental Integrity Literal and Implied Truthfulness Counts I-VII").  See Defendant's Response to Plaintiffs' Motion for Summary Judgment at 20.  Krotzer asserts he did not include this "explanation" of his Website claims in his "Amended Answer, since [sic] not considered central issues." Defendant's Motion for Summary Judgment at 10.  The exhibit is not competent evidence and constitutes nothing more than additional argument well beyond that permitted for Defendant's Motion and Response.  Similarly, DX-3, (Doc. 96-3), is a two-page "history" recounting that Krotzer started his first website in 2005.  DX-104, (Doc. 96-14), is three pages of extractions from the ACF Website, with Krotzer's own commentary regarding sign-up for and cancellation of the Permanent Cure Program.  And DX 105, (Doc. 96-15), is three pages of Krotzer commentary about the "countervailing benefits" of the Permanent Cure Program, and four pages of attached "enews" computer screens showing files dated 2008, which have no meaning standing alone.  These submissions constitute argument and rhetoric, and thus are not competent evidence. See Turnquist v. Noll, No. 10-80030-CIV, 2010 WL 3522011, at *4 (S.D. Fla. Aug. 11, 2010).  Unsworn and conclusory statements from litigants are not competent evidence and should not be considered in determining the

propriety of summary judgment.  West v. Higgins, 346 F. App'x 423, 425-26 (11th Cir. 2009)(citing Gordon v. Watson, 622 F.2d 120, 123 (5th Cir. 1980)); cf. McCaskill v. Ray, 279 F. App'x 913, 915 (11th Cir. 2008)(litigant's unsworn allegations not admissible on motion for summary judgment); Nieves v. Univ. of Puerto Rico, 7 F.3d 270, 276 n.9 (1st Cir. 1993)("[f]actual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment").  "[C]onclusory statements of ultimate facts . . . are not considered competent evidence to defeat summary judgment.'" Nisbet v. George, No. 1:05-cv-570-WKW, 2006 WL 2345884, at *3 (M.D. Ala. Aug. 11, 2006)(citation omitted). Likewise, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  These "exhibits" are not proper evidence and will not be considered by the Court.  As such, the Court need not strike them.

Krotzer's exhibit DX-106, (Doc. 96-16), is a 27-page exhibit of customer "testimonial" statements excerpted by Krotzer.  Krotzer contends that these testimonials are statements by satisfied customers, and were a part of the ACF Website, which Plaintiffs failed to include in their ACF Website exhibit.  See e.g. Defendant's Motion for Summary Judgment at 12; Defendant's Response to Plaintiffs' Motion for Summary Judgment at 5.[26]  The Exhibit bears the heading "Selected Countervailing Benefits" at the top of each page, and cites to

---

[26]   Krotzer acknowledges that Plaintiffs did submit a CD-ROM of the ACF Website which included the testimonials.  See supra n.6.

"http://AlcoholismCure.org/successes _ " and "ENews" DX-106 at 1.  Krotzer asserts that it "shows, exact member quotes expressing wonderful enlightment in 27 densely packed pages."  Defendant's Motion for Summary Judgment at 11.

If indeed these "testimonials" were a part of the ACF Website, they are relevant to whether the advertisement was deceptive or false.  "'[W]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate from the use of the product.'"  FTC v. Bronson Partners, LLC, 564 F. Supp.2d at 125 (citation omitted)("the testimonials in the Chinese Diet Tea advertisement are clearly tiles contributing to the mosaic"); see (Doc. 58-48; Consumer 2 Decl. ¶ 4 ("I browsed the website and read several customer testimonials")).  However, if the anonymous testimonial statements are being offered for the truth of the matter asserted, that is, that the ACF Permanent Cure Program "cures" alcoholism, in their present form they constitute inadmissible hearsay, which cannot be reduced to admissible form at trial short of the actual customer testifying.  See Rule 56(c)(2); see also Macuba v. DeBoer. 193 F.3d 1316, 1322-23 (11th Cir. 1999).  Moreover, Krotzer has failed to meet his burden of establishing that the selected "testimonial" excerpts are admissible, nor has he explained how he might submit the evidence in admissible form.  See Rule 56(c)(2) advisory committee's note 2010 Amendments.

As to Plaintiffs' request that the Court strike portions of Defendant's Motion for Summary Judgment and Exhibits because they constitute a "de facto reply" to an earlier filed response by Plaintiffs, Plaintiffs have failed to designate the portions of the motion which are

"new" and the Court declines to cull through the lengthy motion and exhibits to make that determination. Accordingly, the Court will consider the Defendant's Motion for Summary Judgment and remaining exhibits in their entirety. <u>See</u> <u>Loren v. Sasser</u>, 309 F.3d 1296, 1301 (11th Cir. 2002)(in the summary judgment context, the court must construe <u>pro</u> <u>se</u> pleadings more liberally than those of a party represented by an attorney").[27]

Finally, the affirmative relief requested by Krotzer in his Motion for Summary Judgment, beyond judgment in his favor and "dismissal of this lawsuit with prejudice," including granting his pending Motion to Vacate Preliminary Injunction (Doc. 56); arranging meetings with officers of the "National Institutes of Health ('NIH')," the "National Institutes of Alcohol Addiction and Abuse (NIAAA')," the Governor and Attorney General of the State of Florida; ordering the NIH to fund a $5 million grant to study the efficacy of his Molecule Multiplicity theory; and ordering the withdrawal of all prejudicial pretrial publicity, Defendant's Motion for Summary Judgment at 3-4, is disregarded, as being beyond the scope of the pending cross motions for summary judgment under consideration here, and thus improperly sought.

For the foregoing reasons, Plaintiffs' Motion To Strike Added Text And Certain Exhibits To Defendant Krotzer's "Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law" (Doc. 99; Plaintiffs' Motion to Strike) is due to be **GRANTED IN PART** to the extent that the

---

[27]    The Court does not consider Krotzer's Emergency Dispositive Motion #1: Summary Judgment, Failure to State a Claim, and Judgment as a Matter of Law (Doc. 84; Defendant's First Motion for Summary Judgment), which was superceded by his second, amended motion for summary judgment (Doc. 96; Defendant's Motion for Summary Judgment).  Nor does it consider Plaintiffs' first response, (Doc.93), as it was a response to a motion which has been superceded.

Court will not consider Exhibits to Defendant's Motion for Summary Judgment that are not competent evidence, and otherwise **DENIED**.

**B.** **Plaintiffs' Motions to Strike or to Exclude Defendant's Proffered "Expert" Testimony (Docs. 135, 143)**

After filing his Motion for Summary Judgment (Doc. 96), Defendant Krotzer filed what he has labeled "Affidavit of Robert Douglas Krotzer," (Doc. 122; Krotzer Affidavit), and "Affidavit of Carl Edwards." (Doc.133; Edwards Affidavit). Krotzer subsequently filed his Second Motion for Summary Judgment (Doc. 140), Defendant's Supplemental Memo of Law, (Doc. 152), and Defendant's Response to Plaintiff's Motion for Summary Judgment. (Doc. 136). In the Krotzer Affidavit, Defendant Krotzer professes to be an expert in curing alcoholism and repeats arguments that he has presented extensively in his motion papers. Krotzer Affidavit ¶ 1. Edwards is a former ACF employee, paid consultant of ACF, and then an unpaid consultant. Edwards Affidavit ¶ II.A.3. He alleges that he is an "expert in evaluating and adjusting consumer issues." Id. at ¶ 1.B. Edwards states his belief that ACF customers with whom he communicated "understood the One Sentence Clickwrap Contract." Id. ¶ II.A.3. Additionally, as support for his opinion, Edwards recounts his experience with ACF, and repeats arguments made by Krotzer in his papers.

Plaintiffs move to strike Edwards' Affidavit contending that the affidavit "is permeated by inadmissible purported evidence, including undesignated and unqualified expert opinion testimony, misplaced legal argument, and rank hearsay attributed to alleged, though unidentified, customers of Defendant." (Doc. 135; Plaintiffs' Motion to Strike Edwards' Affidavit at 1). Plaintiffs also note that Defendant Krotzer has not disclosed what the Edwards Affidavit is intended to support. Id. at 4. Additionally, Plaintiffs move to exclude

both the Krotzer Affidavit and the Edwards Affidavit, arguing that both affidavits "fail[ ] to meet admissibility standards, including qualifications, reliability, and relevance." (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony at 1 (citing Fed. R. Evid. 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999)).

Krotzer does not rely on either affidavit as support for his Motion for Summary Judgment. He mentions the affidavits in his Response to Plaintiffs' Motion for Summary Judgment, but does not actually cite to them as expert opinion supporting his position. First, Krotzer cites to a chart entitled "Evidence of Cure," which he calls "my summary" and which is attached as an exhibit to the Krotzer Affidavit, <u>see</u> Krotzer Affidavit at 3 ¶ 3; (Doc. 122-3; DX-502; "Evidence of Cure" Chart), in support for his argument that "it appears the few complainers were mostly cured quite quickly." Defendant's Response to Plaintiff's Motion for Summary Judgment at 17 (citing DX-502; "Evidence of Cure" Chart). Citing the "Evidence of Cure" Chart, Krotzer argues that "Only 11 answered the governments [sic] search for complaining affidavits, most had already confirmed they were cured." Response to Plaintiff's Motion for Summary Judgment at 8 (citing DX-502 "Evidence of Cure" Chart). The "Evidence of Cure" Chart appears to refer to 12 unnamed consumers labeled "Cancelled Before Five Months?", and who Krotzer contends in the "summary" Chart, with no citation to actual admissible evidence, were "cured." The "Evidence of Cure" Chart is not admissible evidence. Fed. R. Evid. 1006; <u>see also</u> <u>Peat, Inc. v. Vanguard Research, Inc.</u>, 378 F.3d 1154, 1160-61 (11th Cir. 2004)(materials or documents on which a Rule 1006

exhibit is based must be admissible; the chart or summary cannot be based upon hearsay statements or conclusory allegations).

Krotzer also includes a reference to the Krotzer and Edwards Affidavits as part of a string-cite in support of his argument that he has adduced "admissible evidence" to oppose Plaintiffs' Motion for Summary Judgment. Defendant's Response to Plaintiffs' Motion for Summary Judgment at 19.[28] This broad brush citation to the affidavits does not invoke the alleged "expertise" of Krotzer or Edwards sufficient to require the Court to consider the affidavits as "expert" testimony. Nor does Krotzer cite to any particular paragraphs of the 25-page Krotzer Affidavit or 22-page Edwards affidavit in support of his assertion.

Finally Krotzer cites to the Edwards Affidavit in connection with his denial that he has violated the Stipulated Preliminary Injunction regarding continued collections of fees from consumers. Id. at 20. Again, Krotzer simply cites generally to the Edwards Affidavit to support his assertion that the consumers "understood" the payment terms of the Permanent Cure Program. In addition to not relying upon any specific "expert" opinion by Edwards, Krotzer concedes that Edwards states "what is common sense among . . . 'reasonable

---

[28] Specifically, Krotzer argues in response to Plaintiffs' Motion for Summary Judgment that Plaintiffs' argument that he has not presented "'admissible evidence'" is:

> CLEARLY NOT TRUE unless the Court buys Plaintiffs [sic] argument actual facts do not matter and applies that to many categories of facts. ADMISSIBLE EVIDENCE INCLUDES over 10,000 unalterable Yahoo email admissions of cure, details of cure and payment negotiations, also, expert Affidavits of Krotzer (Doc # 122) and Edwards, (Doc # 133, and the business records too numerous to mention of direct probative value attached to Defendant various filings as well as the physical filings of CDs, DVD, and books.

Defendant's Response to Plaintiffs' Motion for Summary Judgment at 19.

consumers.'" Id.[29] Such a common sense determination requires no technical or specialized assistance from an expert.  See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)(expert testimony must "assist[ ] the trier of fact through the application of scientific, technical, or specialized expertise, to understand evidence or to determine a fact in issue"). Thus, it is not an appropriate area for expert testimony.

Rule 56 provides that a party must support all assertions made in support of or in opposition to a motion for summary judgment by "citing to particular parts of materials in the record, including . . . affidavits or declarations . . . ."  Rule 56(c)(1)(A).  Moreover, while the Court may consider other evidence, "[t]he court need consider only the cited materials . . . ."  Rule 56(c)(3).  Here, Krotzer has filed two "expert" affidavits, but has not connected them with any other pending filings.  The Court will not scour un-cited portions of the summary judgment record, including lengthy affidavits, searching for evidence that might bolster either side's argument.

Moreover, the Court has serious doubts whether Krotzer can meet his burden of establishing that his and Edwards opinions are supported by the necessary qualifications, reliability and helpfulness to render them admissible expert testimony.  See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1238 (11th Cir. 2005).  Nevertheless, inasmuch as Krotzer did not rely upon any of the opinions expressed by Krotzer and Edwards in the

---

[29]  Specifically, Krotzer responded:

> . . . the **One-Sentence-Clickwrap Contract** terms reasonable consumers understand.  (*Edwards Affidavit Doc # 133 stating what is common sense among non-lawyers, aka "reasonable consumers"*).

Defendant's Response for Plaintiffs' Motion for Summary Judgment at 20.

Affidavits, the Court will not consider them in conjunction with the pending cross motions for summary judgment, and will not engage in a <u>Daubert</u> analysis of the proffered testimony at this time.[30] Accordingly, Plaintiffs' Motion to Strike Edwards' Affidavit at 1. (Doc. 135), and Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony at 1 (Doc. 143) are due to be **DENIED WITHOUT PREJUDICE** to renewal.

## V.    Discussion of Cross-Motions for Summary Judgment

Plaintiffs have alleged seven claims against Defendant Krotzer, and Krotzer has one remaining affirmative defense. Plaintiffs have moved for summary judgment against Krotzer on their claims, and Krotzer has moved for summary judgment, requesting "immediate dismissal of this lawsuit with prejudice." The parties' arguments in their respective motions for summary judgment and responses repeat themselves and overlap. Accordingly, the Court will draw on their arguments and cited evidence from all of their submissions on these cross-motions. The Court will address each claim individually, but opts first to dispense with Krotzer's remaining affirmative defense.

### A.    Defendant's Affirmative Defense: Estoppel

Krotzer has asserted an affirmative defense of "estoppel," contending that Plaintiffs' "multiple stopping of investigation activity after hearing Defendants [sic] responses, helped Defendant reasonably conclude the complained of activities were not viewed as materially

---

[30]   It is also not necessary for the Court to determine at this time whether Krotzer provided the required expert disclosure by January 25, 2011, (see Doc. 62; 10/25/10 Case Management Order), and whether the proffered testimony is inadmissible based upon inadequate expert disclosure. See Fed. R. Civ. P. 26(2). Nor does the Court make a determination at this time whether the proffered affidavits meet the requirements of Rule 56(c)(4) which requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent  to testify on the matters stated."

violative of law." Answer at 14. Krotzer alleges that Plaintiffs have damaged him "thru [sic] years of harassment and diversion," and that Plaintiffs should be "estopped from legal relief whose only and announced effect will be to assure the destruction of such promising technology." Id. at 14-15. The parties did not address this defense in their motions or responses seeking or opposing summary judgment.

Krotzer's estoppel defense is meritless. "As a matter of law, mere inaction, i.e., failing to enforce a statute, cannot give rise to an estoppel claim against [the government]." United States v. Carver, No. 10-11599, 2011 WL 1304757, at *3 (11th Cir. April 6, 2011)(citing United States v. McCorkle, 321 F.3d 1292, 1297 (11th Cir. 2003)). As noted by the Eleventh Circuit,

> To make out a claim of estoppel against the Government, a party must adduce evidence of the following: (1) words, conduct, or acquiescence that induces reliance; (2) willfulness or negligence with regards to the acts, conduct, or acquiescence; (3) detrimental reliance; and (4) affirmative misconduct by the Government. . . . Affirmative misconduct requires more than negligence or inaction; otherwise prong two and prong four would be redundant.

United States v. McCorkle, 321 F.3d at 1297; see also Savoury v. U.S. Atty. Gen., 449 F.3d 1307, 1318-19 (11th Cir. 2006). The burden on the private party seeking to assert equitable estoppel against the government is heavy; equitable estoppel will be applied against the government only in extreme circumstances. Ellinger v. United States, 470 F.3d 1325, 1336 n.9 (11th Cir. 2006); Feldman v. C.I.R.. 20 F.3d 1128, 1134 (11th Cir. 1994). Krotzer has not cited to any evidence in the record of any action by the Plaintiffs which could have induced his reasonable reliance, or to any affirmative misconduct on the part of Plaintiffs.

See <u>Feldman</u>, 20 F.3d at 1134. Accordingly, judgment is due to be entered in favor of Plaintiffs as to Krotzer's one remaining affirmative defense.

### B.    False or Unsubstantiated Efficacy Claims (Count I)

The FTC alleges in Count I of the Complaint, that Defendants ACF and Krotzer directly or indirectly, expressly or by implication represented that the Permeant Cure Program:

> a.    Cures alcoholism for most alcoholics who sign up for the Program;
>
> b.    Cures alcoholism while allowing alcoholics to drink socially; and
>
> c.    Is more effective than other treatments for alcoholism.

Complaint ¶ 38 ("'cure' claims"). The FTC alleges that the representations were "false or were not substantiated at the time the representations were made," and thus, constituted "a deceptive act or practice" and "false advertisement," in violation of §§ 5(a) and 12 of the FTC Act. 15 U.S.C. §§ 45(a) and 52. Complaint ¶¶ 39, 40.

Krotzer contends that Plaintiffs'claims fail because "1.) Reasonable consumers could have easily avoided harm AND enough members were helped or cured of abusing alcohol to qualify as Countervailing Benefits." Defendant's Motion for Summary Judgment at 6, 8-9. Krotzer argues that the FTC Act §§ 5(n) and 12 "not only require [the FTC] to prove falsity, they require them [sic] to prove no countervailing benefit, and that reasonable consumers were not able to avoid substantial harm." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 24. Krotzer's argument that he is entitled to judgment on Count I (and also as to Counts II through V) because any harm caused to consumers was

"reasonably avoidable" "outweighed by countervailing benefits," 15 U.S.C. § 45(n),[31] is misdirected to the FTC's deception and false advertising claims found in Counts I through V of the Complaint, which are brought pursuant to §§ 5(a) and 12. Section 5(n) of the FTC Act, 15 U.S.C. § 45(n), sets forth the elements for an "unfair practices" claim, which is pertinent only to Count VI of the Complaint. Rather, to establish liability under §§ 5(a) and 12 of the FTC Act for deceptive practices and false advertising, the FTC must prove: (1) that there was a representation; (2) that the representation was likely to mislead customers acting reasonably under the circumstances; and (3) that the representation was material. FTC v. Tashman, 318 F.3d at 1277.

### 1. Representation

The first page of ACF's printed Website states in boldface type that the ACF Program offers the "Best Technology to End Alcohol Abuse Permanently . . . Enjoy A Few Drinks" - Without Cravings." Other representations on the first page include:

> Will We Work for You?
> Yes, beyond our PhDs' wildest dreams. We have cured nearly all members - many hundreds. Your guarantees are explained below.

---

[31] Section 5(n) of the FTC Act, 15 U.S.C. § 45, provides:

(n) Standard of proof: public policy consideration

The Commission shall have no authority under this section . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

15 U.S.C. § 45(n).

. . .

> You can really enjoy a few drinks.  No cravings!

. . .

> Welcome to your only chance to have it all -
> You can Enjoy A Few Drinks, without wanting more.

. . .

> We will cure you . . . guaranteed.  Often within 1-10 weeks, nearly
> always by 5 months.

. . .

> Our program can guarantee success

. . .

> Over the years nearly all have been cured.

. . .

> Lowest cost program anywhere that really works.

5/4/09 ACF Website at 1.  Additionally, the first page advises: "Expect a long term cure rate 50% better than expensive clinics."  Id.  Nearly every page of the Website contains similar "cure" representations: "Permanent Cure;" "Most importantly, everyone who faithfully follows their program is Permanently Cured!;" and "only we permanently cure nearly everyone."  Id. at 5.  ACF touts a "Success Rate" of "Above 97%."  Id.  "Permanent Cure is many times more effective than any other treatment, and the only treatment with a truly permanent cure."  Id. at 3; see also id. at 6, 31.  As to social drinking, the ACF Website represents:

> **Can I Drink Socially?**
>
> in your brain much of the stimulation you now seek in alcohol.  We give you a **stable good mood** and eliminate your cravings for "something better." Then, **if you want a buzz, have a drink or two**.  When your brain chemistry is in balance, **you won't need more**.

Id. at 16 (emphasis in original); see also id. at 37 ("Social Drinking is actually part of your cure.  You will feel better about yourself . . .  One drink cannot make you need another . .

. Two Drinks: Great Buzz No Cravings"); 46 (same).  The Court concludes from the face of the ACF Website that the advertisement makes the alleged claims.  Defendants' repeated representations are express and not subtle; there is no question as to the "net impression" of Defendants' "cure claims."  Defendants do not "imply" or employ innuendo to claim that the Permanent Cure Program cures alcoholism for most who subscribe.  ACF unequivocally and indisputably represents that its Permanent Cure Program "cures" alcoholism while allowing for "social drinking," and that its program is superior to all others.

## 2. **Materiality**

It is also undisputed that the "cure" representations are "material."  ACF's claims were widely disseminated via the internet, and easily located using popular search engines.  Approximately 450 consumers across the country subscribed, confirming the presumption of actual reliance by consumers.  See Krotzer Admission 123.  The claims of a "cure" were indisputably used to induce consumers to sign up for the Permanent Cure Program.  Because the "cure" representations addressed in Count I of the Complaint center on the efficacy claim that ACF's Permanent Cure Program "cures" alcoholism, the claims are health related and therefore material.  FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1191; see also Kraft. Inc. v. FTC, 970 F.2d at 322-24; FTC v. SlimAmerica, Inc., 77 F. Supp.2d 1263, 1272 (S.D. Fla. 1999)("Express claims or deliberately made implied claims used to induce the purchase of a particular product or service are presumed to be material").  No reasonable juror could conclude, after reading the ACF Website, that the "cure" claims were not important to consumers and not likely to affect the consumer's choice regarding the product.  Thus, the only significant question with respect to these efficacy claims is whether

ACF and Krotzer had sufficient substantiation for the claims asserted, or whether the claims of "cure" were false.  See FTC v. Pantron I Corp., 33 F.3d at 1095-96 (discussing "likely to mislead" element where no dispute about representation and materiality).

### 3.    Likely To Mislead

The FTC argues that Krotzer has provided "no evidence whatsoever to support his assertion that the majority of users were 'cured' by any reasonable definition," Plaintiffs' Rsponse to Defendant's Motion for Summary Judgment at 10 (emphasis in original), and "no scientific evidence to support any of the challenged efficacy claims."  Plaintiffs' Motion for Summary Judgment at 20 (emphasis in original).  Plaintiffs also argue that Defendant's claims of "cure" are false, contending that the "1000 Diary reports" to which Krotzer points are not of record, and anecdotal statements (testimonials) of unidentified customers summarized by Defendant, have never been evaluated by an independent reviewer or scientist.   As such, Plaintiffs contend that Defendant has not adduced "any admissible evidence to support his claim that the diaries prove his program cures alcoholism." Plaintiffs' Response to Defendant's Motion for Summary Judgment at 13-14.

Plaintiffs present evidence in the form of a declaration by their expert witness, Dr. Kent E. Hutchinson.[32]   Hutchinson states in his Declaration that "adequate scientific evidence" to support the efficacy of a proffered treatment of alcoholism by "intervention

_____

[32]  Dr. Hutchinson received his doctorate in clinical psychology from Oklahoma State University in 1995, and completed a three-year post-doctoral fellowship at the Center for Alcohol Treatment and Addiction Studies at Brown University.   He is currently Chief Science Officer and Director of Neurogenetics Core, Mind Research Network, and Professor of Psychology at the University of Colorado (on leave). He has participated in a number of research grant projects involving alcohol dependence and substance abuse, among other topics.  (Doc. 123-2 at 16; Hutchinson Curriculum Vitae).  Inasmuch as Krotzer has not challenged Dr. Hutchinson's expertise, (see Doc. 147; Defendant's Response to Motion to Exclude Testimony at 6), the Court considers Dr. Hutchinson's expert testimony.  See generally Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338-39 (11th Cir. 2009).

agents" such as those contained in the ACF Permanent Cure Program, requires two or more double-blind placebo-controlled 12-week clinical studies, each consisting of 150 to 1,000 human participants, with follow-up three to six months after the study's conclusion, and with accepted scientific measurement and data analysis. (Doc. 123-2; Hutchinson 3/30/11 Decl. ¶ 23).[33] Hutchinson avers that no well-designed, well-controlled, human clinical study, or scientific study of any kind, or any scientific literature, shows that any of the ingredients used in the ACF Permanent Cure Program, alone or in combination: (1) cure alcoholism for most persons; (2) cure alcoholism while allowing alcoholics to drink socially; or are (3) more effective than other treatments for alcoholism. Hutchinson 3/30/11 Decl. ¶¶ 24-29, 35. Specifically, Hutchinson states that his review of materials provided by Krotzer, and his search of available scientific evidence, failed to identify any peer-reviewed articles supporting the proposition that any of ACF's ingredients, alone or in combination, cure alcoholism in humans. Id. ¶ 24.

According to Hutchinson, Krotzer's "Clinical Study: Alcoholism Cure Foundation, 29 Subjects Chosen By the State of Florida," and a chart entitled "Clinical Study results," authored by Krotzer, see (Docs. 61-30,[34] 61-31), "appear to be conclusions drawn about 29 consumer complaints about the 'Permanent Cure' Program," and "do not constitute

---

[33] A placebo-controlled double-blind study is "a study in which some persons are given the product whose effects are being investigated while others are given a placebo (with the allocation made at random), and neither the person who distributes the product nor the person who measures the effects knows which received the real product." FTC v. QT, Inc., 512 F.3d 858, 861 (7th Cir. 2008).

[34] Krotzer's "Clinical Study: Alcoholism Cure Foundation," dated August 23, 2009, (Doc. 61-30), discussed by Hutchinson, is nearly identical to Krotzer's "Clinical Survey Alcoholism Cure Foundation; 29 Subjects Chosen By the State of Florida," also dated August 23, 2009, but displaying a "Revised 1/3/2010," cited by Krotzer in support of his Motion for Summary Judgment. See (Doc. 68-2; 96-5; DX-30). The later 'Clinical Survey" adds to the "Methodology and Results" discussion.

competent and reliable scientific evidence" because the documents are not peer-reviewed reports of a controlled clinical study. Id. ¶ 25. Rather, Krotzer's "clinical study" involved an insufficient number of subjects to measure an intervention; did not employ reasonable and standard measures at designated points during and after the treatment period; did not involve a sufficiently long trial period or follow-up; and did not employ the standard scientific approach to data analysis. Id.

Hutchinson also rejects Krotzer's reliance on the self-reported diaries of Permanent Cure Program customers who were reporting their experiences with the ACF Program. The information is not peer-reviewed nor is it a published report of a clinical study. Hutchinson notes that there does not appear to be a control group treated with a placebo for comparison purposes; that it is unclear whether the self-reported "diaries" were collected from a random sample of subjects where a non-random sample will likely introduce bias in the data; that there did not appear to be reasonable standard measures; and that the collection of consumer diaries lacks any scientific control, verification, analysis, or follow-up. Id. ¶ 26.[35]

---

[35]  Specifically, Hutchinson reviewed two compact disks containing Excel spreadsheets. The first CD contained 283 spreadsheets totaling 1,063 pages; Hutchinson does not specify the size of the material on the second CD. Hutchinson 3/30/11 Decl. ¶ 20, 21. He said that the spreadsheet "Diaries" do not constitute "competent and reliable scientific evidence" for the following reasons:

    a.    The information is not peer-reviewed or the published report of a clinical study.

    b.    There appears to be no control group that was treated with an alternative (e.g., placebo) that may be used as a comparison point for the effects of the "Permanent Cure" Program.

    c.    It is not clear whether information was collected from a random sample of subjects. As noted above, random assignment of subjects to one or more intervention groups, the assignment of which is unknown to both the author and the subjects, would permit comparing, without bias, the effect of intervention upon

(continued...)

Finally, Hutchinson notes that published studies on humans of certain individual ingredients used by ACF in its recommended Permanent Cure Program, "did not include alcoholism or its treatment and therefore do not provide adequate scientific evidence" in support of ACF's claim that its Permanent Cure Program "cures" alcoholism.  Hutchinson Decl. ¶ 29.

Krotzer responds to these observations by stating, "[s]trictly speaking, . . . science does not support the constituent parts, and has nothing to do with the 'Easy to Avoid Substantial Harm' and 'Countervailing Benefits' allegations required by § 5(n)" of the FTC Act.  Defendant's Motion for Summary Judgment at 16; see also id. at 24 ("the vast amount of good Molecule Multiplicity has done the Act under § 5(n) wipes away any of the relatively

---

[35](...continued)
        cravings for alcohol and drinking over a period of time.  A non-random sample is likely to introduce bias in the data (e.g., individuals who submit diaries may have a different experience than individuals who do not)

.

    d.    It does not appear that the author of the spreadsheets or the individuals filling out the spreadsheets employed reasonable and standard measures, across subjects, of alcohol use, alcohol related problems, and the efficacy of the intervention at baseline, during and at the conclusion of the treatment period, and during a follow-up period.

    e.    The drinking outcome information does not appear to be verified biochemically or by others (e.g., relatives or friends) close to the subject.

    f.    It does not appear the author employed a consistent trial period or conducted any follow-up at any specific periods thereafter.  It is unclear precisely how long the trial period was for any given subject, but the period seemed to vary by subject.

    g.    It does not appear that the author compiled the data in a format that would allow for a statistical analysis or employed a standard approach to such an analysis.  Even if compiled in such a fashion, such an analysis would not be meaningful, given the concerns mentioned above.

Id. ¶ 26.

small sins alleged - offset by massive 'COUNTERVAILING BENEFITS'"). Indeed, Krotzer admits that ACF's claims that the Permanent Cure Program cures alcoholism "are not supported by traditional science." Krotzer Admission 45. In response to FTC's request for production of documents Krotzer acknowledged that neither he nor ACF have conducted any "[r]andomized double blind studies." (Doc. 123-1 at 1099-1100; Krotzer Response to FTC Request for Documents 8). Krotzer further states: "Of course, Molecule Multiplicity has not been reviewed by scientists. DEFENDANT NEVER CLAIMED IT WAS. **NOWHERE IN THE STATUTE DOES IT SAY IT MUST BE**. **New technologies by definition are not generally accepted** . . . ." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 2 (emphasis in original).

Krotzer's chief argument is that customer records, "actions," e-mails, testimonials, and "about 1000" customer diaries substantiate the efficacy of ACF's "cure" claims. Krotzer Admissions 38, 39.[36] In his response to the FTC's request for documents, Krotzer wrote that his and ACF's substantiation for the claim that the ACF Program "cures" alcoholism: "PRIMARY SUPPORT IS All Diaries." (Doc. 123-1 at 1094; Krotzer Response to FTC Request for Documents 11).[37] "FTC ignores what really matters, ~475 Individual Results: Why Krotzer won't quit." Defendant's Response to Plaintiffs' Motion for Summary Judgment

---

[36] In another admission, Krotzer stated that approximately 450 consumers purchased the Permanent Cure Program. He does not explain the discrepancy. Krotzer Admission 123.

[37] On March 15, 2011, Krotzer turned over to the FTC a CD containing "purported consumer diaries. . . . The CD contains the records of 405 individual consumers. Of the 405 individual consumers, 155 made at least one entry in their diary, 238 made no entry in their diary, and 12 were not accessible for viewing as they were password protected." Henry 2d Decl. ¶ 7.

at 11; see also id. at 17 ("Plaintiffs ignoring ~100 (20%) testimonials onsite . . . and ~100% of the diaries reporting success").

Krotzer contends that by relying upon the customer diaries, his case presents one of "first impression," distinguishing it from decisions cited by the FTC involving "inherently unknowable fact situations" "where actual results were not provable." Id. at 5, 21-24. Krotzer argues that existing case-law requiring clinical studies is distinguishable because he provides "information about individual results as reported by the individuals in their own words." Defendant's Motion for Summary Judgment at 7 (emphasis in original). He cites no legal authority in support of his argument that anecdotal customer testimonials and self-documentation may supplant competent and reliable scientific evidence to substantiate his health-related claims.

Krotzer also dismisses Hutchinson's opinions as "[u]nremarkable expert testimony" that confirms what Krotzer has already disclosed, that is, that Krotzer "has not yet proven it [Molecular Multiplicity theory] to near the standards of a prescription drug." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 22. He argues that Plaintiffs' evidence is inadequate to dispute ACF's "cure" claims, stating that "[o]nly 11" consumers answered "the governments [sic] search for complaining affidavits," most of whom had "confirmed" they were "mostly cured," and notes that only three consumers submitted to a deposition. Id. at 2, 8, 18-19, 24.

With leave of Court, Krotzer later supplemented his argument to contend that the "double-blind, randomized, placebo controlled" clinical study is not required to substantiate the efficacy of "natural medicines" "since the costs are huge and the 'Gold Standard' will

prevent any major inventions like Molecule Multiplicity . . . ."  Defendant's Supplemental

Memo of Law at 4.  Krotzer argues that the "INHERENTLY SAFE NATURAL MOLECULES

USED IN MOLECULE MULTIPLICITY NEED NO SUCH TESTING . . . ." Id. at 5 (emphasis

in original).  As support, Krotzer cites to an article recently published in <u>Scientific American</u>

magazine, that argues in favor of less costly and less time-consuming "comparative

effectiveness research," which involves combing computerized medical records of actual

patients to determine the "comparative effectiveness" of various treatments. Id. at 5-6 (citing

(Doc. 152-1; Sharon Begley, <u>The Best Medicine</u>, Scientific American, July 2011, at 50-55)).[38]

Plaintiffs have pleaded Count I in the alternative, alleging that ACF's "cure" claims are

either unsubstantiated or are false.  (<u>See</u> Doc. 153; Plaintiffs' Response to Defendant's

Supplemental Memo of Law at 2-3).  Accordingly, the Court will analyze whether ACF has

a reasonable basis for claiming that the Permanent Cure Program "cured" alcoholism for

most alcoholics who subscribed while permitting them to drink socially, and whether the

---

[38]    Krotzer's argument that the "disclaimers" in the ACF Website - "not FDA approved" and "patent pending" -  accord him First Amendment protection from allegations of deceptive representations and false advertising is unavailing.  See Defendant's Response to Plaintiffs' Motion for Summary Judgment at 6-7 (citing cases); Defendant's Supplemental Memo of Law at 2, 7-8.  Krotzer did not plead or raise the First Amendment as a defense, (See Docs. 53, 77), nor has he presented evidence or sought judgment based upon this defense.  See Defendant's Motion for Summary Judgment.

Moreover, inherently deceptive claims, and false advertising are due no First Amendment protection.  See <u>Friedman v. Rogers</u>, 440 U.S. 1, 9-10 (1979)("restrictions on false, deceptive and misleading commercial speech" are permissible).

Finally, references to the Food and Drug Administration ("FDA") on the ACF Website do not  in anyway disclaim Defendants' claim that the Permanent Cure Program "cures" alcoholism.  See 5/4/09 ACF Website at 1 ("All our ingredients have been used safely for centuries by millions of people as recognized by the FDA"); 4, 7, 9, 11, 15, 22, 25, 28, 30, 34, 36, 38, 40, 42, 44 , 47, 52, 56, 58 ("No statements on this website have been evaluated by the Food and Drug Administration (FDA"); 6, 14, 17, 30, 32, 34, 36, 38, 40, 42, 44, 47, 49, 52, 54, 58 ("Pharmas No Cure - FDA" hyperlink).  Additionally, the statements "Patent Pending," id. at 4, 7, 25, 28; "Patents Applied For," id. at 9, 11, 17, 22, 30, 32, 36, 38, 40, 47, 52, 56, 58 and a hyperlink entitled  "Patents," id. at 6, 14, 17, 19, 32, 34, 36, 38, 40, 42, 44, 47, 49, 52, 54, 58  tend to bolster the legitimacy of the "cure" claims made as opposed to disclaiming them.

Program was more effective than other treatments for alcoholism. Additionally, the Court will address whether ACF's "cure" claims are false.

### a.     Reasonable Basis - Lack of Scientific Substantiation

ACF's Website, Krotzer's Recommendation of dietary supplements sent to consumers, and follow-up e-mail "consultations" all represented that the Permanent Cure Program will successfully "cure" alcoholism. Because ACF and Krotzer's representations implicate health concerns, they must be supported by "competent and reliable scientific evidence." <u>FTC v. Nat'l Urological Group, Inc.</u>, 645 F. Supp.2d at 1190; <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 569 F. Supp.2d at 300-01. "'In determining whether an advertiser has satisfied the reasonable basis requirement, the . . . court must first determine what level of substantiation the advertiser is required to have for his advertising claims. Then the adjudicator must determine whether the advertiser possessed that level of substantiation.'" <u>FTC v. Braswell</u>, 2005 WL 4227194, at *8 (quoting <u>FTC v. Pantron I Corp.</u>, 33 F.3d at 1096. "[W]hat constitutes competent and reliable scientific evidence in this case is a question of fact for expert interpretation." <u>FTC v. Nat'l Urological Group, Inc.</u>, 645 F. Supp.2d at 1190. "The Court can look to what experts in the relevant area of study would consider to be adequate in determining the amount of and type of evidence that is sufficient." <u>FTC v. Braswell</u>, 2005 WL 4227194, at *10.

Plaintiffs produced evidence establishing the application of a rigorous standard of scientific reliability via the testimony of their expert, Dr. Hutchinson. Hutchinson stated that "adequate scientific evidence proving the efficacy of intervention agents . . . for treating or curing alcohol dependence should, at minimum, consist of two or more studies" that are

"double-blinded and placebo-controlled" involving 150 to 1,000 human participants and lasting at least 12 weeks, with standard measures and data analysis, and follow-up three to six months later. Hutchinson 3/30/11 Decl. ¶ 23. Hutchinson stated that the ACF customer self-reported "diaries" (compact disks containing Excel spreadsheets) "do not constitute competent and reliable scientific evidence." Hutchinson 3/30/11 Decl. ¶ 26. The record reveals that ACF fell unquestionably short of the accepted scientific standard, and indeed, Defendant Krotzer admitted that ACF's claims are not substantiated by a controlled scientific study. Krotzer has proffered no legal or scientific support for his assertion that uncontrolled self-reported "diaries" in Excel chart format, and non-randomly selected anonymous testimonials are sufficient to substantiate his claims of a "cure" of alcoholism such that they are not deceptive. Krotzer cites to his own opinion of the efficacy the Permanent Cure Program, Krotzer's "Clinical Study: Alcoholism Cure Foundation," and a chart entitled "Clinical Study results," authored by Krotzer, selected customer "diaries" and testimonials, and two articles,[39] none of which constitute reliable scientific evidence substantiating ACF's claims, as confirmed by Plaintiffs' expert witness Hutchinson.

Given the absence of clinical support for his claims, Krotzer argues that the clinical study requirement does not apply to "natural medicines." "While it seems well-accepted that double-blind, placebo-controlled studies are necessary to substantiate health-related

---

[39] Krotzer cites to two publications as support for his argument that "natural medicines" in the form of "nutritional deficiency-support methods," which are "very similar to Molecule Multiplicity," are superior to traditional medical science in combating alcoholism. See Defendant's Response to Plaintiffs' Motion for Summary Judgment at 4 (citing The Vitamin Cure for Alcoholism, by Dr. Abram Hoffer, and Seven Weeks to Sobriety: The Proven Program To Fight Alcoholism through Nutrition, by Joan Mathews Larson; Dr. Joan Matthews-Larson, Ph.D. and Robert A. Parker, M.Sc., "Alcoholism Treatment with Biochemical Restoration as a Major Component," 9 Int'l J. of Biosocial Research 92-106 (1987)(see Docs. 96-18 - 96-20)); see also Defendant's Motion for Summary Judgment at 13-14, 24.

efficacy claims, it is not firmly accepted by the courts how many such studies must be offered." FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 303. Cases embracing the placebo-controlled, double-blind clinical study as the most basic and fundamental requirement for scientific validity and reliability to support health-related claims (including dietary supplements) include: FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 9 (claims of multiple health benefits from coral calcium dietary supplement could have been substantiated by double-blind, placebo-controlled human studies); FTC v. Patron I Corp., 33 F.3d at 1096 n.23 ("Pantron should be required to possess some controlled clinical evidence that the Helsinki Formula [hair loss product] is effective," calling such a study a "minimal requirement"); FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1202-03 (inasmuch as defendants did not counter FTC expert testimony that substantiation required for dietary supplement claims involved an "independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled clinical trial[ ]," no issue of fact regarding requisite level of substantiation and court will rely on the standards set forth by FTC's experts); FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 303-04 (dietary supplements producing multiple health benefits requires substantiation by a double-blind, placebo-controlled study); FTC v. Braswell, 2005 WL 4227194, at *10 (controlled study required to substantiate claims regarding dietary supplements and other health-related products); FTC v. SlimAmerica, Inc., 77 F. Supp.2d at 1274 ("[s]cientific validation of the defendants' [weight loss] product claims requires a double blind study of the combination of ingredients used in Super-Formula"). The Court need not determine how many studies or the size or length of a scientifically controlled clinical study with human participants must be because the

undisputed fact is that ACF and Krotzer fail to substantiate ACF's claims with <u>any</u> scientific evidence.  Krotzer has not countered the testimony of Hutchinson, except to argue that in this case of "first impression," anonymous customer testimonials and self-reported diaries substantiate ACF's claims of "cure."  Krotzer has offered no legal authority or scientific support for this position.  Indeed, "the existence of some 'satisfied' customers is not a defense to FTC Act liability." <u>FTC v. SlimAmerica, Inc.</u>, 77 F. Supp.2d at 1273.  Moreover, Plaintiffs' expert Hutchinson states that these customer responses are not scientifically reliable and do not rise to the level of competent reliable scientific study required. <u>See</u> <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 624 F.3d at 9 (no evidence advertiser received or reviewed any scientific substantiation for claims); <u>FTC v. QT, Inc.</u>, 512 F.3d 858, 862 (7th Cir. 2008)(advertiser who relied in part on testimonials, had no proof of ionized bracelet's pain-relieving efficacy).   Indeed, in <u>Daniel Chapter One v. FTC</u>, 405 F.App'x 505 (D.C. Cir. 2010), <u>cert. denied</u>, No. 10-1292, 2011 WL 1527273 (U.S. May 23, 2011), a case involving "natural" dietary supplements represented to prevent, treat and cure cancer, the Circuit Court of Appeals for the District of Columbia stated:

> . . . [T]he [FTC] did not exceed its statutory authority by requiring [the marketer] to have a reasonable basis for its claims. <u>See</u> <u>Thompson Med. Co., Inc. v. FTC</u>, 791 F.2d 189, 193 (D.C. Cir. 1986)("in general an advertisement is considered deceptive if the advertiser lacks a 'reasonable basis' to support the claims made in it").  Nor is there anything unreasonable about the specific type of basis required by the Commission, namely "competent and reliable scientific evidence" including clinical trials with human subjects. Contrary to [the marketer's] claim the FTC is "raising the bar" as to the type of support necessary for a reasonable basis, . . . the Commission applied the analysis it has consistently used and which this court approved in <u>Thompson Medical</u>, 791 F.2d at 195.  The Commission's published compliance guide, moreover, gave

notice that a reasonable basis for a claim concerning a dietary supplement consists of scientific evidence, including clinical trials. <u>See</u> FTC, <u>Dietary Supplements: An Advertising Guide for Industry</u> (April 2001).[40]  As noted in the guide, the Commission generally relies upon experts for evidence of the "accepted norms in the relevant field," <u>id.</u>, and the expert testimony before the Commission in the present case supports the type of substantiation it requires of [the marketer].

405 F. App'x at 506 (denying marketer's petition for review of FTC Order prohibiting marketer from representing its herbal formula prevents, treats or cures cancer).

Krotzer's citation to two articles, with nothing more, does not constitute evidence of scientific substantiation for the Permanent Cure Program.  <u>See</u> <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 624 F.3d at 10-11; <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 569 F. Supp.2d at 300-01.  Neither study actually addresses the specific combinations of dietary supplements recommended by ACF.  Moreover, the only study attached to his Motion for Summary Judgment warns that "[t]he nature of our study demands [the] reader's restraint in extrapolating them to other alcoholism treatment programs" and that the "present study supports the hypothesis that a program emphasizing a biochemical based out-patient, non-drug, treatment modality will be more successful in producing long-term sobriety, than conventional therapy-only based programs.  However, as these results are preliminary, <u>controlled studies</u> testing this approach under more rigid <u>scientific controls</u> are required." (Docs. 96-19, 96-20 ; DX-109B, 109C; Larson and Parker, Alcoholism Treatment with Biochemical Restoration as a Major Component at 101, 104)(emphasis added)).  Likewise, the cited <u>Scientific American</u> article advocating comparative research based upon a review

---

[40]  [<u>available at</u> http://business.ftc.gov/documents/bus09-dietary-supplements-advertising-guide-industry (visited Sept. 9, 2011)].

of medical records, is not applicable here. The article does not present a scientific study, nor does it address alcoholism generally, or ACF's Permanent Cure Program specifically. Moreover, it is unclear how scanning existing medical records to compare alternative treatments of a disease would apply to ascertaining the safety and efficacy of a <u>new</u> and untested health-related product, such as the Permanent Cure Program.

Making "guesses" based on an internet Assessment Form completed by consumers,[41] Krotzer "prescribed" massive amounts of "natural" dietary supplements, to be ingested in combination, to consumers who believed the Permanent Cure Program could "cure" their alcoholism. He acknowledges the dietary supplements could and did cause adverse reactions among consumers, including but not limited to nausea, vomiting, diarrhea, difficulty sleeping, mental status changes, rigidity, hot flashes, rapidly fluctuating blood pressure and heart rate, and possible dangerous interactions with prescription drugs. Under Krotzer's theory, "natural medicines" or dietary supplements are appropriate for prescription and dissemination without any prior scientific study as to their efficacy and safety; Krotzer would rather the consumer rely on post-use reports and medical records. This argument has been rejected by the FTC, the Eleventh Circuit, and by other courts, who consistently require that a "reasonable basis" for a representation about the efficacy of "natural" dietary supplements must include an "independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled clinical trial." <u>FTC v. Nat'l Urological Group, Inc.</u>, 645 F. Supp.2d at 1202.

---

[41] <u>See</u> 9/12/08 Telephone Conversation Tr. at 6.

In conclusion, the strong evidence establishing a scientific standard for evaluating ACF's claims of "cure," and the fact that Krotzer acknowledges that ACF lacked any scientific substantiation for the Permanent Cure Program, establish that there is no dispute that ACF lacked reliable and competent scientific substantiation for its claims that its Permanent Cure Program "cures" alcoholism for most participants, cures alcoholism while allowing alcoholics to drink socially, and is more effective than other treatments for alcoholism compels the legal conclusion that Defendant lacked a basis for the health claims it used to sell its product. Where advertisers lack a reasonable basis, their advertisements are deceptive as a matter of law. FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 8.

### b. Falsity

A "false advertisement" is one which is "misleading in a material respect." 15 U.S.C. § 55. ACF represents that its Permanent Cure program cures alcoholism for most alcoholics who sign up, permits social drinking while curing alcoholism, and is more effective than other treatments.

Plaintiffs' unrebutted expert Hutchinson opined that the Permanent Cure Program and other alcohol-related services offered by ACF and Krotzer are not scientifically proven to treat or cure alcoholism. Hutchinson 3/30/11 Decl. ¶ 35. Specifically, no well-designed, well-controlled, human clinical study, or scientific study of any kind, or any scientific literature, shows that any of the ingredients used in the ACF Permanent Cure Program, alone or in combination, cures alcoholism for most persons who sign up for the program; cures alcoholism while allowing alcoholics to drink socially; or is more effective than other treatments for alcoholism. Hutchinson 3/30/11 Decl. ¶¶ 24-29, 35; cf. FTC v. SlimAmerica,

Inc., 77 F. Supp.2d at 1274 (advertiser's representations were false where the "vast majority of the materials purportedly relied on by defendants for support of their product efficacy claims, to the extent they purport to be studies, contain serious methodological and technical flaws, and therefore cannot be characterized as serious scientific research," including animal studies without medical proof that the effects would be the same in humans). Moreover, because of the lack of scientific substantiation, Krotzer is unable to show that the Permanent Cure Program recommended dietary supplements actually <u>caused</u> any of the customers self-reporting their experiences in "diaries" and "testimonials" to overcome alcoholism. "[A] claim of product effectiveness is 'false' for purposes of section 12 of the Federal Trade Commission Act if evidence developed under accepted standards of scientific research demonstrates that the product has no force beyond its placebo effect." <u>FTC v. Pantron I Corp.</u>, 33 F.3d at 1097-98; <u>see also id.</u> at 1098 ("Pantron's evidence of consumer satisfaction is the most obviously flawed").[42] Here, where there is <u>no</u> scientific evidence suggesting that ACF's Molecule Multiplicity theory is effective and actually "cures" alcoholism, and no evidence that the Permanent Cure Program was responsible for reducing alcohol consumption or cravings, Krotzer failed to disprove the "placebo" effect. Accordingly, Krotzer ACF's claims of "cure" are materially misleading, and thus false. <u>See</u> <u>FTC v. Patrron I Corp.</u> 33 F.3d at 1101; <u>cf</u> <u>FTC v, Bronson Partners, LLC</u>, 564 F. Supp.2d at 133-34 (defendant's expert's opinion about weight loss efficacy of green tea was not as strong as advertisement's claims about green tea, and thus representation was false; advertisement's

---

[42] As observed by one court, testimonials "are not a form of proof [of product efficacy] because most testimonials represent logical fallacy: post hoc ergo propter hoc. (A person who experiences a reduction in pain after donning the bracelet may have enjoyed the same reduction without it . . . .)." <u>FTC v. QT, Inc.</u>, 512 F.3d at 862.

objective claims were "wholly without support or patently false"). Indeed, the FTC "is not required to prove that a product is 'wholly ineffective' in order to carry its burden of showing that the seller's representations of product efficacy are 'false.'" FTC v. Pantron I Corp., 33 F.3d at 1100.

Krotzer's self-serving statements about cure do not create a genuine issue of fact on this issue. See FTC v. Career Assistance Planning, Inc., No. 1:96-CV-2187-MHS, 1996 WL 929696, at *3 (N.D. Ga. Sept. 19, 1996). Nor is Krotzer's broad-brush citation to "over 10,000 unalterable Yahoo email admissions of cure, details of cure and payment negotiations," affidavits, business records, CDs, DVD, and books sufficient to create a material issue of fact. Krotzer does not cite to any competent, relevant or admissible evidence, and his citation to the record does not comply with the Rule 56, Federal Rules of Civil Procedure requirement that he make specific citation to the record and designate specific facts. See Rule 56(c)(3)("[t]he court need consider only the cited materials"). The undisputed competent evidence in the record supports a finding that ACF's "cure" claims are false. See FTC v. Medlab, Inc., 615 F. Supp.2d at 1079-80 (defendants' claims are false where FTC experts state that the claims are outside the realm of plausible science, and defendants failed to put forth evidence establishing the existence of a factual dispute on the falsity of the representations).

### C.    False Establishment Claims (Count II)

In Count II of the Complaint, the FTC alleges that ACF's and Krotzer's express or implied claims that the Permanent Cure Program:

a.    Is scientifically proven to cure alcoholism; and

b.     Has been validated by a $35,000,000 research study

constitute a deceptive act or practice, and the making of a false advertisement, in violation

of Sections 5(a) and 12 of the FTC Act.  15 U.S.C. §§ 45(a) and 52.  Complaint ¶¶ 41-43.

The "scientific support" claims are first developed on Page 2 of the printed Website, which

states that the Permanent Cure Program's "Molecule Multiplicity" theory was:


**Developed by:**
- Two times Nobel prize winner known for nutraceutical work **Dr. Linus Pauling**
- PhD teams at worldwide consulting firms
- Harvard University Medical School
- $35,000,000 validating research study
- Expensive clinics use some of our technology

**Backed up by:**
- Over $200,000,000 in research
- Clinical experience of many hundreds of cured members including many doctors, executives and other professionals
- FTC determination supported by substantial science . . . .

Id. at 2; see also e.g. id. at 3 ("A $35 million study validates our molecule multiplicity

method"); 6, 11, 13, 14, 16; 17, 31, 35, 41, 43, 47, 49 55.  The Website displays more similar

representations:


- **Wall Street Journal** article validates **Molecule Multiplicity** methods, but in language too technical for most
- PhD teams at **Harvard University's prestigious Bert L. Vallee Foundation**
- **Many prominent Universities**
- Thousands of well recognized **research doctors (PhDs)**
- PhD teams at **worldwide consulting firms Governments** (US and Canada)
- Clinical experience of hundreds and hundreds of cured members including many doctors (MD, PhD, CD, JD), executives and other professionals
- **Dr. Johns A. Krasney, MD, PhD, Professor, University of Buffalo School of Medicine and Biomedical Sciences** a long time cured member of **Alcoholism Cure Foundation**

- Dr. **Linus Pauling**, two times **Nobel Prize** winner known for nutraceutical work
- Expensive clinics use some of our technology
- PayPal division of EBay vouches we have large numbers of satisfied members
- Huge Number of Testimonials

Id. at 8 (emphasis in original). "The Science is Overwhelming." Id. Later in the Website, ACF represents that "**The American Journal of Psychiatry** (the **most respected independent source** of information for MDs who treat alcoholism) and **The Wall Street Journal**" support the "'Molecule Multiplicity'" theory. Id. at 22 (emphasis in original). Defendants encourage consumers to join "our:

**Science Based Programs**
**Tested and Validated**
**Permanent Cures to Alcohol Abuse and Addiction**"

Id. at 42 (emphasis in original). Additionally, the ACF Website repeats that "**Alcoholism Cure spent a fortune learning to use over $200,000,000** in medical research on how alcohol works." Id. at 9 (emphasis in original); see also id. 17, 31, 33, 41, 51. The ACF Website states that "Many research PhD's (including Nobel prize winners) have proven our **Molecule Multiplicity** methods really work." Id. at 27. The Website provides a hyperlink to a "bibliography" which ACF represents "is a sampling of 100 major scientific articles from well respected medical publications in our **Research Library**. There are 1,000s of such **addiction articles**." Id. at 9 (emphasis in original); see also id. at 14 ("We spent $500,000 with 2 prominent groups of PhDs to tell us which nutraceuticals really cure alcoholism for some"); 35 ("**Over 100 Scientific articles showing our Formulas act like alcohol in Safely Stimulating Brain Pleasure Centers**" (emphasis in original)); 51. Page 39 of the printed ACF Website is entitled "Medical Science Journal Reports" and lists "Many Pages

of Journal Articles Supporting our technology." Id. at 39-40. The ACF Assessment Page, which is the sign-up page on the ACF Website, reiterates: "**$35,000,000 Scientific Validation by the American Psychiatric Association**." Id. at 25.

The FTC argues that "[n]o study, scientific or otherwise, proves that Defendant's Program cures alcoholism" and that "Defendant's Program has not been validated by a $35,000,000 research study, or any study." Plaintiffs' Motion for Summary Judgment at 8. Plaintiffs cite to the Declaration of Dr. Hutchinson. Hutchinson states that he reviewed an eight-page bibliography of studies and abstracts downloaded from ACF's Website; copies of certain studies and abstracts listed in that bibliography; materials prepared for Krotzer by The Weinberg Group; an article from the Wall Street Journal, dated January 3, 2006, entitled "Antidepressant Use Evaluated," which discusses a government-funded $35 million study of anti-depression medication; and a peer-reviewed article from the American Journal of Psychiatry, dated January 2006, and entitled "Lower Serotonin Transporter Binding Potential in the Human Brain During Major Depressive Episodes," authoried by eleven researchers. 3/30/11 Hutchinson Decl. §§ 13.b, 13.c, 13.d, 18.a and 18.b and (Docs. 61-3, 61-4, 61-5, 61-33, 61-34; 10/15/10 Hutchinson Decl. Attachs. 3, 4, 5, 10, 11). In addition, at the request of the FTC, Hutchinson "searched for applicable published studies." 3/30/11 Hutchinson Decl. ¶ 22. Hutchinson stated that his "review of the materials provided and my search of the available scientific evidence failed to identify any peer-reviewed articles supporting the proposition that any of the ingredients [recommended by ACF], alone or in combination, cure alcoholism in humans." Id. ¶ 24. Hutchinson said that "[t]he American Journal of Psychiatry study . . . referenced in the Wall Street Journal article. . . did not examine alcohol

dependence or its treatment as an outcome and therefore does not provide adequate scientific evidence" that the Permanent Cure Program can "cure" alcoholism.  Id. ¶ 27; see also Krotzer Admission 26.  Other studies reviewed by Hutchinson examined the effects of certain individual ingredients included in the ACF recommended Permanent Cure Program on alcohol use by animals.  3/30/11 Hutchinson Declaration ¶ 28.  However, according to Hutchinson, "such research does not, by itself, provide scientific support for claims regarding the efficacy of that ingredient in treating alcoholism in humans."  Id.  Of the published studies involving individual ingredients on humans, "the outcomes examined did not include alcoholism or its treatment and therefore do not provide adequate scientific evidence" of ACF's "cure" claims.  Id. ¶ 29; see also id. ¶¶ 30, 31, 32, 33.  Hutchinson concluded that "[a] review of the available scientific evidence revealed no published study validating the 'Permanent Cure' Program" and that "[t]he 'Permanent Cure' Program and other alcohol-related services offered by . . . Krotzer have not been validated by a $35,000,000 research study."  Id. ¶ 34 and at 13.

Krotzer responds that "**[t]he actual text [of the ACF Website] shows Krotzer <u>never claimed science accepted</u>** Molecule Multiplicity."  Defendant's Response to Plaintiffs' Motion for Summary Judgment at 12 (emphasis in original).  Rather, Krotzer argues that the ACF Website represents that

> 12.     Molecule Multiplicity is successful "beyond our PhD's wildest dreams."  That sure doesn't claim Molecule Multiplicy is generally accepted!
>
> 13.     Then the claim our PhDs <u>combined</u> "vast amounts of accepted science."  That's indisputably true.  See ~ 900 medical journal reported studies, the "gold standard of medical science" at alcoholismcure.org/medical science/1, and the three following pages

> /2, /3 and /4 (Plaintiffs purported "exact copy" omits /3 and /4 referred
> to at the top of /1 and /2.)(quoted directly from the Weinberg report
> redacting names of natural medicines to avoid the dangers of do-it-
> yourselfers. Plaintiffs would have the Court believe Defendant
> routinely represented scientists supported Molecule Multiplicity, a
> proposition for which there is no support anywhere in the website.

Id. at 13. Krotzer cites to the two publications by Dr. Abram Hoffer and Dr. Joan Mathews Larsen, discussed above, but offers no evidence as to whether these publications appeared on the ACF Website, or that these publications actually support ACF's claims of scientific substantiation. See Defendant's Motion for Summary Judgment at 13-14, 24. Additionally, Krotzer continues to maintain that "Harvard Medical School studies" have established the efficacy of "Molecule Multiplicity" in curing alcoholism in humans, without citing the alleged report or evidence or testimony that the "report" in anyway relates to or is supportive of the Permanent Cure Program's recommended dietary supplements. Id. at 20, 24.

As set forth above, the ACF Website repeatedly represents, expressly and impliedly, that the Permanent Cure Program is supported by scientific study. Indeed, ACF's claim that "molecule multiplicity" was "validated" by a $35 million study appears on nearly every page of the Website. Krotzer on the one hand, denies that the ACF Website contains any representation that "science accepted Molecule Multiplicity." On the other hand, he refers to "900 medical journal reported studies" and to Harvard Medical School, without further elucidation or evidence, as supporting "molecule multiplicity." The Court finds that construing the evidence in favor of Krotzer the ACF Website, and Krotzer himself, see 9/12/08 Telephone Conversation Tr. at 6, 16-17, expressly and impliedly represented that the Permanent Cure Program is scientifically proven to cure alcoholism and has been validated by a $35 million study. See FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d

at 1202 n.21 (rejecting defendants' argument that the claims were not made, and defendants' continued position that numerous studies regarding their products' ingredients support their ingredient-specific claims).

Inasmuch as the representations regarding scientific support relate to health claims, they are presumed to be material. See Kraft, Inc. v. FTC, 970 F.2d at 320, 322; FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190-91; see generally FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *34("[e]xpress claims and deliberately made implied claims are presumed material").  While not required to do so to establish materiality or actual consumer reliance in this context, see FTC v. Phoenix Avatar, LLC, 2004 WL 1746698, at *10 (quoting FTC v. World Traveler Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988)); see generally FTC v. FTN Promotions, Inc., No. 8:07-CV-1279-T-30TGW, 2008 WL 151888, at *7 (M.D. Fla. Jan. 15, 2008), the FTC proffered evidence that consumers believed and relied upon the science claims and that the science claims were instrumental in inducing them to sign up for the ACF Permanent Cure Program.  See LS Deposition at 13-14; JR Deposition at 13; RJ Deposition at 14.  The Court concludes that there exists no dispute as to whether the representations regarding scientific validation are material.

As to whether the representations were likely to mislead, in Count II the FTC is proceeding under the "falsity" theory.  Plaintiffs' Motion for Summary Judgment at 27; see also Plaintiffs' Response to Defendant's Supplemental Memo of Law at 2-3.  This case is similar to the case FTC v. Nat'l Urological Group, Inc., supra, involving weight loss dietary supplements.  There, the court found that defendants' advertising claim that a clinical test

was performed on the product was inherently false and likely to mislead consumers because the defendants admitted that the products had not been clinically tested. 645 F. Supp.2d at 1203. The court determined that defendants did not concisely and with competent evidence counter the FTC's expert testimony that there was no evidence that the active ingredients in defendants' products could accomplish the weight loss promised. Id.

Here, ACF's claims that the Permanent Cure Program has been scientifically validated, cannot be construed as anything but an express representation. The undisputed evidence is that the oft-referred-to "$35 million study," which apparently refers to the study chronicled in the American Journal of Psychiatry, cited above, has nothing to do with alcoholism, "molecule multiplicity," or with the dietary supplements individually or in combination that are recommended to consumers by ACF and Krotzer. Moreover, Krotzer can cite to no study or scientific proof to counter Plaintiffs' evidence that such scientific validation does not exist. Krotzer's citation to a bibliography, which is included as an exhibit to Hutchinson's 10/15/10 Declaration, without more, is insufficient citation to the record to direct the Court to any evidence which disputes Hutchinson's opinion. See Rule 56(c) and (e).

Additionally, Krotzer's reliance on "1000 medical journal article reports about alcoholism," compiled by The Weinberg Group, (see Doc. 96-3; DX-3; "History and Development"), Defendant's Response to Plaintiff's Motion for Summary Judgment at 13, see also Defendant's Supplemental Memo at 7 ("Weinberg Group long ago determined each molecules [sic] of Molecule Multiplicity has signfiicant scientific support for curing some alcoholics"), is rebutted by evidence in the record that the work of the Weinberg Group does

not support ACF's claims that the recommended dietary supplements of the Permanent Cure Program can "cure" alcoholism.  Indeed, at deposition, (Doc. 123-1 at 1060; Weinberg Dep.), Matthew Weinberg, testified that The Weinberg Group conducted a scientific literature review and analysis, and presented its results to Krotzer; it did not conduct any clinical studies of the ingredients recommended by ACF in the Permanent Cure Program, nor did it conduct any original scientific research.  Weinberg Dep. at 33; (see generally Docs.61-14 - 61-28; 10/15/10 Hutchinson Declaration, Attach. 5, Reports, each of which includes a bibliography of publications, prepared by The Weinberg Group for Adams Beverages, Ltd. in connection with an alcohol-free drink, and regarding individual dietary supplements).  After reviewing the available literature, the Weinberg Group reported to Krotzer that "'[t]o date, no study has evaluated the effect of the combination of ingredients included in Alcohol Free to stimulate the brain reward center."  Rather, the Weinberg Group's evaluation focused upon each ingredient individually, and did not review a "mixture" of the ingredients.  Weinberg Dep. at 51-52. The Weinberg's Group's role was to "provide[ ] advice and counsel in how to stay within DSHEA [the Dietary Supplement Health and Education Act], the dietary supplement regulations with regard to this product."  Id. at 41.  Weinberg testified in deposition that The Weinberg Group's analysis was on individual ingredients and whether the levels proposed by ACF were safe, and that no conclusions could be reached from its research about whether the mixture of ingredients was safe.  Id. at 53, 56.  Moreover, Weinberg testified: "I don't believe you can take what we wrote and use It to say that alcoholism can be cured."  Id. at 43; see also id. at 50, 58-59.  Weinberg further

acknowledged that the Weinberg Group did not evaluate ACF's "proposed cure" for alcoholism.  Id. at 59-60, 73-74; see also Krotzer Admission 31.

Viewing the facts and representations in the light most favorable to Krotzer, the Court is nevertheless compelled to find that the undisputed evidence establishes that ACF and Krotzer made material representations, express and implied, regarding scientific validation of the Permanent Cure Program, that were likely to mislead reasonable consumers.  These representations were patently false and deceptive as a matter of law, and no reasonable fact-finder could conclude otherwise.  See FTC v. Bronson Partners, LLC, 564 F. Supp.2d at 133-34.

### D.  False Claims About Cost and Cancellation Policy (Count III)

In Count III, Plaintiff FTC alleges that ACF and Krotzer's representations that:

a       The "Permanent Cure" Program is virtually free, costing
         only $350 or, at most, a few hundred dollars more; and

b       Consumers can cancel the "Permanent Cure" Program
         anytime if not being cured.

constitute a deceptive act or practice, and false advertising, in violation of §§ 5(a) and 12 of the FTC Act.  15 U.S.C. §§ 45(a) and 52.  Complaint ¶¶ 44, 46.  The FTC alleges that in truth, "Defendants claim that consumers owe from $9,350 to more than $20,000 for the 'Permanent Cure' Program" and that "consumers cannot cancel the 'Permanent Cure' Program anytime if not being cured because, when they cancel, Defendants attempt to collect additional fees up to the full cost of the Program by, among other things, sending dunning notices, billing consumers without authorization, and filing lawsuits."  Id. ¶ 45.  The evidence and argument relating to Count III is extensive.

Again, the FTC proceeds under the falsity theory.  When assessing whether an advertisement is "deceptive," in violation of § 5 of the FTC Act,  "the court must look to the advertisement's overall, net impression rather than the literal truth or falsity of the words of the advertisement." <u>FTC v. Nat'l Urological Group, Inc.</u>, 645 F. Supp.2d at 1189; <u>see also</u> <u>FTC v. Capital Choice Consumer Credit, Inc.</u>, 2004 WL 549998, at *32  ""[W]hether a representation is likely to mislead reasonable consumers must be determined 'by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.'" <u>FTC v. Peoples Credit First, LLC</u>, 2005 WL 3468588, at *6 (internal quotations and citations omitted).  Deception may be accomplished by innuendo rather than outright false statements.  <u>FTC v. Capital Choice Consumer Credit, Inc.</u>, 2004 WL 5149998, at *32. Additionally, headline, general tone, juxtaposition of phrases, and contradictions may all contribute to the "net impression" of a presentation. <u>Id.</u>  Fine print notices placed in obscure locations of an advertisement will not preclude liability for deceptive practices under § 5 of the FTC Act.  <u>FTC v. Cyberspace.com LLC</u>, 453 F.3d at 1200; <u>see also</u> <u>FTC v. Medlab, Inc.</u>, 615 F. Supp.2d at 1077 (qualifying and cautionary statement in "minuscule type" does not excuse defendant from representations in the body of the text).  Disclaimers or qualifications "are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 624 F.3d at 12.  Finally, "[w]hile '[p]roof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show a practice is likely to mislead consumers acting reasonably under the

circumstances.'" <u>FTC v. USA Financial, LLC</u>, No.10-12152, 2011 WL 679430, at *2 (11th Cir. Feb. 25, 2011)(quoting <u>FTC v. Cyberspace.com LLC</u>, 453 F.3d at 1201.

The ACF Website representations about cost and cancellation are legion.  Page 1 of the printed ACF Website announces in bold print, "**Our Program is Virtually Free! Pay Little Until You See Results!  Most fees payable from savings on alcohol not used.**" 5/4/09 ACF Website at 1 (emphasis in original).  The first page claims, in bold-faced type:

**We will cure you . . . guaranteed.  Often within 1-10 weeks, nearly always by 5 months.
You may cancel anytime you are not being cured as we describe.
Virtually cost free. Cure dividends Savings typically exceed regular monthly fees.**

<u>Id.</u>  This is followed by:

> **Costs - Virtually free**
>
> 1-10 weeks.  Difficult cases spend a few hundred dollars more.  This **includes the cost of ingredients** which are purchased separately from major manufacturers of your choice to assure highest quality and freshness.  Typically your costs are paid by your **Cure Dividend Savings**, the alcohol you no longer drink.  You must follow your program for 5 months, since you may be a difficult case and may cancel anytime after 5 months if not being cured as we describe.
>
> Base fees are - Heavy Drinker $2/day - Very Heavy Drinker $3.33/day.  Fees step up by less than typical **Cure Dividend Savings**, cost savings as your alcohol consumption goes down. Daily fees step up a little after the first month, again in the third month to HD $6/day (VHD $9/day).  **We cheerfully refund step up amounts** if results are slower than typical and to help make sure your fees are paid from **Cure Dividends**.  The conditions? You must take your ingredients and submit reports. . . .

<u>Id.</u> at 2; <u>see also</u> <u>id.</u> at 10, 26, 27, 43; <u>see also</u> <u>id. e.g.</u> at 6, 7, 26, 27, 31, 33 ("cure dividend").  Later, the Website proclaims: "**Our programs are Virtually Free / Most spend less than $350** (fees plus ingredients) before starting to save money on alcohol within 1-10 weeks."  <u>Id.</u> at 43.  The phrase "**Costs: You may cancel anytime** if not being cured as we

tell you" appears repeatedly. Id. at 6, 10[43], 21[44], 26[45], 27[46], 29[47], 43[48]. Other bold-faced representations (and sometimes larger font) include: "**Low Cost Cure,**" id. at 3, 5, 8, 10, 13, 21 ("**little cost to you**"), 31, 33, 43 ("**Many reasons for Low Cost**"), 45, 46, 51. ACF claims:

- Most member's monthly fees plus ingredients total less than $500 ($2 or $3/Day) until **Drinking Down Half**.
- **Overall cost almost never exceeds $750** compared to next best treatment - clinics costing **$30,000**.
- **Fees mostly payable only when you are cured**
- Fees mostly paid from Cure Dividend Savings . . .

Id. at 16; see also id. at 47. The Website also distinguishes its Permanent Cure Program from other expensive treatments: "**Not the $15,000-$30,000 in advance fees** you may have thought about for a recovery . . . **Not the $5,000-$10,000 cost of psychiatrists who have no drugs to permanently cure you.**" Id. at 5 (emphasis in original); see also id. at 21, 36, 37. The Website offers the following unclear explanation about cancellation, directly following the claim: "**Costs: you may cancel anytime** if not being cured as we tell you":

- **$2,600 Resignup fee** When you join the first time, we **invest a lot of money in you**, counting on your being able to stick

_____

[43] "**You may cancel anytime if not being cured** as we tell you on seven month's notice."

[44] "**• You may cancel anytime** you are not cured after following the program for five months.

[45] "**You may cancel anytime** you are not at least **Drinking Down Half** after following your program for five months, or if we can not bring you down to **Social Drinking** within a reasonable time afterwards. . . . "**You may quit anytime if not being cured as we describe.**".

[46] "**Monthly payments you can cancel unless you are being cured should make your decision so simple** you can comfortably sign up **Right Now**."

[47] "**You may cancel at any time** on seven months notice if you are not being cured as we describe. . . . **We discourage canceling . . . .**"

[48] "**You may cancel anytime** if not being cured as we tell you."

> with our program for many months. Cancelling is a strong symptom of **alcohol caused brain damage**. Once you demonstrate we cannot count on you, you must pay our costs for curing you up front.

Id. at 6 (emphasis in original). "You should plan on more than a year to be sure of your **Safety Net Formula**." Id.

The ACF Website invites consumers to receive a "Free Assessment," by submitting their health histories and other personal information through ACF's on-line form. The Assessment page, which is headlined: "**Do Your Assessment - Then Sign Up**, states the following:

- **Costs are typically under $350 until you see results in 1-10 weeks**. Difficult cases only a few hundred more
- **We cheerfully refund step up fees** if you are not *drinking Down Half* in the typical 1-10 weeks. This typically keeps your costs (including ingredients) less than a single bar drink/day.
- **You may cancel** anytime you are not at least *Drinking Down Half* after following your program for five months, or we can not bring you down to *Social Drinking* within a reasonable time afterwards. The **Cure Dividend Savings** typically exceed all costs, and your program is virtually **cost free** until you are **Permanently Cured**.

Id. at 23 (emphasis in original). The Assessment page states, at the bottom of page 2: "By submitting your Free Assessment you agree to terms and conditions. A small hyperlink to "Terms and Conditions" appears at the bottom of the third page of the Assessment page. Id. at 25.[49]

---

[49] The 5/4/09 ACF Website repeats hyperlinks which direct consumers to key pages, many times appearing in a list of some 90 minuscule-type hyperlinks streaming down the margins of multiple pages in the 5/4/09 ACF Website.

The "Secure Sign-Up" page appears directly following the Assessment page.  Id. at 26.  The Sign-Up Page repeats the cancellation claim, stating "**You may cancel anytime you are not at least *Drinking Down Half* after following your program for five months,**" and "**You may quit anytime if not being cured as we describe.**"  The Sign-Up Page offers multiple hyper-links to enable a consumer to sign-up for the Permanent Cure Program: "**Yes! I Want My Life Back,**" "**Buy Now!**" "**Yes,**" and "**PayPal Subscribe.**"  Id. at 26-28.[50]

The actual "Terms and Conditions Refunds and Cancellation Policies" pages consist of 110 paragraphs filled with very small print, reviewable on a computer screen two paragraphs at a time, appearing at the end of the ACF Website, thirty printed pages after the Assessment and Sign-Up pages.  Id. at 53-55; Krotzer Admissions 85, 86.  In the "Terms and Conditions" ACF repeats the phrase: "**You may cancel anytime if not being cured as described** after following your program for five months,**" Id. at 54, but then later states in very fine print that "you are an indefinite commitment if your long term drinking stops for any reason" and that "You may stop your membership only by meeting the unlikely conditions described below."  Id.  The "unlikely conditions" for proof of continued drinking to establish that the customer is not "cured" of alcoholism and thus eligible for cancellation, are represented to be: submitting "a hair sample for analysis which will disclose your drinking over an [sic] 90 day period, or your choice of two from our standard list of simple and inexpensive 'Proofs of Continued Drinking.'  In extreme cases, we will require the hair test, which costs over $500."  Id. at 55.  The Website never discloses the draconian proof later

---

[50]  The "Secure Sign Up" page does not have a hyperlink to the "Terms and Conditions."  Sign-up hyperlinks in bold print announcing "**Sign Up Now**" "**Join Now**, "**Secure Sign Up,**" and "**Yes! I Want My Life Back**!" appear on nearly every page of the 5/4/09 ACF Website.

required by Krotzer for cancellation including a notarized letter from a doctor and five friends, liquor receipts, extensive laboratory testing done at the customer's expense, and submission of pubic hair, and that Krotzer requires "as many as possible."  See supra at 32 and n.9 (citing Doc. 58-11; Henry 1st Decl. Attach. J at 8-9).  This same fine-print Terms and Conditions states:

> You authorize us now to charge then for part or all of your remaining fees totaling 76 months. . . . If you attempt to cancel prematurely, denying us the chance to permanently cure you, or fail to follow your program, you are considered cured for all purposes and our fees are fully earned. . . . That means you have a legal obligation to follow these Cancellations and Refund Policies.

Id. at 54; see also id. at 55 ("you [sic] obligation to pay us for 76 months").  More fine-print speaks of cancellation "triggering the acceleration of your entire obligation as happens if you just quit paying."  Id.

In his conversation with FTC investigator Henry, Krotzer alluded to a consumer's inability to cancel after receiving ACF's dietary supplement recommendation.  "That's like getting the car from the car manufacturer and then saying, I've decided I'd rather not pay for it, but you'll let me keep the car, won't you?"  9/12/08 Telephone Conversation Tr. at 40. He went on to say, however, that "if we don't cure you, then you can cancel."  Id. at 42.  No where in the conversation did he suggest to the "consumer" that she would be contractually committed to pay thousands of dollars more if she signed up for the Permanent Cure Program.

Krotzer's method patent application is prescient.  It talks about designing an "internet methodology" to "captur[e] the client during a short window of opportunity" by "providing a means to join the voluntary treatment program immediately online through acceptance of

credit cards as payment; . . . and providing a long-term contract that is executed by the individual, wherein the individual agrees to acceleration of all charges in the event of a cancellation request by the individual." Internet Patent Appl. at 1-2. "The request for cancellation is the trigger for acceleration . . . ." Id. at 6. Krotzer's patent application describes providing an Internet website "with multiple pages of text, the text ending beyond a single visible screen" to require the reader to continue scrolling. Id. at 2. "The client should find it very easy to sign up by credit card, with ample linking via many Express buttons to the sign-up [page]." Id. at 6. Krotzer explained that the consumers "need to be eased into pricing by avoiding the significance of the expense . . . . " Id.

While not necessarily required to do so in order to prove deception, see FTC v. USA Financial, LLC, 2011 WL 679430, at *2, Plaintiffs have submitted consumer evidence in which the customers consistently stated, either by declaration or in deposition, that they were misled by the ACF Website to believe that they could cancel their participation in the Permanent Cure Program at any time after the first five months. None of the consumers believed that they would be liable for years of financial commitment, totaling anywhere from $13,000 to $20,000. None said that they read about the "accelerated payments" or a 76-month commitment, nor did they see the "Terms and Conditions section. E.g. JR Deposition at 12-13, 16-18, 44; RJ Deposition at 11, 19, 33-35; LS Deposition at 17-19; Consumer 1 Decl. ¶ 4.

Plaintiffs argue that while the ACF Website expressly represents to consumers that they may cancel at any time after five months participation, and that their costs will remain "typically" under $350, Krotzer admits that the "Program really costs $20,000 and being able

to cancel is 'unlikely.'" Plaintiffs' Motion for Summary Judgment at 22 (citations omitted). Plaintiffs contend that "Defendant's intentionally buried, confusing, and inconsistent terms . . . are insufficient to modify his express cost and cancellation claims." Id. (citations omitted). "Defendant's admissions, combined with his unauthorized billing practices, . . . reveal that his advertised cost and cancellation claims are blatantly false and therefore deceptive." Id. Moreover, argue Plaintiffs, "Defendant has not shown . . . that any of his alleged disclaimers effectively corrected the deceptive net impression created by his express cost and cancellation claims." Plaintiffs' Response to Defendant's Motion for Summary Judgment at 14-15.

In response, Krotzer asserts that the "One-Sentence-Clickwrap-Contract" is "prominently featured many places, including where members read most carefully, right above where members clicked to sign up and make their first payment." Defendant's Motion for Summary Judgment at 17 (emphasis omitted)(citing DX-104 (displaying Website excerpts with hyperlink nomenclature "Heavy Drinker" and "Very Heavy Drinker"; the word "contract" does not appear on the Website excerpts displayed in the exhibit)); see also Defendant's Response to Plaintiffs' Motion for Summary Judgment at 16. Krotzer argues that this "One-Sentence-Clickwrap-Contract" "was sufficient notice to establish the contingent payment contract and its acceleration . . . ," and "adequate disclosure to support $20,000 charges . . . ." Defendant's Motion for Summary Judgment at 17 and n.12; Defendant's Response to Plaintiffs' Motion for Summary Judgment at 16. Krotzer states:

> Perhaps 'You May Quit Anytime Not Being Cured as Described Following Your Customized Program for Five Months.' is not totally clear, but **it describes and suggests the most important major terms**. At the very least, it gives glaring

> <u>Inquiry Notice</u> of the terms and conditions page <u>accessible by</u>
> <u>hyperlinks on nearly every page</u>.

Defendant's Motion for Summary Judgment at 22.  Krotzer contends that the ACF Website's Terms and Conditions pages contain "language suggesting a long term commitment.  Any reasonable consumers [sic] about to spend a lot of money could not fail understand he was authorizing long term payments unless he could prove he was not cured."  Defendant's Response to Plaintiffs' Motion for Summary Judgment at 14.

Additionally, Krotzer argues that "members could have avoided damages easily" by submitting "their choice of one in five simple proofs they continued to abuse alcohol."  Defendant's Motion for Summary Judgment at 10.  He contends "it was everywhere apparent ACF warned potential members it expected to cure them" and that if they "could not prove their continued abuse of alcohol, they owed many months of fees, quickly amounting to thousands of dollars/year (but less than their savings on alcohol no longer used.)."  <u>Id.</u> at 10-11.[51]

The indisputable net impression of the ACF Website is that the Permanent Cure Program is not expensive, and that the consumer can cancel at any time, after five months, if they are not being cured.  Indeed, the ACF Website distinguishes the Permanent Cure Program from "other expensive treatments," such as "the $5,000-$10,000 cost of

---

[51]  Indeed, Krotzer laments that:

> [t]he unavoidable weakness of Krotzer's business model is once alcoholics know how to stop they would rather save an additional $19,000.  There is no car to reposses, so they thought they could get away with it - until Krotzer won many arbitrations and in Court.

Defendant's Motion for Summary Judgment at 15.  He contends that "[t]he only complaint from members is that they do not want to pay as agreed in their **One-Sentence-Clickwrap-Contract**."  <u>Id.</u> at 18 (emphasis in original).

psychiatrists." 5/4/09 ACF Website at 5. Thus, the overall net impression is that the cost of the program to consumers never exceeds $350, or $750, depending on which cost representation read. See e.g. id. at 16, 23. Moreover, the "you may cancel anytime if not being cured" representation is repeated in bold-faced font throughout the Website, never disclosing how impossible it is to actually establish that you are not being cured. The ACF Website never informs consumers that the total cost of their commitment could be more than $13,000 and as much as $20,000; nothing in the "One-Sentence-Clickwrap-Contract" sign-up hyperlinks cited by Krotzer puts any consumer on notice that they may be liable for $20,000 in accelerated fees if they request to cancel the Program. The closest the Website comes to disclosing the $20,000 financial liability espoused by Krotzer is the mention of a 76-month commitment, buried in fine print on the fifty-fifth page of the printed ACF Website, in the incomprehensible small print Terms and Conditions section, following repeated claims of "virtually free," "low cost," "no more than $350," and "you can cancel at any time." A careful reading of the "Terms and Conditions" section found at the end of the voluminous Website, reveals confusing and contradictory terms, none of which set forth the true total cost of the Program. The inconspicious "Terms and Conditions" section in the ACF Website did nothing to affect, disclaim or qualify the repeated, highlighted and bold-faced claims of low cost and easy cancellation. Krotzer's assertion that the "Terms and Conditions" pages are "accessible by hyperlinks on nearly every page" and thus the consumer is on "inquiry notice" to read the Terms and Conditions is belied by the structure of the ACF Website and Krotzer's own admissions. The hyperlinks to which Krotzer refers appear at the end of a list of more than 90 hyperlinks presented in minuscule type along the right-hand margin of a

number of web pages, and appear as "Cancellation Policy," and "Refund Policy." The consumer is never guided to navigate to the Terms and Conditions pages, and, no where is the consumer specifically advised of the total cost of the Permanent Cure Program. Nor does the Website advise of the unrealistic and impossible conditions Krotzer later demands in order for a customer to establish that he or she is not "cured" in order to cancel.

The Court concludes that no issue of fact exists regarding Count III. The indisputable net impression to be derived from the ACF Website is that the Permanent Care Program is low-cost, and that the customer may cancel the Program at anytime after five months if his or her alcoholism is not cured. This impression is borne out by evidence of consumers, who stated under oath that they were misled to believe those repeated representations. Such express and deliberately implied claims used to induce the purchase of a product or service are presumed to be material to consumers as a matter of law. FTC v. 1st Guaranty Mortgage Corp., 2011 WL 1233207, at *12. Moreover, the testimony of the consumers confirms that the representations were material to their subscribing to the Permanent Cure Program. And, it is undisputed that the "virtually free," "low cost" and "cancel anytime" claims were likely to mislead, and in fact did mislead. Krotzer himself has stated that the customer "[n]eeds to be eased into pricing by avoiding the significance of the expense." Internet Patent Appl. at 6. The ACF Website not only "avoided" the significance of the expense, it captured vulnerable and unsuspecting consumers, with deceptive representations which in no way disclosed that they would be liable for up to $20,000 in costs even if not cured of alcoholism. The FTC is entitled to summary judgment as to Count III.

**E.    False Claims About Professional Qualifications (Count IV)**

In Count IV of the Complaint, the FTC alleges that ACF and Krotzer represent "directly or indirectly, expressly or by implication, that Krotzer and other ACF employees have doctorates or licences in areas related to the treatment of alcohol." Complaint ¶ 47. The FTC alleges that "[n]either Krotzer nor any ACF employee, agent, or independent contractor holds any doctorates or licenses related to the treatment of alcoholism." Id. ¶ 13. This, contends the FTC, constitutes a deceptive act or practice, and the making of a false advertisement, in violation of §§ 5(a) and 12 of the FTC Act.  15 U.S.C. §§ 45(a), 52.

Photographs of men in white coats appear 20 times in the ACF Website.  See 5/4/09 ACF Website at 9, 10, 11, 14, 17, 19-20, 21, 22, 29, 35, 37, 44, 47, 51-52, 58.[52]  In the first instance, a caption reading: "The **team of doctors** employed by Alcoholism Cure did the research in the sciences of Alcoholism and Nutraceuticals . . . Our clinical successes have been beyond their wildest dreams."  Id. at 9; see also id. at 31 ("The **team of doctors** employed by Alcoholism Cure did the research in the two sciences"); 33 ("Doug hired a **prestigious group of doctors** and spent a fortune learning from all the research . . . ").

The Website refers to "**our specialized knowledge, experience and monitoring**," Id. at 1, and cautions: "**No Lists of Ingredients in Advance**. Without supervision by our doctors . . . ."  Id. at 1; see also id. at 6.  The Website represents:

---

[52]   There are actually three different photographs that are repeated throughout the Website.  A photograph of a smiling man wearing a white coat appears 12 times.  See 5/4/09 Website at 9, 10, 14, 17, 19-20, 21, 29-30, 35, 37, 47, 51-52, 58.  A second photograph, this of a man in a white coat peering into an illuminated screen of a skull appears eight times.  Id. at 11, 17, 22, 29, 44.  A third image, a man holding a model of a brain in what appears to be a research laboratory, appears eight times.  Id. at 1, 6, 16, 26, 27, 38, 41, 49.

> **Your Personal Doctor** (PhD, ND, JD, not MD) studies your assessment answers for many insights into what you brain seeks in alcohol. He screens to avoid any adverse interactions with your medications. Based on our successful experience, he determines the composition and amounts of your First Recommendation. We do that so well, most are cured with few further adjustments.
>
> **Doctor Monitoring 15/7** We can safely do many things others cannot because Your World Class Specialist is only minutes away.
>
> . . .
>
> **Support Systems**: We encourage members to not change their minds in several ways:
> - **Personal relationship** with your same doctor for your entire program
> - **Weekly support** - ENews. Free to members

Id. at 2; see also id. at 5 ("**Doctor Monitoring** Your doctor is always available to answer your questions . . . you talk to your doctor as soon as you need to"); 14 (**15/7 doctor monitoring**"). ACF promises that "Complex analysis of your reactions to many Formulas by World Class Specialists is the very heart of how we find out what your brain needs." Id. at 7. The Website exhorts that "The **team of doctors** employed by Alcoholism Cure are expert in addictive diseases and nutraceutical medicine." Id. at 3; see also id. at 13 ("• **Our Doctors"** and "**Only our experts can safely cure you**"); 47 ("you need **our doctors** reliably available to advise and support your, without the delay and cost of doctor appointments"); 48 ("**Only Our Doctors** . . . ). The Website proclaims (next to a photograph of the smiling man in a white coat):

> - **A World Class Doctor** who **regularly cures almost everyone** is assigned as your personal doctor for the duration of your program.
> - **His experience and careful detailed analysis** of your information determine your First Recommendations ingredients. **different for every individual**.
> - We immediately have invested in your actual doctoring more than 15 times what the best clinics spend in 30-45 days. . . .

Id. at 21.

Notably, the "not MD" disclaimer rarely appears with the "doctor" and "specialist" representations.[53]   Indeed, at at least one point, the Website actually claims "MD" involvement, stating: "Our MDs do a great job at a reasonable price, since counseling by internet is available much more when you need it, and much more efficiently, maximizing the benefits of your counselors [sic] expensive time."  Id. at 5.

Consumer testimony submitted by Plaintiffs consistently establishes that consumers believed from the representations they read on the ACF Website that they were being monitored by professionals, including medical doctors, trained in health care and curing alcoholism.  See LS Dep. at 12, 14, 16-17 ("it was asserted that . . . your results would be monitored by medical professionals"); JR Dep. at 11-12; RJ Dep. at 14-15; Consumer 1 Decl. ¶ 5;  Consumer 4 Decl. ¶ 5.  For example, one consumer stated that "I was told I would be assigned a doctor who would be in constant touch with me and would develop a plan of ingredients for me to take that was, supposedly, tailored to my specific physical needs." (Doc 60-14; Consumer 7 Aff. at 4).  Even after becoming involved in the Permanent Cure Program, consumers believed that they were being monitored by specialists:

> I noticed that in Dr. Doug's emails he included "not md" after his signature. I did not necessarily expect the ACF recommendations to come from a medical doctor, as the ACF implied that medical doctors could not cure alcoholism. However, I was under the impression that those recommendations would come from a specialist with a Ph.D in

---

[53]   The Court located several "not MD" disclaimers, all of which were in fine print. 5/4/09 Website at 1 ("Doctor (not MD) 15/7 monitored programs); 2 (**Your Personal Doctor** (PhD, ND, JD, not MD)"); 27 (**Talk to Your Alcoholism Cure Doctor** (not MD)($180/half hour)" and "**monitoring by world class doctor**")).  At page 57 of the Website, there appears the following, in fine print: "Alcoholism Cure advisors hold doctorate degrees (PhD, ND, JD) but are not medical doctors (MD)." Id. at 57.

> chemistry or another field relevant to alcoholism or addictive
> disease.

Consumer 1 Decl. ¶ 5.

According to Plaintiffs, "Defendant refers more than 500 times on his website to 'doctor,' 'world class specialist,' and other specialized and scientific knowledge." Plaintiffs' Motion for Summary Judgment at 8. Plaintiffs argue that "Defendant's professional qualification claims . . . are false. 'Dr. Doug' and ACF's employees do not hold any scientific degree or license relevant to treating or curing alcoholism." Id. at 23 (citations omitted). Although Defendants sometimes parenthetically indicated that "the 'doctors' are 'PhD ND JD, not MD,'" Plaintiffs argue that "such disclaimers are ineffective because they do not correct consumers' false notion that they will be treated by someone with relevant scientific or professional qualifications." Id. (citations omitted).

Krotzer argues only that there is "no support anywhere in the website" that "Defendant routinely represented scientists supported Molecule Multiplicity." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 13. Defendant does not otherwise specifically deny the allegations in Count IV other than to say that "[l]arge numbers" of customers "thanked him profusely, or compared him to God." Id. at 21.

There is no factual dispute that the ACF Website, and subsequent communications between consumers and "Dr. Doug" represented that "doctors," "world class specialists," "world class doctors," and "experts," would develop each customer's Permanent Cure Program recommended dietary supplement dosages; be available to answer customers' questions; and monitor and oversee each and every customer's use of the recommended dietary supplements. These representations were indisputably made to induce consumers

to purchase Krotzer's service and were health related, and thus were presumptively material. FTC v. Urological Group, Inc., 645 F. Supp.2d at 1190. Defendant has offered no evidence or argument to overcome that presumption. Moreover, the representations regarding the involvement of professionally qualified specialists were likely to mislead. There is no dispute that the net impression of the ACF Website and the subsequent communications between Krotzer and consumers was that customers would be cared for via e-mail communications by qualified professionals, with doctorates or licenses in relevant scientific or health-related fields. The representations made in the ACF Website were not subtle; they were repeated hundreds of times, and displayed prominently in bold-faced type, explicitly and, by innuendo, impliedly representing medical oversight. The fine-print "not MD" disclaimers were not adequate to dispel the unavoidable "net impression" of the ACF Website and subsequent communications. Accordingly, the Court determines that there is no triable issue as to whether Defendant's representations regarding the professional qualifications of Krotzer or ACF employees, agents or independent contractors were deceptive and false, in violation of § 5 of the FTC Act. See FTC v. Medlab, Inc., 615 F. Supp. 2d at 1079-81 (advertiser's representations which included claim that weight loss supplement was a "'doctor-designed'" therapy was a deceptive act or practice under the FTC Act); see also Stanley Lab., Inc. v. FTC, 138 F.2d 388, 390-91 (9th Cir. 1943)(evidence sustained FTC's findings that use of the letters "MD" or "M.D.," either alone or in conjunction with picturization of a doctor, nurse, or cross, in connection with medicated douche powder, was deceptive in leading public to believe that powder was endorsed by medical profession or by the Red Cross, justifying FTC's cease and desist order).

**F.      False Privacy Claims (Count V)**

In Count V of the Complaint, the FTC alleges that ACF and Krotzer, directly or indirectly, made representations "that they would keep consumers' personal health information private, confidential, and anonymous."  Complaint ¶ 50.  Instead, according to the Plaintiffs' allegations, "in numerous instances, . . . Defendants disclosed the personal and health information they collected from consumers to the Better Business Bureau, credit card companies, PayPal, other consumers, and the public, among others."  Id. ¶ 51. Plaintiffs allege that the representations of privacy were false, and constituted a deceptive act or practice.  Id. ¶ 52.

The last page of the printed 5/4/09 ACF Website is a page devoted to ACF's "Privacy Policy."  5/4/09 ACF Website at 57.  It states:

> We recognize that **many alcohol abusers cannot participate** in most recovery programs **because they are prominent** citizens, or work for **government** or **large corporations**.  Disclosure would put their careers at risk, or otherwise **jeopardise** [sic] **their social lives**.
>
> With Alcoholism Cure, you are **inherently protected by Internet anonymity**.  Although we would rather deal with you by name, if you wish further secrecy, we accept aliases, other than on credit or contractual information.
>
> **Under no circumstances will we sell or share your identity for commercial purposes to anyone, ever, period.**
>
> **Your records are protected by us, Norton Internet Security Systems and PayPal ultra secure payment technology.  Each the best in their class.**

5/4/09 ACF Website at 57.  The Privacy Policy advises that "Alcoholism Cure advisors hold doctorate degrees (PhD, ND, JD) but are not medical doctors (MD).  We strongly believe the DSHEA [the Dietary Supplement Health and Education Act] law gives us the right to extend

to you the same total privacy rights extended by all medical doctors." Id.  Small hyperlinks to the "Privacy Policy" appear on the right margin of pages throughout the ACF Website. Under "Benefits of Membership," the Website represents that the relationship between ACF and the consumer is "**Totally confidential and private**." Id. at 21.  "As doctors, we have a stronger privacy policy than anywhere on the Internet." Id.  Krotzer personally reassured Investigator Henry, who was posing as an interested consumer, that ACF "guards" the names of its members "jealously," and that ACF's "security is second to none."  9/12/08 Telephone Conversation Tr. at 46-47.

The privacy representations were material and important to consumers who actually did sign up for the Permanent Cure Program.  See JR Dep. at 14-15 ("I live in a small town. I'm a professional. My husband's a professional.  It's [privacy] very important").  They believed that they were going to be anonymous and that their privacy would be protected by the "doctor/patient" privilege.  See LS Dep. at 17; JR Dep. at 14; RJ Dep. at 17.

Despite the repeated assurances of privacy, Krotzer threatened customers wishing to cancel their "membership" in the Permanent Cure Program, with filing a lawsuit which would involve the "local media."  (Doc. 58-13; Henry 1st Decl. Att. L; 2/2/07 E-Mail); see also JR Dep. at 52 ("felt threatened" that his name would become public if ACF and Krotzer filed a lawsuit); Consumer 3 Decl. ¶ 10.  Krotzer also threatened to expose the alcoholism of a pilot to the FAA.  LS Dep. at 42; RJ Dep. at 37; (Doc. 59-8; Consumer 5 Decl. Ex. G; 12/20/06 E-mail from Krotzer to Consumer 5 at 1).  Additionally, ACF sent a "dunning" letter by certified mail to another consumer's office, which made the consumer concerned that his or her privacy was at risk.  Consumer 4 Decl. ¶ 10.

The undisputed evidence further establishes that Krotzer exposed consumers' sensitive health information to third parties. For example, in response to inquiries from the Better Business Bureau with the State of Florida, or from credit card companies inquiring about customer chargeback requests, Krotzer would send the agency or company e-mails between Krotzer and the customer which included sensitive personal and health information. Further, Krotzer revealed the names of at least 11 consumers and purchasers of the Permanent Cure Program in small claims lawsuits filed against consumers who attempted to cancel. Krotzer Admissions 70, 109; Henry 1st Decl. ¶ 17 and Attach. M (Doc. 58-14; Krotzer letter to "Sean").

Krotzer does not specifically address Plaintiffs' arguments as to the allegations of Count V of the Complaint. Instead he appears to rest upon his argument that "1.) Damages if they existed were easily avoidable by consumers and 2.) massive countervailing benefits." Defendant's Motion for Summary Judgment at 9. Krotzer argues that "Plaintiffs are still groping for a single credible, reasonable consumer who was materially harmed." Krotzer Motion for Summary Judgment at 19 (emphasis omitted).

Section 12 of the FTC Act addresses false advertising and provides that "dissemination of false advertisements - defined as advertisements that are misleading in a material respect - is an unfair or deceptive practice in commerce." FTC v. Nat'l Urological Group, 645 F. Supp.2d at 1188 (citing 15 U.S.C. §§ 52(b) and 55). Thus a violation of § 12 constitutes a violation of Section 5. Id. Consumer injury is not an element of a § 5 claim of deception and false advertising. FTC v. Braswell, 2005 WL 4227194, at *4.

Here, it is undisputed that ACF and Krotzer, through the ACF Website, made representations that consumers' sensitive personal and health information would remain private, and that these representations were material to a consumer's decision to purchase the Permanent Cure Program product. Krotzer does not deny that he disclosed private information to third parties, and cites to no evidence establishing that he did not do so. As such, there is no dispute that the "privacy" representations were "likely to mislead." ACF and Krotzer's representations of privacy were "false" because Krotzer routinely used disclosure of personal and health information as a threat to extract payment from consumers who expressed a desire to withdraw from the Program, and actually followed-through on those threats by revealing consumers' personal information to third parties. The Court concludes that there exist no triable issues as to Count V of the Complaint, and that the FTC is entitled to summary judgment. Cf. Dorfman v. FTC, 144 F.2d 737, 740 (8th Cir. 1944)("threats to sue for the purpose of extorting money from customers where no money is due may be forbidden by the Federal Trade Commission").

### G.   Unauthorized Billing (Count VI)

Count VI of the Complaint presents an "unfair practices" claim. The FTC alleges that in connection with their advertising, promotion and sale of the Permanent Cure Program, ACF and Krotzer "have caused charges to be submitted for payment to financial institutions without obtaining the express informed consent of consumers." Complaint ¶ 53. The FTC alleges that ACF and Krotzer's "actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by

countervailing benefits to consumers or competition." Id. ¶ 54. As such, the FTC contends that Krotzer's conduct violated § 5, of the FTC Act, 15 U.S.C. §§ 45(a), 45(n).

The FTC's factual allegations track the legal requirements for an "unfair practices" claim. "'To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.'" FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 299 (citation omitted); 15 U.S.C. § 45(n); see also Orkin Exterminating Co. v. FTC, 849 F.2d at 1364. "Consumer injury" is required to establish liability for an "unfair practice." See FTC v. Braswell, 2005 WL 4227194, at *4. "In most cases 'substantial injury' involves monetary harm." FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 299; see also FTC v. Global Mktg. Group, Inc., 594 F. Supp.2d 1281, 1288 (M.D. Fla. 2008). As to the second prong of the unfairness standard, while certain practices can create a mixture of both beneficial and adverse consequences, "when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition, the unfairness of the practice is not outweighed." FTC v. Windward Mktg., Ltd, 1997 WL 33642380, at *11 (citing Orkin Exterminating Co., 849 F.2d at 1365). Finally, "'[c]onsumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it.'" FTC v. Global Mktg. Group, Inc., 594 F. Supp.2d at 1289 (quoting Orkin Exterminating Co v. FTC, 849 F.2d at 1365). As such, when evaluating whether consumers reasonably could have avoided the injury, "the Court focuses on whether the consumers had a free and

informed choice that would have enabled them to avoid the unfair practice." <u>FTC v. Windward Mktg., Ltd.</u>, 1997 WL 33642380, at *11 (citing <u>Amer. Fin. Servs. Ass'n v. FTC</u>, 767 F.2d 957, 976 (D.C. Cir. 1985)).

Plaintiffs argue Krotzer and ACF's "buried disclaimers" do not entitle Krotzer to declare dissatisfied customers as "cured" and to place charges on their credit accounts, unbeknownst to the consumer. Plaintiffs' Motion for Summary Judgment at 12, 25. Further, argue Plaintiffs, "Consumers cannot avoid the harm where, as here, Defendant does not notify them of, and give them an opportunity to reject, the charges." <u>Id.</u> at 25. Plaintiffs reiterate that the cost and cancellation terms were deceptive and incoherent to consumers, making it impossible for consumers to discern that their credit cards would be charged thousands of dollars if they wished to cancel. Plaintiffs' Response to Defendant's Motion for Summary Judgment at 16-21.

In response, Krotzer again contends that "[t]he prominently featured **One-Sentence-Clickwrap-Contract** was sufficient notice to establish the contingent payment contract and its acceleration with great regularity by credit card companies, mediators and arbitrators, pre trial mediators and others," and that it was "adequate disclosure to support $20,000 charges as made more clear in the formal terms and conditions." Defendant's Motion for Summary Judgment at 17, 23; <u>see also</u> Defendant's Response to Plaintiffs' Motion for Summary Judgment at 16.[54] Krotzer argues that consumers could have "avoided' injury by providing "one of five simple proofs they continued to abuse alcohol." Defendant's Motion for

---

[54] Although citing no evidence in support, Krotzer asserts that ACF "won the majority of its chargeback cases amounting to about $100,000." <u>See</u> Defendant's Motion for Summary Judgment at 17(indicating that consumers disputed charges placed on their credit cards).

Summary Judgment at 10, 23. Indeed, Krotzer contends that "cured" customers - those who could not prove they were continuing to abuse alcohol - were improperly trying to avoid their financial obligations:

> ***Unreasonable Consumers (Members) Same benefits,*** Nearly all positively or negatively confirmed their cure. Their refusal to pay once cured lead to acceleration of otherwise monthly payments and meant not all got off "Virtually Free". This class of customers, **the cheaters and scofflaws, are entitled to no weight - they are Plaintiffs' whole case.**

Id. at 16. He contends that "No reasonable member was ever harmed other than being pressured to keep their ***One-Sentence-Clickwrap-Contract*** and the Cancellation Policies/Terms and Conditions of which it gave notice." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 17.

Undisputed consumer testimony illustrates Krotzer's scheme in action, and its devastating effects. Consumers consistently testified that they believed they were signing up for a five or six-month membership costing approximately $100 a month, and that they could cancel at anytime thereafter if not cured, without paying any additional money. LS Dep. at 17; JR Dep. at 12-13; RJ Dep. at 11, 19; Consumer 4 Decl. ¶ 5; Consumer 5 Decl. ¶¶ 4, 5. They did not see or read the Terms and Conditions, or accelerated payments or proof of cure. JR Dep. at 16-18; LS Dep. at 17; RJ Dep. at 35; Consumer 1 Decl. ¶ 4. They had no idea they were signing a "long-term contract" that committed them to thousands of dollars in accelerated fees if they attempted to cancel. LS Deposition at 18-19.

Consumers also testified they did not authorize ACF or Krotzer to charge their credit card for 52 weeks, 76 weeks, or for life, or for anywhere between $13,000 to $22,000. LS Dep. at 18-19, 28; JR Dep. at 44; RJ Dep. at 33-34. Nonetheless, ACF and Krotzer placed

charges on the consumers' credit cards when they attempted to cancel. LS Dep. at 24-25, 28, 35 ($12,800); JR Deposition at 48 ($13,378); Consumer 1 Decl. ¶¶ 13, 15, 16 ($13,378, securing a $5,879.12 "'refund"')' Consumer 2 Decl. ¶ 12 ($3,950); Consumer 3 Decl. ¶ 10 ($7,000 charged to credit card and $13,527.96 still "owed"); Consumer 4 Decl. ¶ 11 ($8,400 "settlement fee"); Consumer 5 Decl. ¶¶ 7, 10 ($13,527.96, securing a $12,688.12 "charge-back" from her credit card company); (Doc. 59-5; Consumer 11 Aff., Ex. D; 11/29/06 e-mail from Krotzer to consumer stating: "**You have pre-authorized these charges on your credit card**. The sums of $839.84 for the five month commitment and $12,688.12 for the remaining 47 months of your contract have been charged today").

In the context of this unfair practices claim, Krotzer's position amounts to an argument that the billing was with authorization, and thus was not an "unfair practice." This position is contradicted by the undisputed facts. The first prong of the unfairness standard requires a finding of substantial injury to consumers. The undisputed evidence establishes that consumers were monetarily injured by ACF and Krotzer's practices for which they did not bargain. Consumers testified they were charged as much as $13,000. While Krotzer contends that the FTC did not proffer sufficient consumer testimony regarding unauthorized charges, see Defendant's Response to Plaintiffs' Motion for Summary Judgment at 8, he does not deny that he did in fact charge consumers' credit cards when they attempted to cancel, and that he was aware of charge-back requests from consumers. Krotzer Admission 120. Once he obtained credit card information, Krotzer maintains that he was entitled to "accelerate" charges on it if the consumer expressed an interest in cancelling his or her "membership." Alternatively, he would threaten to bring a lawsuit or to expose the consumer

in an attempt to secure a "settlement." Remarkably, Krotzer continues to justify the practice, the effects of which are far-reaching.

Second, consumer injury outweighed any countervailing benefits to consumers or competitors. Krotzer has adduced no admissible evidence that consumers were indeed "cured" of their alcoholism as a result of following the Permanent Cure Program dietary supplement regimen. Indeed, those wishing to cancel wanted to do so because the Program at best, was not working, and at worst, was making them sick. Krotzer has only proffered his conclusory statements on this point and inadmissible anonymous purported testimonials of persons he maintains were ACF customers. He has adduced no scientific evidence to substantiate any benefit to consumers caused by the Permanent Cure Program. Even if the ACF Permanent Cure Program has "cured" some consumers (of which there is no evidence in this record), the evidence submitted regarding the high volume of consumer complaints, charge-backs and credits shows that Krotzer deceived many others who were not "cured." Thus any alleged benefits do not offset the harm Defendants have done. See FTC v. The Crescent Publ'g Co., 129 F. Supp.2d 311, 322 (S.D. N.Y. 2001).

Finally, under the facts presented here, consumers could not have reasonably avoided their injuries because the ACF Website makes no mention of and gives consumers absolutely no reason to anticipate that their credit cards would be charged thousands of dollars if they wished to cancel or withdraw from the Permanent Cure Program. In Krotzer's own words, the consumers were unknowingly "captured" and "retained" in a "long-term contract," by representations which "avoided" the significance of the expense, where it was more costly to the consumer to drop the program due to automatic acceleration of credit

card charges. Internet Patent Appl. at 1-2. While perhaps the repeated representations on the ACF Website could have been reasonably construed by consumers as providing for a five-month contract, nothing in the lengthy Website, and certainly nothing in the so-called "one-sentence-clickwrap-contract" where consumers clicked a hyperlink to the Sign-Up page, could have given consumers a reason to anticipate that they were signing up for a multi-year $20,000 contract which in essence could not be cancelled, and which subjected them to instant accelerated charges on their credit cards if they expressed a desire to cancel. Rather, consumers were led to believe they would be liable only for a monthly subscription fee of approximately $100 a month, for at least five months, and could cancel at any time thereafter if they were not "cured." The inconspicuous fine-print "Terms and Conditions" found at the end of the lengthy ACF Website, well beyond the Assessment and Sign-Up pages were confusing and self-contradictory. Mention of "legal obligation," "contract," "long term commitment" and "fees are fully earned" if the consumer "attempts" to cancel, 5/4/09 ACF Website at 53-54, and "obligation to pay us for 76 months" and "acceleration," id. at 55, all appear in fine print and fail to set forth any explanatory terms to put the consumer on notice of any obligation to pay thousands of dollars if they wish to cancel because they are not cured, as repeatedly claimed in boldface type. Moreover, the conclusion that consumers could not reasonably avoid the injury is supported by the fact that so many consumers sought cancellation of payment and charge-backs from their credit card companies and PayPal, complained to state and federal authorities, and sought refunds from Defendant. Indeed, Krotzer's argument that consumers could have avoided injury by submitting "one of five simple proofs" is belied by his own impossible demands on

consumers that they submit notarized statements, expensive lab test results, product labels, and hair samples. See supra at 36-39.

The Court concludes that ACF and Krotzer engaged in an unfair practice, in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a), by charging consumer credit accounts without authorization. See FTC v. Global Mktg. Group, Inc., 594 F. Supp.2d at 1288-89 (defendant engaged in unfair acts and practices in violation of FTC Act by withdrawing funds from consumers' bank accounts for purchase of credit cards and credit card loss protection which consumers never received); FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *37-38 (unauthorized debits were a violation of § 5 of the FTC Act, where consumers were tricked into providing authorizations by a nearly unintelligible recording which shows that consumers could not have reasonably avoided having their accounts debited); FTC v. The Crescent Publ'g Co., 129 F. Supp.2d at 322 (enjoining as an unfair practice internet pornographic websites which billed site visitors' credit cards without authorization through deliberate confusion as to when "free tour" ended); FTC v. Windward Mktg., LTD, 1997 WL 33642380, at *11-13 (unfair practices where defendants obtained victims' banking information by phone and illegitimately debited accounts for magazine subscriptions consumers did not realize they were purchasing; unauthorized billing practice (bank drafts) found to be "unfair"). The FTC is entitled to summary judgment as to Count VI of the Complaint.

## H. Violation of Florida Deceptive and Unfair Trade Practices Act (Count VII)

The State of Florida brings Count VII of the Complaint. The State of Florida alleges that Defendant violated FDUTPA based upon Defendants' representations that the

Permanent Cure Program "cures alcoholism" while allowing alcoholics to drink socially; is "scientifically proven to cure alcoholism;" and is "virtually free" and can be cancelled at any time if the customer is not cured. Complaint ¶ 57 a.-c. Additionally, the State of Florida alleges Defendants violated FDUTPA by representing that Krotzer and others with ACF "hold doctorates or licenses in areas related to the treatment of alcoholism," and by representing that consumers gave authorization for their credit card or PayPal accounts to be charged for Defendants' services and accelerated payments without obtaining the express informed consent of consumers. Id. ¶ 57 d.-e. The State of Florida alleges that based upon these activities, "Defendants have engaged in representations, acts, practices, or omissions that are material, and which are likely to mislead consumers under the circumstances," constituting "deceptive acts or practices" in violation of FDUTPA. Id. ¶¶ 58-59. In essence, Count VII compiles all of the allegations contained in Counts I through VI to allege a violation of FDUPTA.

Plaintiffs argue that the State of Florida is entitled to summary judgment as to Count VII because "Deceptive or unfair acts or practices that violate Section 5 of the FTC Act also violated the FDUTPA." Plaintiffs' Motion for Summary Judgment at 17; Plaintiffs' Response to Defendant's Motion for Summary Judgment at 19 (citing Fla. Stat. § 501.203(3)(a)-(c)). Defendant Krotzer does not discuss Count VII in his papers.

The Florida Deceptive and Unfair Trade Practices Act makes clear that conduct which constitutes a "deceptive" act or practice, false advertising, and/or an "unfair" act or practice under the FTC Act is a violation of FDUPTA. Specifically, the Act provides that:

**501.202.  Purposes; rules of construction**

The provisions of this part shall be construed liberally to promote the following policies:

(1) to simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.

(2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

(3) to make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

Fla. Stat. § 501.202.  Additionally, FDUPTA provides that "Violation of this part" may be based upon any of the following:

. . .

(b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

(c) Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair deceptive, or unconscionable acts or practices.

Fla. Stat. § 501.203(3)(b) and (c).  FDUPTA makes "unlawful":

(1)  Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . .

(2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2006.

Fla. Stat. § 501.204(1) and (2).

"The Florida legislature enacted FDUPTA in 1973 to protect consumers against commercial wrongdoing and it is patterned after the [FTC Act], 15 U.S.C. §§ 45 et. seq." Millennium Commc'ns & Fulfillment, Inc. v. Office of the Atty. Gen., 761 So.2d 1256, 1260 (Fla. 3d DCA 2000). Florida courts have determined that "subsection 501.204(2) should be interpreted to mean that, in determining whether particular conduct violates the Florida DTPA, a court should consider whether the FTC and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under section 5(a)(1) of the FTC Act." Mack v. Bristol-Myers Squibb Co., 673 So.2d 100, 104 (Fla. 1st DCA 1996). "Because the legislature did not define what is an unfair or deceptive act, a practice which 'offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers may violate [F]DUPTA.'" State of Fla., Office of the Atty. Gen. v. Tenet Healthcare Corp., 420 F. Supp.2d 1288, 1310 (S.D. Fla. 2005)(citation omitted); see also Trent v. Mortgage Electronic Registration Sys., Inc., 618 F. Supp.2d 1356, 1365 (M.D. Fla. 2007). "'[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" Zlotnick v. Premier Sales Group, Inc., 480 F.3d 1281, 1284 (11th Cir. 2007)(quoting PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003). FDUPTA empowers the State of Florida, Office of the Attorney General, Department of Legal Affairs to bring an action to "enjoin any person who has violated, is violating, or is otherwise likely to violate" FDUPTA. Fla. Stat. §§ 501.203(2), 501.207(1)(b); see also Millennium Commc'ns, 761 So.2d at 1257, 1260.

For the reasons set forth above in the Court's analysis of Counts I through VI, in which the Court determined that Plaintiff FTC is entitled to summary judgment under the FTC Act, the Court concludes that there are no triable issues and that the State of Florida is entitled to summary judgment as to Count VII.

## I.    Krotzer's Individual Liability

An individual may be held directly liable for his own violations of the FTC Act, or jointly and severally liable for a corporation's violation.  FTC v. Windward Mktg., Ltd., 1997 WL 33642380, at *13;  see also FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1207. FTC v. Capital Choice Consumer Credit, Inc. 2004 WL 5149998, at *46.

It is undisputed that Krotzer communicated directly with consumers, repeating the same representations that appeared on the ACF Website.  Additionally, he made representations to consumers which were not on the Website, including additional requirements for establishing that the consumer was "not cured"; representations regarding thousands of dollars owed; and threats of legal action and public disclosure.  Because of these representations, Krotzer may be held individually liable for his direct violations of the FTC Act.

The undisputed evidence also establishes that Krotzer may be held liable for ACF's violations of the FTC Act.  Krotzer is the 100 percent owner and sole corporate officer of ACF, and is literally the face of Alcoholism Cure Foundation, the fictitious name for Alcoholism Cure Corporation.  He is singularly responsible for the ACF Website and the representations made thereon; he authored and signed all correspondence to consumers; and he initiated collection efforts against them.  Krotzer does not dispute his singular control

of ACF. As such, there is no triable issue as to whether Krotzer both participated directly in the deceptive acts or practices, false advertising and unfair acts and practices of ACF, had knowledge of ACF's wrongful acts and practices, and was in control of ACF at all times. On this record, Krotzer may be held personally liable for his own violations of the FTC as well as for ACF's violations. Accordingly, judgment is due to be entered in favor of Plaintiffs and against Defendant Krotzer as to Counts I through VII of the Complaint.[55]

## J.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Doc. 123) will be **GRANTED**, and Defendant's Motion for Summary Judgment (Doc. 96) will be **DENIED**.[56]

---

[55]    The Court has previously denied without prejudice Plaintiffs' Motion for Entry of Default Judgment against Defendant ACF. (Doc. 141; 05/10/11 Order). In doing so, the Court did not address the merits of the motion, but rather denied it without prejudice based upon the procedural posture of the case. The Court specified that the Motion for Default Judgment was "[d]enied without prejudice to refiling after the Court has made a final determination on the merits in this case as to Defendant Krotzer." Id. at 4.

[56]    Defendant has filed a second motion for summary judgment, entitled Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice - Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology (Doc. 140; Krotzer's Second Motion for Summary Judgment). Krotzer's Second Motion for Summary Judgment repeats the arguments made in his first motion for summary judgment considered above, including the "one piece of paper" citation to a testimonial by "Pam," which Krotzer says appears on the ACF Website. See id. at 7-8, 18. Having already considered the arguments of the parties, and determined that Plaintiffs' Motion for Summary Judgment is due to be granted and Krotzer's Motion for Summary Judgment is due to be denied, Krotzer's Second Motion for Summary Judgment (Doc. 140), will be **DENIED AS MOOT**. In light of this determination, Plaintiffs' Motion to Strike Krotzer's Second Motion for Summary Judgment (Doc. 142, will be **DENIED AS MOOT**.

## VI.    The Stipulated Preliminary Injunction

Several of the pending motions and responses are directed to the Stipulated Order for Preliminary Injunction previously entered in this case.  (Doc. 12-1; Stipulated Preliminary Injunction).[57]

### A.    Defendant's Motion to Vacate the Stipulated Preliminary Injunction (Doc. 56)

On October 16, 2010, Defendant Krotzer, proceeding pro se after having dismissed his attorney on July 14, 2010, (see Docs. 17 and 18; Motion to Withdraw and 7/19/10 Order), filed a Motion to Vacate the Stipulated Preliminary Judgment, or alternatively to "interpret" the injunction.   Motion to Vacate.   Krotzer contends that the Stipulated Preliminary Injunction, which was entered on May 26, 2010, should be vacated because it was "obtained under false pretenses, by fraud, and by intentional infliction of severe economic and emotional distress."   Id. at 2.  As support, Krotzer cites to a July 26, 2010 e-mail from counsel for the FTC to Krotzer saying that the FTC "would be happy to discuss with you any compliance issues with the Stipulated Final Judgment and Order . . . after you sign and return it to us," which Krotzer terms as "sign first and ask questions later . . . unethical legal advice trying to rush" him into signing an injunction order.  Id. at 2 (citing Doc. 56-1; Motion to Vacate Ex. A).  Krotzer argues that he was assured when he negotiated the Stipulated Preliminary Injunction, that he could continue making "minimal health claims that accurately

---

[57]  See Defendants' Motion to Vacate the Preliminary Injunction (Doc. 56; Motion to Vacate), and Plaintiffs' Response in opposition (Doc. 71; Plaintiffs' Response to Motion to Vacate); Plaintiffs' Motion for Order to Show Cause to Hold Defendant Krotzer in Civil Contempt (Doc. 58; Motion for Order to Show Cause) and Defendant Krotzer's Response in opposition (Doc. 74; Defendant's Response to Motion for Order to Show Cause); Defendant's Motion To Permit Speaking And Book Writing (Doc. 144; Defendant's Motion To Give Speeches and Publish Books); Plaintiffs' Response in opposition (Doc. 146; Plaintiffs' Response to Motion to Give Speeches and Publish Books)

described" the results of the Permanent Cure Program "without additional scientific support Plaintiff knew well Defendant cannot afford." Id. at 3.

Plaintiffs oppose the Motion to Vacate, arguing that Krotzer voluntarily agreed to the terms of the Stipulated Preliminary Injunction, while represented by counsel. Plaintiffs' Response to Motion to Vacate at 2-3. Plaintiffs contend that the Stipulated Preliminary Injunction is a "valid order entered by the Court pursuant to agreement among all the parties when represented by counsel," and that Krotzer's contentions of "false pretenses, fraud, and duress" are not supported by the facts or any evidence. Id. at 3. As to Krotzer's argument of fraud, Plaintiffs respond that there is no evidence that Plaintiffs' counsel ever communicated directly with Krotzer, inasmuch as he was represented by counsel prior to and upon the entry of the Stipulated Preliminary Injunction. Id. at 4-5. Plaintiffs argue that Krotzer cannot make a claim of fraud in the inducement and that Krotzer's "unilateral mistake provides no rationale for invalidating the Court's Order." Id. at 5-6.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Court to enter a preliminary injunction upon proper showing by the FTC. 15 U.S.C. § 53(b). This section invokes the full equitable jurisdiction of the district court. See FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984); FTC v. Home Assure, LLC., No. 8:09-cv-547-T-23TBM, 2009 WL 1043956, at *2 (M.D. Fla. April 16, 2009); see also Fla. Stat. § 501.207(1)(b).

Inasmuch as the Stipulated Preliminary Injunction is an interlocutory Court Order, it is unclear whether the standards for vacatur or modification set forth in Rule 60, Federal Rules of Civil Procedure, govern the Court's analysis of the question, see FTC v. Amer.

Entertainment Distributors,Inc., No. 11-10150, 2011 WL 2672545, at *1 (11th Cir. July 8, 2011)(whether settlement agreement in the form of a proposed consent decree is a valid contract is determined by the substantive law of contracts of the forum state, but the court's authority to enter a consent decree is a question of federal procedural law); Reynolds v. McInnes, 338 F.3d 1221, 1225-27 (11th Cir. 2003)(applying Rule 60(b)(5) to analyze motion to modify a consent decree); Sierra Club v. Meiburg, 296 F.3d 1021, 1033 (11th Cir. 2002)(citing Rule 60(b)(5) as providing the district court with power to modify a consent decree); Doe, 1-13 v. Bush, 261 F.3d 1037, 1063 n.22 (11th Cir. 2001)("a consent decree is treated as 'a judicial decree that is subject to the rules generally applicable to other judgments and decrees'" (citation omitted)), or whether the determination to vacate or modify the Stipulated Preliminary Injunction is left to the sound discretion of the Court as with any interlocutory order.[58]

---

[58]  Rule 60(b) provides the "Grounds for Relief from a Final Judgment, Order, or Proceeding." However, "[t]he addition of the qualifying word 'final' emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires." Rule 60 1946 advisory committee's note.  However, "[b]ecause of the extraordinary nature of a preliminary injunction, and the possibility of error when an action is predicated on less than a full and complete trial, Congress by passing 28 U.S.C. § 1292 created an exception to the rule that an appeal will lie only after final judgment." Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005).  Thus, a preliminary injunction order takes on many of the characteristics of a final order, and in that respect, is amenable to analysis pursuant to Rule 60(b).  See Valpak Direct Mktg. Sys. v. Hyde, No. 8:06-cv-347-T-26-EAJ, 2006 WL 1982877, at *2 (M.D. Fla. July 13, 2006)(applying Rule 60(b)(1) analysis to deny request to vacate a Consent Preliminary Injunction); but see FTC v. Magui Publishers, Inc., No. CV 89-3818-RSWL, 1990 WL 132719, at *2 (C.D. Cal. April 24, 1990)(declining to grant relief from preliminary injunction pursuant to Rule 60(b) because rule is expressly applicable only to a "final judgment, order or proceeding," and interlocutory orders such as a preliminary injunction are not within the provisions of Rule 60(b)).  The fact that the preliminary injunction is stipulated would not change a Rule 60(b) analysis.  See Reynolds v. McInnes, 338 F.3d 1221, 1225 (11th Cir. 2003)("[f]or modification purposes, a consent decree is not treated as a contract, but as a judicial act akin to an injunction").

In the event Rule 60(b) standards are not applicable, alternatively the Court may afford such relief from an interlocutory order "as justice requires."  Rule 60 1946 advisory committee's note.   A

(continued...)

Rule 60(b) provides:

> (b)    . . . On motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons:
>
>> (1)    mistake, inadvertence, surprise, or excusable neglect;
>>
>> . . .
>>
>> (3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>>
>> (4)    the judgment is void;
>>
>> (5)    . . . applying [the judgment] prospectively is no longer equitable; or
>>
>> (6)    any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Rule 60(b) "should be construed in order to do substantial justice."

Griffin v. Swim-Tech Corp., 722 F.2d 677, 680 (11th Cir. 1984).  "Motions under the rule are

directed to the sound discretion of the district court."  Id.; see also Conn. State Dental Ass'n

v. Anthem Health Plans, Inc., 591 F.3d 1337, 1355 (11th Cir. 2009).  As the party seeking

modification or vacation of the Stipulated Preliminary Injunction, Krotzer bears the burden

of proof.[59]  See Johnson v. Florida, 348 F.3d 1334, 1345 (11th Cir. 2003)(citing Rufo v.

_____

[58](...continued)
district court, in the exercise of its own discretion, may reconsider or readdress any order prior to the entry of final judgment.  See Harper v. Lawrence County, Ala., 592 F.3d 1227, 1231 (11th Cir. 2010)("[i]t is permissible for a district court to rescind its own interlocutory order"); Hardin v. Hayes, 52 F.3d 934, 938 (11th Cir. 1995).  However, reconsideration of a previous order is "an extraordinary measure and should be applied sparingly in the interests of finality and conservation of scarce judicial resources." Scelta v. Delicatessen Support Servs., Inc., 89 F. Supp.2d 1311, 1320 (M.D. Fla. 2000).

[59]    The Court has continuing jurisdiction over the Stipulated Preliminary Injunction.  Stipulated Preliminary Injunction at 15-16; see also Hodge v. Dep't of Housing and Urban Dev., 862 F.2d 859, 861-62 (11th Cir. 1989); Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 578 (5th Cir. 1974); Atlanta

(continued...)

Inmates of Suffolk County Jail, 502 U.S. 367, 393 (1992)); The Atlanta Journal and Constitution v. City of Atlanta Dep't of Aviation, 6 F. Supp.2d 1359 (N.D. Ga. 1998)("[o]n a motion to dissolve preliminary injunction, the movant has the burden of proof"). "Because the rule allows extraordinary judicial relief, it should be invoked only upon a showing of 'exceptional circumstances.'" Larsen Co. v. Consol. Mktg., Inc., 148 F.R.D. 664 (N.D. Ga. 1993)(citing Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986)), aff'd 15 F.3d 1098 (11th Cir. 1994). "Moreover, '[w]hen the parties submit to an agreed-upon disposition instead of seeking a resolution on the merits . . . the burden to obtain Rule 60(b) relief is heavier than if one party proceeded to trial, lost, and failed to appeal.'" Id. (quoting Nemaizer, 793 F.2d at 63).

Krotzer's first argument that he was mistaken about the interpretation of terms in the Stipulated Preliminary Injunction is insufficient to support vacatur here. Krotzer's alleged mistaken belief that he could make minimal health claims without further scientific support is not a "mistake of fact" that can be rectified under Rule 60(b)(1). "'Rule 60(b)(1) was not intended to relieve a litigant from the consequences of . . . a conscious decision, however unwise the decision may appear in retrospect.'" Valpak Direct Mktg. Sys. v. Hyde, No. 8:06-cv-347-T-26EAJ, 2006 WL 1982877, at *2 (M.D. Fla. July 13, 2006)(quoting Parrilla-Lopez v. United States, 841 F.2d 16, 20 (1st Cir. 1988)); see also Citibank, N.A. v. Data Lease Fin. Corp., 700 F. Supp. 1099, 1103 (S.D. Fla. 1988)(defendant may not amend stipulation and order of dismissal pursuant to rule 60(b)(1); "'an attorney's failure to evaluate carefully the

---

[59](...continued)
Journal and Constitution v. City of Atlanta Dep't of Aviation, 6 F. Supp.2d 1359, 1364 (N.D. Ga. 1998).

legal consequences of a chosen course of action provides no basis for relief from judgment'" (quoting Nemaizer, 793 F.2d at 62), aff'd 904 F.2d 1498, 1505 (11th Cir. 1990)("Data Lease, represented by counsel, entered into the stipulation dismissing its claims against agent directors 'with prejudice.' Represented by new counsel, Data Lease cannot avoid the consequences of such a prior act").  Krotzer cannot use Rule 60(b)(1) to vacate the prior Stipulated Preliminary Injunction based upon his "mistaken" understanding of it.

Krotzer argues that he was induced to agree to the Stipulated Preliminary Injunction by fraud and "false pretenses" on the part of Plaintiffs.  Relief under Rule 60(b)(3) is appropriate only if the movant establishes "by clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case."  Montgomery v. Hall, 592 F.2d 278, 278-79 (5th Cir. 1979); accord Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300, 1309 (11th Cir. 2003); Taylor v. Texgas Corp., 831 F.2d 255, 259 (11th Cir. 1987). Even if applicable to the Stipulated Preliminary Injunction, Krotzer has presented no more than conclusory allegations that he was the victim of "fraud" or "false pretenses."[60]  The Stipulation was negotiated by lawyers for the Plaintiffs and Defendants, and there is no evidence whatsoever that Plaintiffs misrepresented any aspect of the Stipulation to Krotzer's attorney (or to Krotzer himself) during the course of these negotiations.[61]

---

[60]  Krotzer's reference to an e-mail sent by counsel for Plaintiff FTC is unavailing.  The e-mail was sent during negotiations concerning a possible final judgment in this case, occurring two months after entry of the Stipulated Preliminary Injunction.  (See Doc. 56-1; Motion to Vacate Ex. A).  As such, the e-mail is irrelevant to the question presented here.

[61]  Rule 60(b)(4) refers to judgments that are void.  A judgment is void for Rule 60(b)(4) purposes "if the rendering court was powerless to enter it."  Burke v. Smith, 252 F.3d 1260, 1263 (11th Cir. 2001). This Court had jurisdiction to enter a preliminary injunction pursuant to 15 U.S.C. § 53(b).  FTC v. U.S.
(continued...)

Rule 60(b)(5) "permits a party to obtain relief from a judgment or order if, among other things, 'applying [the judgment or order] prospectively is no longer equitable.'" Horne v. Flores, 129 S.Ct. 2579, 2593 (2009)(quoting Fed. R. Civ. P. 60(b)(5)). "[T]he Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" Horne, 129 S.Ct. at 2593 (quoting Rufo, 502 U.S. at 384).

 "Changed circumstances" justifying vacatur or modification of a consent decree are those that "have caused compliance with the decree to become substantially more onerous, or have rendered the decree impracticable, or its continued enforcement inimical to the public interest." Johnson, 348 F.3d at 1344. Generally invoked in litigation involving institutional reform and covering a span of years, under Rule 60(b)(5) the "'party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree'" by showing a "significant change either in factual conditions or in law.'" Reynolds, 338 F.3d at 1226 (quoting Rufo, 502 U.S. at 383-84). Krotzer has failed to adduce any evidence to carry his burden of establishing any changed circumstances. Krotzer's reference to a "new" website does not eliminate the "basic purpose" of the Stipulated Preliminary Injunction. Nor has Krotzer established changed factual conditions which have made compliance with the Preliminary Injunction "substantially more onerous" or "unworkable," or detrimental to the public interest. Krotzer's

---

[61](...continued)
Oil & Gas Corp., 748 F.2d at 1434-35 ("preliminary injunction . . . founded on the Court's equitable powers to provide relief ancillary to the Commission's complaint for permanent injunction"); see also FTC v. Bishop, No. 10-10715, 10-12901, 2011 WL 1560656, at *1 (11th Cir. April 25, 2011), Krotzer's argument notwithstanding. See Motion to Vacate at 13-16.

conclusory statement that he cannot afford scientific verification of the Permanent Cure Program does not represent a good-faith attempt to comply with the provisions of the Stipulated Preliminary Injunction, nor is it sufficient evidence that the Stipulated Preliminary Injunction is unworkable.  See Reynolds, 338 F.3d at 1226-29.

Finally, relief pursuant to Rule 60(b)(6) is available only "in the most 'extraordinary' circumstances," and "only in dealing with a request for relief not falling within clauses one through five." Harduvel v. Gen. Dynamics Corp., 801 F. Supp. 597, 612-13 (M.D. Fla. 1992); accord Beavers v. A.O. Smith Elec. Products Co., 265 F. App'x 772, 779 (11th Cir. 2008); Solaroll Shade & Shutter Corp., Inc. v. Bio-Energy Sys., Inc., 803 F.2d 1130, 1133 (11th Cir. 1986).  "The party seeking relief has the burden of showing that absent such relief, an 'extreme' and 'unexpected' hardship will result."  Griffin, 772 F.2d at 680.  Krotzer has not presented the "extraordinary circumstances" that require that the Stipulated Preliminary Injunction be vacated or modified.  Nothing has changed since the entry of the Stipulated Preliminary Injunction other than the passage of time.

Alternatively, if the Stipulated Preliminary Injunction is to be considered interlocutory, the Court, in the exercise of its discretion, may reconsider or readdress it prior to the entry of final judgment. Hardin v. Hayes, 52 F.3d 934, 938 (11th Cir. 1995).  "Principles governing general contract law apply to interpret settlement agreements," and even though the Stipulated Preliminary Injunction arises under federal law, state contract law directs the Court's analysis.  Resnick v. Uccello Immobilien, GMBH, Inc., 227 F.3d 1347, 1350 (11th

Cir. 2000).[62] Thus, Florida contract principles apply to evaluate Krotzer's attempt to vacate the Stipulated Preliminary Injunction in this case. Cf Shepard v. Fla. Power Corp., No. 8:09-CV-2398-T-27TGW, 2011 WL 1465995, at *2 (M.D. Fla. April 18, 2011)("[a] settlement agreement is a contract and, as such, its construction and enforcement are generally governed by state law").  Indeed, "'[t]he rules we use to interpret a consent decree are the same ones we use to interpret a contract - since a consent decree is a form of contract.'" FTC v. Leshin, 618 F.3d 1221, 1231 (11th Cir. 2010)(quoting Sierra Club v. Meiburg, 296 F.3d 1021, 1029 (11th Cir. 2002)).  "'One who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted.'" Mid-South Towing Co. v. Har-Win, Inc., 733 F.2d 386, 392 (5th Cir. 1984)(quoting Callen v. Pa. R.R. Co., 332 U.S. 625, 630 (1948)).  "[A]bsent claims of fraud or duress, a [party] who executes a settlement agreement pursuant to the advice of independent counsel is presumed to have executed the agreement knowingly and voluntarily." Shepard, 2011 WL 1465995, at *2 (citing Myricks v. Fed. Reserve Bank of Am., 480 F.3d 1036, 1041 (11th Cir. 2007)).

Krotzer alleges that the Stipulated Preliminary Injunction was obtained "by intentional infliction of severe economic and emotional duress."  Motion to Vacate at 2.  "'Duress is a condition of mind produced by an improper external pressure or influence that practically

---

[62] "Federal common law may govern a state claim based on a contract with the United States, which was entered into under authority of a federal statute, if a national uniform rule is necessary to further the interests of the federal government." City of Huntsville v. City of Madison, 24 F.3d 169, 172 n.3 (11th Cir. 1994).  The Court is aware of no authority mandating the application of "federal common law" to determine the validity of a settlement agreement such as the one embodied by the Stipulated Preliminary Injunction, where the FTC is a party to the agreement.  Moreover, it does not appear to the Court that independent federal common law is necessary to protect uniquely federal interests in this matter or to further a uniform national rule.  See FTC v. Leshin, 618 F.3d 1221, 1231 (11th Cir. 2010)(applying contract principles to interpret a stipulated injunction entered pursuant to the FTC Act).

destroys the free agency of a party and causes him to do an act or make a contract not of his own volition.'" Peralta v. Peralta Food, Corp., 506 F. Supp.2d 1274, 1280 (S.D. Fla. 2007)(quoting City of Miami v. Kory, 394 So.2d 494, 497 (Fla. 3d DCA 1981)).

> Florida courts have articulated two factors that must coexist when setting aside a contract or settlement on the grounds of duress . . . Specifically, "[i]t must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side."

Id. (quoting Kory, 394 So.2d at 497). "'[I]t is not improper and therefore not duress to threaten what one has a legal right to do.'" Id. (quoting Kory, 394 So.2d at 498); see also G.E.E.N. Corp. v. Southeast Toyota Distributors, Inc., No. 93-632-CIV-ORL-19, 1994 WL 695364, at *4-5 (M.D. Fla. Aug. 31, 1994). Here, Plaintiffs had a legal right to pursue a preliminary injunction. See FTC v. U.S. Oil & Gas Corp., 748 F.2d at 1434-35. The fact that Krotzer faced the possibility of opposing Plaintiffs' Motion for Preliminary Injunction does not create the type of duress necessary to vacate an agreed Stipulated Preliminary Injunction.

Alternatively, "[t]he doctrine of economic duress permits an aggrieved party to rescind an agreement that was entered into under severe financial anxiety or pressure." Amoco Oil Co. v. Gomez, 125 F.Supp.2d 492, 503 (S.D. Fla. 2000). Assuming arguendo that "economic duress" can provide a basis for invalidating a settlement agreement, see Edwards v. Kia Motors of Am., Inc., 486 F.3d 1229, 1235-37 (11th Cir. 2007)(analyzing the defense of economic duress under Alabama law to determine whether release was voidable), establishing economic duress, is "extremely difficult." Amoco Oil, 125 F. Supp.2d at 503. The aggrieved party must show: "(1) wrongful acts or threats, (2) financial distress caused

-154-

by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action." Id. Krotzer has presented no evidence that Plaintiffs, by pursuing a Motion for Preliminary Injunction, were engaged in any "wrongful acts or threats." Moreover, because Krotzer could have opposed the impending Motion for Preliminary Injunction, he had available to him a reasonable alternative to entering into the Stipulation. Accordingly, Krotzer does not establish a basis to invalidate or modify the Stipulated Preliminary Injunction because he entered the agreement under "economic duress."

Additionally, Krotzer contends that he was fraudulently induced to enter into the Stipulated Preliminary Injunction by Plaintiffs' reassurances that he could continue making "minimal health claims," Motion to Vacate at 3-4. Under Florida law, the elements of fraudulent inducement are: "(1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance." Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1315 (11th Cir. 2007) (citing Wadlington v. Cont'l Med. Servs., Inc., 907 So.2d 631, 632 (Fla. 4th DCA 2005); and Biscayne Inv. Group, Ltd. v. Guarantee Mgmt. Servs., Inc., 903 So.2d 251, 255 (Fla. 3d DCA 2005)). Again, Krotzer has cited to no evidence of any allegedly false statement made by Plaintiffs' counsel in negotiating the Stipulated Preliminary Injunction. Moreover, even assuming false statements were made, Krotzer, who was represented by his own counsel at the time, has not established that he was entitled to justifiably rely upon the representations made by Plaintiffs' counsel. See Pettinelli, 722 F.2d at 709-10 (parties in adversarial relationship not entitled to rely upon representations of opposing counsel in settlement negotiations (citing

Columbus Hotel Corp. v. Hotel Mgmt. Co., 156 So. 893, 900 (1934)); see also Austin v. Spirit Airlines, Inc., No. 08-60540-CIV-COHN, 2008 WL 4927003, at *2 (S.D. Fla. Nov. 17, 2008)(citing Mergens v. Dreyfoos, 166 F.3d 1114, 1117-18 (11th Cir. 1999)); Somerset Pharms., Inc. v. Kimball, 49 F. Supp.2d 1335, 1340 (M.D. Fla. 1999)("In Mergens, the Eleventh Circuit held that reliance on misrepresentations or omissions by the opposing parties negotiating a settlement agreement in the context of a contentious and adversarial relationship is unreasonable as a matter of law.").

Finally, Krotzer argues that he was mistaken as to the meaning of the term "implied" found in the Stipulated Preliminary Injunction, and Plaintiffs' broad construction of that term which he argues reaches beyond Krotzer's understanding of the agreement. Motion to Vacate at 3-4. "[A] unilateral mistake of fact is not a basis for avoidance of a settlement agreement. . . ." Mid-South Towing Co., 733 F.2d at 391. In this vein, "'[a] party to a settlement who has the means in hand of ascertaining the facts, but neglects to use those means cannot thereafter have the settlement set aside because of mistake.'" Peralta, 506 F. Supp.2d at 1283 (quoting Davis v. Huskipower Outdoor Equip. Corp., 936 F.2d 193, 197-98 (5th Cir. 1991)). Krotzer, who says he has a Juris Doctorate degree himself, (see Doc. 17; Motion to Withdraw at 1), was represented by counsel during the negotiations which led to the Stipulated Preliminary Injunction. He later "dismissed his counsel so he could negotiate a Proposed Final Order directly with Plaintiff [sic] counsel that would not be marred by possible communication difficulties, which he feared since Plaintiff FTC steadfastly refused to talk with or confront Defendant." Motion to Vacate at 8. Moreover Krotzer cannot prevail based upon his claim that he did not understand the implication of the terms of the

Proposed Preliminary Injunction because of an alleged communications breakdown between Plaintiffs and Krotzer, through Krotzer's former attorney. "[M]ere dissatisfaction with the advice of [an] attorney cannot support a finding that [the] agreement to settle . . . was not knowing or voluntary." Shephard, 2011 WL 1465995, at *4; see also Myricks, 480 F.3d at 1041 ("an employee's decision to consult an attorney before signing a clear release creates a presumption that the release is enforceable"); Riley v. Am. Family Mut. Ins. Co., 881 F.2d 368, 373 (7th Cir. 1989)("a plaintiff who executes a release within the context of a settlement pursuant to the advice of independent counsel is presumed to have executed the document knowingly and voluntarily absent claims of fraud or duress"). Defendant Krotzer is presumed to have known what he was agreeing too, and he has not presented any basis for believing otherwise. Having "paid a high price for this lesson," Motion to Vacate at 11, is not a basis for vacating the Stipulated Preliminary Injunction. The Motion to Vacate (Doc. 56) will be **DENIED**.

Alternatively, Krotzer moves to modify the terms of the Stipulated Preliminary Injunction.[63] Although the Stipulated Preliminary Injunction was agreed to by the parties, for modification purposes, it is treated as a judicial act, as opposed to a contract. Reynolds, 338 F.3d at 1226. If the Stipulated Preliminary Injunction is to be treated similarly to a consent decree, "Rule 60(b) . . . allows a district court to modify a consent decree when 'it is no longer equitable that the judgment should have prospective application.'" Id. at 1226 (quoting Fed. R. Civ. P. 60(b)(5) prior to the 2007 Amendment re-wording the provision).

---

[63] This becomes abundantly clear in the context of his response to the Plaintiffs' Motion for Order to Show Cause why Krotzer should not be held in civil contempt for alleged violations of the Stipulated Preliminary Injunction. See Defendant's Response to Motion for Order to Show Cause at 9, 15.

However, as previously noted, Krotzer has failed to establish any change in law or factual circumstances, other than that he has discovered that he cannot continue marketing his alcoholism "cure" product. The fact that the Stipulated Preliminary Injunction may have turned out to be disadvantageous to Defendants is not a basis to modify it. Thus, to the extent Defendant's Motion to Vacate seeks to modify the Stipulated Preliminary Injunction, it it is due to be **DENIED**.

The Stipulated Preliminary Injunction remains in full force and effect.

### B. Plaintiff's Motion To Give Speeches and Publish Books (Doc. 144)

On June 2, 2011, Defendant Krotzer filed a motion entitled Opposed Motion to Permit Unfettered Speaking and Book Writing. (Doc. 144; Motion to Give Speeches and Publish Books). In it, Krotzer asks the Court to give "Krotzer the peace of mind and unfettered freedom to give speeches and publish books describing Molecule Multiplicity and the results of his ~500 members, without risking violating the Preliminary Injunction." Id. at 1-2. Alternatively, Krotzer requests that the Court "dismiss the Preliminary Injunction, in whole or in part" as "unconstitutional," or for the grounds set forth in his previous Motion to Vacate. Id. at 2, 11. Krotzer states that he is "nearing completion of a book," and he wishes to speak publically as part of marketing this yet-to-be published book. Id. at 3, 4. He contends that the Stipulated Preliminary Injunction is unconstitutional because it extends an order "enjoining sales of medicines to include preventing Speeches or Books," "chilling" his First Amendment right to free speech. Id. at 6, 10, 13. Krotzer complains that Plaintiffs seek to assert a right to approve speeches, or read any books by Krotzer "before deciding whether

to ask the Court to issue a Contempt Order for violation of the Preliminary Injunction." Id. at 9-10.

Plaintiffs oppose Krotzer's motion, arguing that Krotzer cannot receive a "guarantee that under no conceivable scenario," he be permitted to publish a book and give speeches. (Doc. 146; Response to Motion to Give Speeches and Publish Books at 1). Plaintiffs argue that Krotzer's motion should be denied because it fails to comply with the Local Rules by not stating a basis for the request or citing legal authority, and because it includes no evidentiary support. Id. at 2.

To the extent Krotzer asks the court to "dismiss" or vacate the Stipulated Preliminary Injunction, the motion is denied, for the reasons already set forth above in connection with Krotzer's Motion to Vacate the Stipulated Preliminary Injunction. Likewise, to the extent Krotzer requests that the Court advise that his yet to be published book and unspecified hypothetical speeches are exempt from the provisions of the Stipulated Preliminary Injunction, the motion must also be denied. While it may be within the discretion of the Court to entertain a petition for modification or construction of an injunction order "in the light of a concrete situation," it may not determine the operation of the Stipulated Preliminary Injunction in the face of a "sterile" or "abstract controversy" such as Krotzer presents here. See Regal Knitwear Co. v. Nat'l Labor Relations Bd., 324 U.S. 9, 15-16 (1945); see Kaimowitz v. The Florida Bar, 996 F.2d 1151, 1153 (11th Cir. 1993)(affirming denial of motion requesting to enjoin The Florida Bar's future interference with attorney's federal court practice, where The Florida Bar had taken no action to do so; "adjudication of the issue would constitute an advisory opinion treating a hypothetical case rather than an actual

controversy"); Pac. and Southern Co. v. Duncan, 792 F.2d 1013, 1015 (11th Cir. 1986)(court refuses to alter the wording of the injunction, and declines to issue an "advisory opinion" to address the "future possibility" that Plaintiff may wish to provide news summaries to clients). The Court declines Krotzer's invitation to enter an advisory opinion as to whether hypothetical situations might be contrary to the Stipulated Preliminary Injunction.

Finally, as to Krotzer's apparent First Amendment challenge to the Stipulated Preliminary Injunction, the government may ban commercial speech which is deceptive and misleading, and "more likely to deceive the public than to inform it." Central Hudson Gas & Electric Corp. v. Pub. Serv Comm'n of N.Y., 447 U.S. 557, 563, 566 (1980); FTC v. Direct Mktg. Concepts, Inc., 648 F.Supp.2d at 213.[64] The provisions of the Stipulated Preliminary Injunction do not raise First Amendment constitutional concerns because they prohibit only the dissemination of deceptive and misleading advertising which, by definition, does not have any First Amendment protection. FTC v. Direct Mktg. Concepts, Inc., 648 F. Supp.2d at 217. Moreover, the Stipulated Preliminary Injunction preserves the distinction between prior restraint of speech before it occurs, which is presumptively unlawful under the First

_____

[64] The four-part test to determine whether government regulation of commercial speech is permissible is set forth by the Supreme Court in Central Hudson as follows:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Central Hudson, 447 U.S. at 566. Thus, misleading commercial speech receives no First Amendment protection. FTC v. Direct Mktg. Concepts, Inc., 648 F. Supp.2d at 213.

Amendment, and subsequent punishment for deceptive speech.  See Alexander v. United States, 509 U.S. 544, 553-54 (1993).  Nothing in the Stipulated Preliminary Injunction requires Krotzer to obtain a permit or license or permission from Plaintiffs before he speaks or writes, nor does it suggest outright suppression of all speech on the part of Krotzer. Rather, it prohibits five categories of misleading and deceptive representations; requires clear and conspicuous disclosure of all costs and fees and conditions applicable to the purchase or cancellation of the product or service; prohibits unauthorized billing; and requires cessation of collection efforts.  Stipulated Preliminary Injunction at 7-12.  It is only after the speech is uttered that, if Krotzer has violated the Stipulated Preliminary Injunction, he may be brought into court by Plaintiffs to face possible subsequent punishment, after a hearing and an opportunity to be heard.  Compare Suntrust Bank v. Houghton Mifflin Co., 252 F.3d 1165, 1166 (11th Cir. 2001)(unwarranted grant of preliminary injunction preventing publication of a specified book by copyright infringement defendant amounted to unlawful prior restraint in violation of the First Amendment).  Nor is there any evidence that the provisions of the Stipulated Preliminary Injunction burden more speech than necessary to serve the government's significant interest in preventing deceptive and false advertising. See United States v. Kahn, 244 F. App'x 270, 273-74 (11th Cir. 2007)(permanent injunction barring tax consultant from preparing frivolous letters and complaints to the Internal Revenue Service, falsely advising client, and frustrating federal tax administration was not prior restraint on consultant's speech because the injunction burdened no more speech than necessary to serve significant government interest in administration and enforcement of internal revenue laws).  Finally, the Stipulated Preliminary Injunction, entered with the

consent of Plaintiffs and Defendant Krotzer, provides that the "Entry of this Order is in the public interest." Stipulated Preliminary Injunction ¶ 9. While not conceding in the Stipulated Preliminary Injunction any liability for the conduct alleged in Plaintiffs' Complaint, Krotzer does acknowledge that the Complaint does state a claim upon which relief may be granted, and that the Plaintiffs have the authority to seek the relief they have requested. Id. at 1 and ¶ 3. Thus, the Stipulated Preliminary Injunction is properly remedial in purpose, and not an improper prior restraint on speech. See Lucero v. Trosch, 121 F.3d 591, 600 (11th Cir. 1997). Accordingly, for these reasons, Krotzer's Motion to Give Speeches and Publish Books (Doc. 144) is due to be **DENIED**.

**C.  Plaintiffs' Motion for Order to Show Cause to Hold Defendant Krotzer in Civil Contempt (Doc. 58)**

In their Motion, Plaintiffs ask the Court "to issue an order to show cause why Defendant . . . Krotzer . . . should not be held in civil contempt for multiple violations" of the Stipulated Preliminary Injunction. (Doc. 58; Motion for Order to Show Cause at 1). Krotzer responds in opposition that Plaintiffs have "[o]verly strict interpretations" of the Stipulated Preliminary Injunction, and that the Injunction was not meant to prevent him from continuing his business, but rather to "to regularize his representations." (Doc. 74; Response to Motion for Order to Show Cause at 3). Krotzer denies Plaintiffs' allegation that he has violated the Stipulated Preliminary Injunction. Id. at 8. He wishes to communicate with "existing customers" and to continue to receive payments from them, contending that "cease collection efforts" does not prohibit him from receiving money from satisfied customers. Id. at 9. He also contends that the Stipulated Preliminary Injunction infringes on his First

Amendment right of free speech because, according to Plaintiffs, it prevents Krotzer from "publicly talking about alcohol." Id. at 11; see also id. at 14, 15.

District courts have inherent and statutory power to enforce their Orders and to punish violators for contempt. Roadway Express Inc. v. Piper, 447 U.S. 752, 764-65 (1980). "Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949). "An injunction can be enforced, if necessary, through a contempt proceeding." Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002).

The Stipulated Preliminary Injunction was entered on May 26, 2010. Plaintiffs' Motion was filed on October 21, 2010. Plaintiffs contend that Krotzer's conduct as of that date violated the Stipulated Preliminary Injunction. Plaintiffs cite to a new website, www.guiltfreedrinking.com, ("Guiltfree Website") which was registered on May 26, 2010, by a person named "Magic Krotzer," believed to be Defendant Krotzer's wife, and which is "substantially similar" to the ACF Website challenged in the Complaint. The Guilt Free Website, though shorter, with six pages and 42 hyperlinks, has many of the same features, photographs and representations as the ACF Website. Motion for Order to Show Cause at 1, 4-8, 10-15; Henry 1st Decl. ¶¶ 26, 28-34. Plaintiffs also contend that Krotzer has made other violative representations on other websites, www.dougkrotzer.com, and www.linkedin.com. Motion for Order to Show Cause at 1, 4-8, 10-15. Plaintiffs cite to e-mail correspondence by Krotzer, dated June 26, 2010, July 27, 2010, and August 24, 2010, as support for their argument that Krotzer has contacted consumers for both advertising and

debt collection purposes, in violation of the Stipulated Preliminary Injunction. Id. at 1, 16. Plaintiffs seek an Order requiring "a daily fine" of $1,000.00 to coerce Krotzer's compliance and that Krotzer "redress to all consumers injured by Defendant's violations." Id. at 1-2, 21.

As set forth above, the Court has determined that the Plaintiffs are entitled to summary final judgment on Counts I through VII of the Complaint against Defendant Krotzer. Now that liability has been determined, the Court will enter the remedial phase of this litigation. Among the possible remedies to be considered, are: permanent injunction, freezing of Defendants' assets, and awarding consumers redress or restitution. E.g. FTC v. USA Financial, LLC, 2011 WL 679430, at *3-4; FTC v. RCA Credit Servs., LLC, 727 F. Supp.2d at 1335-40.

In light of the current posture of this case, the fact that the Stipulated Preliminary Injunction remains in place, and the time that has passed since the filing of Plaintiffs' Motion for Order to Show Cause and the basis therefore, the Court determines that the better course at this time is to deny Plaintiffs' Motion for Order to Show Cause without prejudice. If Plaintiffs believe it necessary to file an updated Motion for Order to Show Cause, they may do so, with supporting citation to alleged violations of the Stipulated Preliminary Injunction, and to a basis for the remedies sought. Krotzer is cautioned that, in the interim, the Court intends for the mandates of the Stipulated Preliminary Injunction to be followed strictly. To the extent the findings in this Order assist Krotzer in interpreting the Stipulated Preliminary Injunction, he should carefully review it. The Court will not hesitate to find Krotzer in civil contempt if he chooses to disregard the Court's mandate.

## VII.    Remedies

Having concluded that judgment should be entered in favor of Plaintiffs and against Defendant Krotzer on all claims and affirmative defenses, the Court must now determine the appropriate remedies.  In their Complaint, Plaintiffs seek a permanent injunction against ACF and Krotzer, an award to redress consumers for injuries resulting from Defendants ACF and Krotzer's violations of the FTC Act and FDUPTA, "including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies," and costs of bringing this action.  Complaint at 26.

In their Motion for Summary Judgment, Plaintiffs argued for entry of a permanent injunction with "broad fencing-in provisions" that would reach "other health-related claims." Motion for Summary Judgment at 28.  Plaintiffs contend that the "appropriate measure for redress is the aggregate amount paid by consumers less refunds made by Defendants." Id. at 29 (citing FTC v. Nat'l Urological Group, 645 F. Supp.2d at 1212 and FTC v. SlimAmerica, 77 F. Supp.2d at 1276).  Plaintiffs cite to evidence in the record that indicates that "Krotzer, alone and with ACF, took in $732,480 from consumers." Id.  Krotzer responds that should he be found to be liable, he "hopes for a token penalty" that rejects Plaintiffs' "'fencing out'" provisions which he contends would deny him reasonable job prospects AND assure no legitimate scientist, responsible corporation, foundation or government will help him . . . ." Defendant's Response to Plaintiff's Motion for Summary Judgment at 7.

The parties have not fully briefed the issue of remedies.  Issues which remain pending include whether permanent injunction should be entered, and if so, the scope of that permanent injunction; the proper baseline amount of Defendants' unjust gains; what

reductions, if any, are appropriate when calculating Defendants' ultimate liability; the proper amount of equitable restitution or disgorgement; whether the Court should order an asset freeze; future monitoring; and costs recoverable by Plaintiffs. "To calculate the appropriate size of disgorgement relief, a district court must engage in a two-step burden shifting analysis. The FTC must first 'show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate.'" FTC v. QT, Inc., 448 F. Supp.2d at 974 (quoting FTC v. Febre, 128 F.3d 530, 535 (7th Cir. 1997)). The burden for showing the amount of assets subject to disgorgement is light: "a reasonable approximation of a defendant's ill-gotten gains is required. . . . Exactitude is not a requirement." FTC v. Bishop, No. 10-10715, 2011 WL 1560656, at *1 (11th Cir. April 25, 2011)(citation and internal quotations omitted).

In consideration of the state of the record, the Court will require additional briefing to address the appropriate remedies in this case. Plaintiffs shall file their Motion for Remedies, setting forth legal and factual support for remedies sought, and including a proposed permanent injunction order, no later than **October 31, 2011**. Defendant shall file his response no later than **November 25, 2011**.[65]

Upon due consideration, and for the foregoing reasons, it is hereby

**ORDERED**:

1. The Stipulated Order For Preliminary Injunction (Doc. 12-1) remains in **full** force and effect.

---

[65] Additionally, now that liability has been determined as to Defendant Krotzer, Plaintiffs may re-file their Motion for Entry of Default Judgment Against Defendant Alcoholism Cure Corporation. (See Doc.141; 5/10/11 Order).

2.   Defendant's Opposed Motion to Vacate Preliminary Injunction Stipulated Under False Pretenses and Without Statutory Authority Or Jurisdiction. Alternatively Request For Order Interpreting The Injunction (Doc. 56; Motion to Vacate) is **DENIED**.

3.   Plaintiffs' Motion For An Order To Show Cause Why Defendant Robert Douglas Krotzer Should Not Be Held In Civil Contempt, And Memorandum In Support (Doc. 58; Motion for Order to Show Cause) is **DENIED WITHOUT PREJUDICE**.

4.   Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law; Oral Hearing Requested (Doc. 96; Defendant's Motion for Summary Judgment) is **DENIED**.

5.   Plaintiffs' Motion To Strike Added Text And Certain Exhibits To Defendant Krotzer's "Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law" (Doc. 99; Plaintiffs' Motion to Strike) is **GRANTED IN PART, AND DENIED IN PART**.

6.   Plaintiffs' Motion For Summary Judgment And Memorandum In Support, Dispositive Motion (Doc. 123; Plaintiffs' Motion for Summary Judgment) is **GRANTED** as to liability.

7.   Defendant's Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc.131; Defendant's Motion to Strike) is **DENIED**.

8.   Plaintiffs' Amended Motion To Strike The Affidavit Of Carl Edwards Filed By Defendant Robert Douglas Krotzer (Doc. 135; Plaintiffs' Motion to Strike Edwards' Affidavit) is **DENIED WITHOUT PREJUDICE**.

9.     Defendant's Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice - Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology (Doc. 140; Krotzer's Second Motion for Summary Judgment) is **DENIED AS MOOT**.

10.     Plaintiffs' Motion To Strike Defendant Robert Douglas Krotzer's "Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice - Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology" (Doc 142; Plaintiffs' Motion to Strike Krotzer's Second Motion for Summary Judgment) is **DENIED AS MOOT**.

11.     Plaintiffs' Motion To Exclude The Proffered Expert Testimony Of Defendant Robert Douglas Krotzer And Carl Edwards, And Memorandum In Support (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony) is **DENIED WITHOUT PREJUDICE**.

12.     Defendant's Opposed Motion To Permit Unfettered Speaking And Book Writing (Doc. 144; Plaintiff's Motion To Give Speeches and Publish Books) is **DENIED**.

13.     Plaintiffs may re-file their Motion for Entry of Default Judgment Against Defendant Alcoholism Cure Corporation.

14.     Plaintiffs Federal Trade Commission and Office of the Attorney General, Department of Legal Affairs, State of Florida shall file their Motion for Remedies, setting forth legal and factual support for remedies sought, and including a proposed Permanent Injunction order, no later than **October 31, 2011**.  Defendant Robert Douglas Krotzer shall filed his response no later than **November 25, 2011**.

    **DONE AND ORDERED** in Jacksonville, Florida, this 16th day of September, 2011.

**MARCIA MORALES HOWARD**
United States District Judge

lc12
Copies to:

Counsel of Record
Unrepresented Party